PHILLIPS PETROLEUM COMPANY, Shell Oil Company, Northern Petrochemical Co., El Paso Products Company and Himont U.S.A., Inc., Plaintiffs,

v.

UNITED STATES STEEL CORPORATION, Hercules Incorporated and Phillips Petroleum Company, Defendants.

Civ. A. Nos. 83–143, 83–148, 83–547, 83–801, 84–79 and 85–255 LON.

United States District Court,
D. Delaware.

Oct. 28, 1987.

C. Waggaman Berl, Jr., Wilmington, Del. (Harry J. Roper, Sidney Neuman, George S. Bosy, Nicholas A. Poulos, Robert W. Fieseler, Raymond N. Nimrod, Philip T. Petti, Erick D. Ponader, Steven Trybus, Esquire and Julia D. Hart, of Neuman, Williams, Anderson & Olson, Chicago, Ill., of counsel), for Phillips Petroleum Co.

Charles S. Crompton, Jr., of Potter, Anderson & Corroon, Wilmington, Del. (Francis T. Carr, Kenneth E. Madsen, Alan T. Bowes, James Galbraith, Philip G. Hampton, II, and Deborah S. Rittman, of Kenyon & Kenyon, New York City, of counsel), for Shell Oil Co., Northern Petrochemical Co., United States Steel Corp., Hercules Inc. and Himont U.S.A., Inc.

Arthur G. Connolly, Jr., of Connolly, Bove, Lodge & Hutz, Wilmington, Del. (Stanton T. Lawrence, III, Thomas F. Reddy, Jr., and James A. Power, Jr., of Pennie & Edmonds, New York City, of counsel), for El Paso Products Co.

## TABLE OF CONTENTS

I. Chemistry of Polymers
 A. Building Blocks
 B. The Formation of Polymers

II. The '851 Patent

III. Invalidity
 A. Anticipation
 1. The Natta '300 Patent
 a. The Section 146 Proceeding
 b. The Evidence at Trial
 1) Written Description
 2) Enablement
 2. The Zletz '257 Patent
 a. Express Disclosure
 b. Inherent Disclosure
 1) EP-34
 a) Percent Crystalline Polypropylene
 b) Percent Ethylene Content
 2) EP-35
 a) Percent Crystalline Polypropylene
 b) Percent Ethylene Content
 1)) The Gardner Method
 2)) The Brame Method
 3)) Other Experiments
 a)) Maury
 b)) Zletz
 (i) AZ-14
 (ii) AZ-20
 c. Chemistry
 1) Disproportionation
 2) Ethylene Polymerization
 3) Alkylation
 B. Double Patenting
 C. Obviousness
 1. Scope and Content of the Prior Art
 2. Differences Between the Prior Art and the Claimed Invention
 3. The Level of Ordinary Skill in the Art
 4. Secondary Considerations
 a. Commercial Success
 b. Failure of Others
 c. Contemporaneous Independent Development
 1) The Peters' Runs
 a) P-1
 b) P-9
 5. Conclusion
 D. Section 101, 112
 1. Utility and Enablement

 a. The Interference Proceedings
 b. Defendants' Arguments
 1) Disclosure Is Insufficient
 2) Underlying Factual Basis for the 146 Proceedings
 a) Young's Modulus
 b) Molecular Weight
 c) Thermal Stability
 2. Best Mode
E. Inequitable Conduct
 1. Factual Background: The Development of Crystalline Polypropylene
 a. The Early Work at Phillips
 b. The Discoveries of Ziegler and Natta
 c. Subsequent Development at Phillips
 2. Materiality
 3. Intent
IV. Infringement
 A. Literal Infringement
 1. Phillips' 1953 and 1954 Specifications
 2. File Wrapper Estoppel
 a. Claims 29–37
 b. Claim 38
 B. Reverse Doctrine of Equivalents
 1. Molecular Weight
 2. Toughness
 3. Commercial Utility
 a. Solubility
 b. Melting Point
 c. Density
 d. Infrared Analysis
 e. X–Ray Analysis
 4. Conclusion
V. Attorneys' Fees
VI. Conclusion

## OPINION

LONGOBARDI, District Judge.

U.S. Patent 4,376,851 ("the '851 patent") was issued on March 15, 1983, to Phillips Petroleum Company ("Phillips") as assignee of John P. Hogan and Robert L. Banks ("Hogan and Banks"). The patent claims the invention of crystalline polypropylene. Phillips sued all other parties ("Defendants") to this litigation for infringement of the '851 patent. Subsequently, each of Defendants was licensed and the suits against Shell Oil Co. ("Shell"), Northern Petrochemical Co. ("Northern") and El Paso Products Co. ("El Paso") were dismissed. Each of them, however, sued Phillips in a declaratory judgment action claiming that the '851 patent was invalid, not infringed and unenforceable. The original suits against Hercules Incorporated ("Hercules") and U.S. Steel ("U.S.X.") were then consolidated with the declaratory judgment actions.

Defendants' contentions may be summarized as follows:

(a) The '851 patent is invalid because it was anticipated by prior art, in particular, U.S. Patent No. 3,112,300 ("the '300 patent" or "Natta patent"). In this respect, the '851 patent's parent applications in 1953 and 1954 were not valid under 35 U.S.C. § 112 and, therefore, they did not pre-date the Natta patent's effective date of June 8, 1955.

(b) The '851 patent is invalid for double patenting.

(c) The '851 patent is unenforceable because of inequitable conduct.

(d) Although Defendants concede literal infringement, they contend the reverse doctrine of equivalents negates liability.

(e) Phillips should be estopped from enforcement of the patent based on cancellation of claims during prosecution of its applications.

(f) The '851 patent is invalid because it is anticipated under 35 U.S.C. § 102(e) and/or obvious as provided under 35 U.S.C. § 103 because of U.S. Patent No. 2,692,257 ("the '257 patent" or "the Zletz patent") granted October 19, 1954, on an application filed on April 28, 1951.

(g) The '851 patent is invalid because the application fails to state a specific utility for the product in violation of 35 U.S.C. § 101.

(h) The '851 patent is invalid because the patentees failed to set forth in their application a written description for making the invention and the best mode known to them for making the invention, in violation of 35 U.S.C. § 112.

The first application leading to the '851 patent was filed on January 27, 1953 ("the 1953 application") and was assigned Serial No. 333,576 by the U.S. Patent Office. Phillips filed another application, Serial No. 476,306 on December 20, 1954 ("the 1954 application") as a continuation-in-part application. On January 11, 1956, Phillips filed application Serial No. 558,530 ("the 1956 application") as a continuation-in-part of both the 1953 and the 1954 applications. Ultimately, the 1956 application, after twenty-seven years of protracted litigation, resulted in the issuance of the '851 patent.

On September 9, 1958, the Patent Office declared an interference. At least five groups of inventors and their corporate assignees were contending that they were the first to discover crystalline polypropylene. The Patent Office Board of Patent Interferences ("Board") issued an opinion on November 29, 1971, awarding priority of

invention to Montedison, S.p.A. ("Montedison") which claimed the benefit of U.S. Application No. 514,099 filed by Guillo Natta, et al, on June 8, 1955. Phillips, E.I. Du Pont de Nemours & Co. ("DuPont") and the Standard Oil Company (Indiana) ("Standard") sought review pursuant to 35 U.S.C. § 146. The actions were consolidated and tried before The Honorable Caleb M. Wright, United States District Judge for the District of Delaware. The Court resolved the priority issue in favor of Phillips. *Standard Oil Company v. Montedison*, 494 F.Supp. 370 (D.Del.1980), *aff'd*, 664 F.2d 356 (3d Cir.1981). Phillips was then granted the '851 patent after proceedings before the United States Patent and Trademark Office ("PTO").

## I. CHEMISTRY OF POLYMERS

### A. Building Blocks

Each chemical element has a unique atomic structure composed of protons, neutrons and electrons, the building blocks common to all chemical elements. An atom of hydrogen, the simplest element, is composed of one proton and one electron. It has an atomic weight of 1. (Bailey, Tr. at 106, 127–27).[1] Carbon has an atomic weight of 12. (Bailey, Tr. at 127). Hydrocarbons are molecules formed from hydrogen atoms and carbon atoms. (Bailey, Tr. at 104; Glossary, D.I. 206, at 24).[2]

The hydrocarbon ethylene is formed from two carbon atoms, each bonded by two hydrogen atoms. (Bailey, Tr. at 129–30; Glossary, D.I. 206, at 13–14):

$$H-C=C-H \quad \text{or} \quad CH_2=CH_2 \quad \text{or} \quad C_2H_4.$$

The hydrocarbon propylene is formed from three carbon atoms and six hydrogen atoms. (Bailey, Tr. at 131–32; Glossary at 34):

---

1. The trial transcript is cited herein by witness and page number; Phillips' trial exhibits are cited PTX ___; Defendants' trial exhibits are cited DTX ___; Plaintiffs' briefs are cited PB; Defendants' briefs are cited DB.

2. The parties have stipulated to a Glossary of terms.

$$H-C=C-H \quad \text{or} \quad CH_2=CH-CH_3 \quad \text{or} \quad C_3H_6.$$

with pendant structure:

H
|
H-C=C-H or CH$_2$=CH-CH$_3$ or C$_3$H$_6$.
|
H-C-H
|
H

Both the ethylene and propylene molecules have double bonds (=) between two adjacent terminal carbon atoms. Such compounds are called 1–olefins or alpha-olefins. Because the double bond is more reactive than a single bond, chemical reactions are more likely when molecules with double bonds are present. (Bailey, Tr. at 119–21, 129; Glossary, D.I. 206, at 10–11, 31).

**B. The Formation of Polymers**

Polymers are large chain-like molecules formed by bonding together several much smaller molecules called monomers, *e.g.*, ethylene or propylene. (Bailey, Tr. at 140–41). If only one monomer is used, that is, if all the links in the chain are identical, the polymer is a homopolymer. If some differ from others, the polymer is a copolymer. (Glossary, D.I. 206, at 17, 24).

The process of combining monomers to make polymers is called polymerization. In the polymerization of propylene, the double bond in each monomer molecule opens up so that adjacent monomer units share a bond, thereby creating a linear chain. (Bailey, Tr. at 162–63, 165–67).

Polymerization reactions are usually induced by means of a catalyst. The catalyst is the stimulus which induces the monomers to bond together and the agent which determines the nature of the resulting structure. (Bailey, Tr. at 151; Long, Tr. at 576).

Any polymerization process consists of three essential steps: first, the catalyst must be prepared; second, the monomer must be brought in contact with the cata-

lyst under appropriate conditions; and third, the polymer of interest must be separated from the catalyst and from other products of the reaction. (Bailey, Tr. at 151; Long, Tr. at 2752). All three steps are important and a polymer chemist who reports a new polymerization process will describe all of them. (Long, Tr. at 2753).

A combination of only two monomers into one molecule is called a "dimer", a molecule formed from three monomers is called a "trimer", a molecule of four monomers is called a "tetramer" and so on. Each combination results in a unique and distinct compound, differing from all the others in the length of the chain. (Bailey, Tr. at 140–42, 250–52). As the number of monomer units added to the chain becomes large, it is inconvenient to give each new compound a separate name. The resulting molecules are all generically called "polymers." If propylene is used, the polymer is called polypropylene.

In the polymerization process, many polymer chains are formed. Not all polymer chains are the same length. Most processes will produce a variety of lengths corresponding to a certain range of molecular weights. Therefore, a polymer product is characterized by an average molecular weight. (Bailey, Tr. at 146–47).

Polymers composed of monomer units which have entered the chain in a regular and ordered way may pack together with other ordered polymer chains to form crystals if the ordered structure is long enough. (Bailey, Tr. at 173–75). Depending on the catalyst used, the polymerization of propylene can yield molecules having an ordered linear structure known as "isotactic." In isotactic polypropylene, the propylene monomer enters the chain in a regular head-to-tail fashion and the pendant methyl group is always located on the same side of the backbone of the chain:

.... CH$_2$-CH-CH$_2$-CH-CH$_2$-CH .... (backbone)
 | | |
 CH$_3$ CH$_3$ CH$_3$ (pendant methyl group).

On the other hand, polypropylene chains may also have a disordered structure, called "atactic", which may result from a random orientation of the pendant methyl group with respect to the backbone:

$$\ldots CH_2\text{-}CH\text{-}CH_2\text{-}CH\text{-}CH_2\text{-}CH\text{-}CH_2\text{-}CH \ldots$$

with $CH_3$ groups alternating above and below the chain.

The disordered structure prevents the polymer from forming crystals and hence the polymer is amorphous. The product of a polymerization reaction may contain both atactic and isotactic molecules. (Bailey, Tr. at 160–79, 201–06, 208–11, 278; Glossary, D.I. 206, at 12, 25–26).

## II. THE '851 PATENT

The '851 patent contains one claim which reads as follows: "Normally solid polypropylene consisting essentially of recurring propylene units, having a substantial crystalline polypropylene content...." (PTX 1). The claim defines the composition generally referred to as "crystalline polypropylene" by reference to three properties. First, the product is "normally solid." This means that under normal conditions of temperature and pressure, the product holds its shape. (Bailey, Tr. at 188). Second, the product must be "polypropylene, consisting essentially of recurring propylene units." The claim of the '851 patent does not require that the composition be composed entirely of recurring propylene units but rather that it consist "essentially of recurring propylene units." A small degree of irregularity is permissible so long as it does not affect the basic and novel properties of the composition. (Bailey, Tr. at 188–90). Third, the composition must have "a substantial crystalline polypropylene content." When propylene polymerizes in such a way that the structure of the resulting polymer is linear with all the methyl groups located on the same side of the polymer chain (sometimes referred to as an "isotactic" structure), the polypropylene molecules are able to crystallize. This means that the polymer molecules can pack together in a tight, regular array known as a crystal lattice. (Bailey, Tr. at 172–77; PTX 15, 116). The crystallinity is "substantial" when it is present in an amount sufficient to influence the properties of the polymer. (Bailey, Tr. at 190–91).

The crystal lattice ultimately has a very profound effect upon the physical properties of the polymer composition. The strong attractive forces in the lattice render the polymer insoluble in solvents which would otherwise dissolve the polymer if it were not crystalline. (Bailey, Tr. at 211–18; PTX 29). Crystallinity also is manifested if the material exhibits a melting point, which is the temperature at which the polymer changes from the solid, crystalline state to a molten state. (Bailey, Tr. at 218). In general, the density of crystalline polypropylene will be higher than that of the amorphous or non-crystalline form because of the close packing of the polymer molecules in the crystal lattice. For example, the density of crystalline polypropylene is in the range of about 0.90 grams per cubic centimeter (g/cc) while the density of amorphous polypropylene is about 0.85 g/cc. (Bailey, Tr. at 220–22; PTX 35).

Crystallinity also imparts several important mechanical properties to polypropylene. As Professor Fred W. Billmeyer, Jr., one of Defendants' experts, noted in his book *Textbook of Polymer Science:*

Polypropylene is the lightest major plastic, with a density of 0.905. Its high crystallinity imparts to it high tensile strength, stiffness and hardness. The resulting high strength-to-weight ratio is an advantage in many applications. Finished articles usually have good gloss and high resistance to marring. The high melting point of polypropylene allows well-molded parts to be sterilized,

and the polymer retains high tensile strength at elevated temperatures. (PTX 1858 at 368; Bailey, Tr. at 2329–32). In fact, Defendants' witnesses unanimously agreed that crystallinity is a key property of the polypropylenes of commerce and is at least in part responsible for the wide use of polypropylene in many demanding commercial applications. (Powers, Tr. at 1942; Porter, Tr. at 1120–21, 1125–28, 1143).

Prior to the discovery of crystalline polypropylene, the only known polypropylenes were those with very irregular structures which prevented the polymer molecules from crystallizing. The structure of these non-crystalline, amorphous polypropylenes was irregular in two respects. First, the methyl groups were randomly oriented with respect to the polymer chain. Second, the backbone of the polymer molecules was not linear but "tree-branched." (Bailey, Tr. at 191–210; PTX 1703, 1704, 1705, 1706, 1808, 135, 136, 1765; Mark, Tr. at 521). The amorphous polypropylenes accordingly had none of the beneficial properties of the crystalline form of polypropylene. (Bailey, Tr. at 211–22). As Professor Billmeyer stated: "[t]he crystallizability of isotactic polypropylene makes it the sole form with properties of commercial interest." (PTX 1858 at 368).

In sum, the '851 patent claims the discovery of a wholly new form of polypropylene with a structure quite different from the prior art polypropylenes. (Bailey, Tr. at 2332).

### III. INVALIDITY

#### A. Anticipation

█ In order to prove anticipation of a patent claim under 35 U.S.C. § 102, a party must show, *inter alia*, identity of invention. *Tyler Refrigeration v. Kysor Indus. Corp.*, 777 F.2d 687, 689 (Fed.Cir.1985) (quoting *Kalman v. Kimberly–Clark Corp.*, 713 F.2d 760, 771 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984)); *Schering Corp. v. Precision–Cosmet Co. Inc.*, 614 F.Supp. 1368, 1373 (D.Del.1985). Identity of invention is a question of fact. *Kalman*, 713

F.2d at 771 (noting *Coupe v. Royer*, 155 U.S. 565, 578–79, 15 S.Ct. 199, 204–05, 39 L.Ed. 263 (1895)); *see Tyler Refrigeration*, 777 F.2d at 689; *Lindemann Maschinenfabrik v. Am. Hoist and Derrick*, 730 F.2d 1452, 1458 (Fed.Cir.1984); *Schering Corp.*, 614 F.Supp. at 1373. As the Federal Circuit has noted:

> [O]ne who seeks such a finding must show that each element of the claim in issue is found, either expressly described, or under principles of inherency, in a single prior art reference, or that the claimed invention was previously known or embodied in a single prior art device or practice.

*Kalman*, 713 F.2d at 771, *quoted in Schering Corp.*, 614 F.Supp. at 1373; *see Great Northern Corp. v. Davis Core & Pad Co., Inc.*, 782 F.2d 159, 165 (Fed.Cir.1986); *Tyler Refrigeration*, 777 F.2d at 689; *American Hosp. Supply Corp. v. Travenol Lab.*, 745 F.2d 1, 6 (Fed.Cir.1984); *RCA Corp. v. Applied Digital Data Systems, Inc.*, 730 F.2d 1440, 1444 (Fed.Cir.1984).

The prior art reference must be enabling, *i.e.*, it "must contain within its four corners a sufficient description to enable one to practice the invention without experimentation or inventive skills." *Schering Corp.*, 614 F.Supp. at 1373; *see also Akzo N.V. v. U.S. Intern. Trade Com'n*, 808 F.2d 1471, 1479 (Fed.Cir.1986). Of course, the prior art need not state the elements of the claim in identical language. *See, e.g., Akzo*, 808 F.2d at 1479 (noting *Application of Brown*, 51 CCPA 1254, 329 F.2d 1006, 1011 (1964)). In short, "[a]nticipation and infringement are reciprocals.... [A] structure in a prior art reference which would infringe the patent if later in time, anticipates it if earlier in time." 1 P. Rosenberg, *Patent Law Fundamentals* § 7.04 (2d ed. 1986) (noting *Knapp v. Morss*, 150 U.S. 221, 228, 14 S.Ct. 81, 84, 37 L.Ed. 1059 (1893)).

█ Under section 102(e), the Court must identify the elements of the claim of the '851 patent, determine their meaning in light of the specification and prosecution history and identify corresponding ele-

ments described in the alleged prior art patents. (See discussion *infra* under Infringement.) *Lindemann*, 730 F.2d at 1458. In other words, the inquiry for the Court is whether the '851 claim "reads on" the prior invention. In engaging in this analysis, the question is *not* the precise scope of the claim in the prior patent, but "what is disclosed in the specification and made known to the world." *Minerals Separation v. Magma Copper Co.*, 280 U.S. 400, 402, 50 S.Ct. 185, 185, 74 L.Ed. 511 (1930) (noting *Milburn Co. v. Davis–Bournonville Co.*, 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651 (1926)). Anticipation relates to the novelty and identity of invention. Because of the strict requirement that all elements of the claimed invention must be present within a single prior art reference, the requisite degree of identity is rarely found and anticipation is deemed a "technical defense." *See Mannesmann Demag v. Engineered Metal Products*, 605 F.Supp. 1362, 1368 (D.Del.1985), *aff'd*, 793 F.2d 1279 (Fed.Cir.1986).

### 1. The Natta '300 Patent

[3] Defendants argue that the Natta '300 patent (DTX 71), which issued on an application filed June 8, 1955, anticipates the invention claimed in Phillips' 1956 application and, thus, invalidates the '851 patent under 35 U.S.C. § 102(e). The '300 patent was originally issued to Guilio Natta, Piero Pino and Giorgio Mazzanti and was ultimately assigned to Montecatini, an Italian corporation. (DTX 71). The patent is entitled "Isotactic Polypropylene." (DTX 71). Phillips does not seriously contest that the '300 patent in fact discloses the invention of the '851 patent. Instead, Phillips argues that the effective date of its invention is not the filing date of its 1956 application but rather the date of its 1953 application. As such, Phillips argues that the '300 patent cannot be considered prior art as to Phillips' invention.[3]

In support of its contentions, Phillips relies on 35 U.S.C. § 120. Section 120 pro-

vides that a patent applicant is entitled to rely on a previously filed application as the effective date of its invention if that earlier application meets the disclosure requirements set forth in the first paragraph of 35 U.S.C. § 112. Section 112 in turn requires that a patent application (1) contain a written description of the invention, (2) in such terms as to enable a person skilled in the art to make and use the invention. The description and enablement requirements of section 112 are separate and distinct. *In re Wilder*, 736 F.2d 1516, 1520 (Fed.Cir. 1984). So long as Phillips' 1953 application complied with each of the disclosure requirements of section 112, Phillips is entitled to rely on the filing date of its 1953 application as the effective date of its invention and the '300 patent, therefore, would not be considered prior art. *See Paperless Accounting v. Bay Area Rapid Transit Sys.*, 804 F.2d 659, 664 (Fed.Cir. 1986).

Phillips contends that both Judge Wright and the Third Circuit ruled in the section 146 action that Phillips' 1953 application adequately supported the count in interference, now the claim of the '851 patent, and thus satisfied the requirements of section 112. Phillips thus argues that it is Defendants' burden to establish by new, clear and convincing evidence that the 1953 application falls short of the requirements of section 112. Phillips further asserts that Defendants have failed to meet that burden.

#### a. *The Section 146 Proceeding*

One of the central issues before Judge Wright was whether Phillips' 1953 application constituted a "constructive reduction to practice" for the purposes of establishing priority. *Standard Oil*, 494 F.Supp. at 420–35. The resolution of that issue was based squarely on whether the 1953 application satisfied the requirements of section 112. As Judge Wright explained, "[a] constructive reduction to practice is established as of the date that an inventor files

---

**3.** Phillips also relies on its 1954 application in support of its argument that the '300 patent cannot be considered prior art. Because the disclosure of the 1954 application is largely

identical to that of the 1953 application, the Court will not address the 1954 application separately.

an application complying with 35 U.S.C. § 112." *Id.* at 383. Thus, in deciding whether Phillips' 1953 application constituted a constructive reduction to practice, Judge Wright was required to determine whether the application complied with the provisions of section 112. Based upon the evidence before him, Judge Wright concluded that the 1953 application met both the description and the enablement requirements of section 112.

In addressing the sufficiency of Phillips' 1953 application, Judge Wright first noted that the application did not describe the invention in the precise language of the count. *Standard Oil,* 494 F.Supp. at 420. Indeed, Phillips conceded as much. *Id.* Nonetheless, Judge Wright recognized that in order to comply with section 112, an application need not describe the invention *in haec verba. Id.* at 383–84. Instead, an application is sufficient under section 112 if the description of the invention, though not set forth in the precise language of the count, is the "legal equivalent" of that language. *Id.* at 384. Based on the evidence before him, Judge Wright concluded that the description contained in the 1953 application was in fact the legal equivalent of the language of the count and that it therefore satisfied the written description requirement of section 112. *Id.* at 420–432.

Judge Wright also determined that the disclosure contained in Phillips' 1953 application would enable one skilled in the art to practice the invention. *Id.* at 432–35. Thus, Judge Wright concluded that the 1953 application satisfied both the written description and enablement requirements of section 112.

Nonetheless, Defendants argue that the issue before Judge Wright was different from that presented here. Citing such authorities as *Swain v. Crittendon,* 51 CCPA 1459, 332 F.2d 820 (1964) and *Application of Kyrides,* 159 F.2d 1019 (C.C.P.A.1947),

they argue that in finding that Phillips' 1953 application constituted a constructive reduction to practice, Judge Wright decided only that Phillips was the first party to disclose a *species* falling within the broader *genus* of the interference count. They contend that Judge Wright did not hold that Phillips was entitled to a patent on the broad count in interference.

Defendants are correct in their assertion that merely winning an interference does not necessarily entitle the winning party to a patent, the scope of which is commensurate with that of the count in interference. *Swain,* 332 F.2d at 824; *Kyrides,* 159 F.2d at 1021.[4] Judge Wright, however, did not determine priority alone. Instead, following the mandate of *Hill v. Wooster,* 132 U.S. 693, 10 S.Ct. 228, 33 L.Ed. 502 (1890), Judge Wright determined that he was required to decide whether the count in interference was patentable to Phillips. *Standard Oil,* 494 F.Supp. at 430 n. 637, 454–56. As Judge Wright explained:

> [T]his case involves patentability issues ... one of which concerns the *breadth of Phillips' 1953 specification and claims.* 35 U.S.C. § 112. In particular, Phillips may not be entitled to patent the full range of crystalline polypropylene unless its 1953 application specified all of them. The Court therefore must eventually address the issue of the breadth of Phillips' specification.

*Id.* at 430 n. 637 (emphasis added). Judge Wright went on to conclude that the product of the count was novel, non-obvious and useful and was patentable to Phillips. *Id.* at 454–56, 461. The Court thus concludes that Judge Wright held that Phillips' 1953 application fully satisfied the requirements of section 112.

On appeal, the Third Circuit affirmed Judge Wright's holding that Phillips' 1953 application complied with the requirements of section 112. *Standard Oil Co.*

---

**4.** While Phillips argues that *Squires v. Corbett,* 560 F.2d 424 (C.C.P.A.1977), overruled the principle of *Swain* and *Kyrides,* the Court disagrees. *Squires* did not disturb the principle that merely because a party wins an interference he is not necessarily entitled to a patent on the product of the count. Indeed, while the court explained

that proof of a prior constructive reduction to practice of a species within the count would be sufficient to allow a party to prevail on *priority,* the count "need *not* be *patentable* to either party in the sense of being fully supported by either party's disclosure." *Id.* at 433 (emphasis added).

*(Indiana) v. Montedison, S.P.A.*, 664 F.2d 356 (3d Cir.1981). Indeed, while the Third Circuit believed it appropriate to review Judge Wright's decision under a "clearly erroneous" standard, the Court nonetheless independently reviewed the record and concluded that even under a broader standard of review, Judge Wright's decision should be affirmed. *Id.* at 362. Thus, the Third Circuit independently determined that the 1953 application fully satisfied the requirements of section 112.

### b. *The Evidence at Trial*

Phillips having previously established that its 1953 application fully satisfied the requirements of section 112, it is Defendants' burden to demonstrate by new, clear and convincing evidence that the application was inadequate. Defendants have failed to meet that burden.

#### 1) *Written Description*

■ As recognized by both the District Court and the Third Circuit, an application need not describe its invention *in haec verba* in order to comply with the description requirement of section 112. *Standard Oil*, 664 F.2d at 364; 494 F.Supp. at 383–84. *See also In re Wilder*, 736 F.2d 1516, 1520 (Fed.Cir.1984); *In re Kaslow*, 707 F.2d 1366, 1375 (Fed.Cir.1983); *Flynn v. Eardley*, 479 F.2d 1393, 1395 (C.C.P.A. 1973); *Application of Lukach*, 58 CCPA 1233, 442 F.2d 967, 969 (1971). Instead, the relevant inquiry is "whether the disclosure of the application relied upon 'reasonably conveys to the artisan that the inventor had possession at that time of the later claimed subject matter.'" *Ralston Purina Co. v. Far–Mar–Co., Inc.*, 772 F.2d 1570, 1575 (Fed.Cir.1985) (quoting *In re Kaslow*, 707 F.2d at 1375). *See also Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1576 (Fed.Cir.1986); *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.*, 758 F.2d 613, 624 (Fed.Cir. 1985); *Application of Wertheim*, 541 F.2d

257, 262 (C.C.P.A.1976). Applying that standard to the instant case, the Court finds that Defendants have failed to establish that Phillips' 1953 application did not satisfy the written description requirement of section 112.

In its 1953 application, Phillips described its invention as follows:

> The solid polymer fraction is insoluble in pentane at room temperature. The solid material has a melting point in the range of 240 to 300°F, a density in the range of 0.90 to 0.95, an intrinsic viscosity in the range of 0.2 to 1.0, and a weight average molecular weight range in the range of approximately 5,000 to 20,000.

(DTX 15 at 30–31). The properties described would indicate to one skilled in the art that Phillips was in possession of a new, crystalline form of polypropylene. (Bailey, Tr. at 211–23).

Defendants do not dispute that the 1953 application described crystalline polypropylene. Indeed, they concede that the properties reported indicate that "the polypropylene has substantial crystallinity." Moreover, Defendants apparently do not contend that the application failed to describe a product satisfying each of the remaining limitations of the claim (*i.e.*, a "normally solid" polymer which consists "essentially of recurring propylene units"). In fact, at least one of Defendants' own witnesses admitted that the 1953 application describes a product satisfying each limitation of the '851 claim. (Porter, Tr. at 1156–62).

Instead, Defendants argue that the 1953 application did not describe the entire class of compounds falling within the claim of the '851 patent. In particular, they focus on the range of intrinsic viscosities set forth in the application. Defendants assert that in specifying a range of intrinsic viscosities of 0.2 to 1.0, the application describes only low molecular weight materials which are useless as plastics.[5] Defend-

---

5. Defendants introduced a great deal of evidence designed to demonstrate the differences in physical and mechanical properties of their commercial polypropylenes, on the one hand, and polypropylene having an intrinsic viscosity within the range specified in the 1953 application, on the other. Since the Court concludes as a matter of law *infra* that such evidence in no way aids Defendants in their attempt to establish the inadequacy of Phillips' 1953 application, the Court will not discuss the evidence in detail at this point. Defendants rely on the same

ants argue that the application does not describe the high molecular weight, tough commercial polypropylenes manufactured by Defendants, all of which have intrinsic viscosities above 1.0.

Defendants have misconstrued the inquiry under section 112. The focus of that inquiry is whether the *claimed* subject matter is adequately described. *See, e.g., Ralston Purina*, 772 F.2d at 1575; *In re Wilder*, 736 F.2d at 1520. If the '851 claim contained a limitation regarding intrinsic viscosity or molecular weight, Defendants' arguments would have merit. Yet, the '851 claim contains no such limitation. The fact that the 1953 application specified a range of intrinsic viscosities of only 0.2 to 1.0 is, therefore, immaterial to the present inquiry.

While Defendants rely on such authorities as *Application of Wertheim*, 541 F.2d 257 and *Application of Lukach*, 442 F.2d 967, in support of their position, that reliance is misplaced. The issue in those cases was whether the application in question contained adequate support for limitations expressly included in the claim. In *Application of Wertheim*, 541 F.2d 257, for example, the patent application failed to satisfy the express limitation of the claim that the solid content be "at least 35%." Similarly, in *Application of Lukach*, 442 F.2d 967, the application failed to describe a product having a weight-average molecular weight/number-average molecular weight ratio of "at least 2.0 and less than about 3.0", an express limitation of the claim. In contrast to the cases cited by Defendants, there is no limitation in the '851 claim regarding the intrinsic viscosity or molecular weight of the polymer. Defendants' authorities are therefore inapplicable.

In sum, Defendants have pointed to absolutely no evidence, let alone clear and convincing evidence different from that considered by Judge Wright and the Third Circuit, that Phillips' 1953 application failed to describe the *claimed* invention of the '851 patent. The Court finds that De-

fendants have failed to establish that Phillips' 1953 application did not satisfy the written description requirement of section 112.

### 2) *Enablement*

█ In order to satisfy the enablement requirement of section 112, a patent application must contain a description which enables one skilled in the art to make and use the claimed invention. *See, e.g., DeGeorge v. Bernier*, 768 F.2d 1318, 1323 (Fed.Cir. 1985); *Atlas Powder Co. v. E.I. Du Pont de Nemours*, 750 F.2d 1569, 1576 (Fed.Cir. 1984); *Lindemann*, 730 F.2d at 1463. That some experimentation may be necessary in order to practice the invention does not render an application non-enabling so long as the amount of experimentation is not unduly extensive. *See, e.g., Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed.Cir.1986), *cert. denied*, — U.S. —, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987); *DeGeorge*, 768 F.2d at 1323; *Atlas Powder*, 750 F.2d at 1576. Moreover, because an application speaks to those skilled in the art, it need not set forth every minute detail regarding the invention. *DeGeorge*, 768 F.2d at 1323. Nor need an application disclose that which is already well known in the art. *See, e.g., Paperless Accounting*, 804 F.2d at 664; *Hybritech*, 802 F.2d at 1384 ("[A] patent need not teach, and preferably omits, what is well known in the art."); *Lindemann*, 730 F.2d at 1463.

█ Whether an application is sufficiently enabling is to be determined as of its filing date rather than as of the date of trial. *Hybritech*, 802 F.2d at 1384; *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1556 (Fed.Cir.1983), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984); *White Consol. Industries v. Vega Servo–Control*, 713 F.2d 788, 791 (Fed.Cir.1983). Thus, post-filing developments in the art are irrelevant to the enablement inquiry. *W.L. Gore*, 721 F.2d at 1556. The critical inquiry is whether, at the time the application was filed, the application contained a description sufficient to

evidence, however, in support of their assertion of non-infringement. The Court will scrutinize

the evidence in detail in the context of its Infringement discussion *infra*.

enable one skilled in the art to practice the invention.

Defendants do not dispute that the 1953 application enables one skilled in the art to make (1) normally solid polypropylene, (2) consisting essentially of recurring propylene units, (3) having a substantial crystalline polypropylene content. Indeed, at least two of Defendants' own witnesses conceded that the application enables one to make a product satisfying each limitation of the claim. (Long, Tr. at 816; Porter, Tr. at 1156–62).

Moreover, the results of certain reproduction experiments introduced by Defendants themselves demonstrate that Phillips' 1953 application enables the production of polypropylene of the '851 claim. In 1985, Dr. Long, acting on behalf of Defendants, prepared samples of polypropylene in accordance with the 1953 application. (Long, Tr. at 595–605). He admittedly followed the general teachings of the 1953 application. *Id.*[6] Each of the resulting samples, A, B and C, satisfied the limitations of the '851 claim. (Wiles, Tr. at 1978–85; PTX 1860–62).

In attacking Phillips' 1953 disclosure, Defendants again focus on the range of intrinsic viscosities set forth in the application. Once again, they contend that the 1953 application does not enable one to produce polypropylene having an intrinsic viscosity greater than 1.0. They argue, therefore, that the 1953 application does not enable one to produce the high molecular weight, tough polypropylenes of commerce.

Defendants have again missed the point of the inquiry under section 112. As the Federal Circuit has explained, it is the *claimed* invention for which enablement is required. *W.L. Gore,* 721 F.2d at 1557; *see also DeGeorge,* 768 F.2d at 1323. The applicant is not required to include in his application support for matters not set forth in the claim. *DeGeorge,* 768 F.2d at 1324. As explained *supra,* there is no limitation in the '851 claim regarding intrinsic viscosity or molecular weight. Even assuming *arguendo* that the 1953 application did not enable one skilled in the art to produce polypropylene having an intrinsic viscosity greater than 1.0, Phillips' disclosure would not be rendered non-enabling.

Thus, with respect to both the written description and enablement requirements, Defendants have misconstrued the inquiry under section 112. They have sought to read into the '851 claim a molecular weight/intrinsic viscosity limitation which simply is not there. Nearly thirty-five years after Phillips' application was filed, they fault Phillips for not describing a polypropylene of high molecular weight/intrinsic viscosity, a property which we *now* know to be extremely important.[7] A patent applicant is not required, however, to predict every possible variation, improvement or commercial embodiment of his invention. *See SRI Intern. v. Matsushita Elec. Corp. of America,* 775 F.2d 1107, 1121 (Fed.Cir.1985); *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1362 (Fed. Cir.1983). In seeking to impose such a requirement on Phillips, Defendants have wholly failed to carry their burden in establishing the insufficiency of Phillips' 1953 application under section 112. Phillips, therefore, may rely on the 1953 application as the effective date of its invention. The '300 patent cannot be considered prior art.

### 2. The Zletz '257 Patent

Defendants next contend that the '851 patent is invalid in view of the alleged prior art Zletz '257 patent issued in October, 1954, on application filed in April, 1951, and assigned to the Standard Oil Company (Indiana) ("Standard"). Defendants argue that the '257 patent is prior art

---

6. Because all parties have admitted that Dr. Long followed the general teachings of the 1953 application, the Court will not discuss Dr. Long's procedures in detail. Those procedures are set forth in PTX 1721.

7. The importance of high molecular weight/intrinsic viscosity is discussed in detail in the context of the Court's Infringement determination *infra. See also* the discussion *infra* on section 112 and section 101.

effective to invalidate the '851 patent under 35 U.S.C. §§ 102(e).[8]

The '851 patent is, of course, entitled to the statutorily-mandated presumption of validity. *See* 35 U.S.C. § 282. The burden of persuasion rests permanently with the party asserting invalidity. *See, e.g., Atlas Powder,* 750 F.2d at 1573 (noting *American Hoist & Derrick Co. v. Sowa & Sons,* 725 F.2d 1350, 1358–60 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). That burden is met only with proof of facts supported by clear and convincing evidence. *Id.* Further, as Phillips notes, the '257 patent was before the Patent Examiner during the prosecution of the '851 patent. (*See* DTX 13A, Papers No. 26, 28.) As such, Defendants have an added burden. "When no prior art other than that which was considered by the PTO examiner is relied upon by the attacker, he has the added burden of overcoming the deference that is due a qualified administrative agency presumed to have properly done its job." *American Hoist,* 725 F.2d at 1359. As the Federal Circuit has noted, the introduction of prior art not before the PTO may facilitate the attacker's ability to meet his burden of proof but the burden of persuasion remains on the challenger and the "clear and convincing" standard does not vary. *Atlas Powder,* 750 F.2d at 1573 (noting *Jervis B. Webb Co. v. Southern Systems, Inc.,* 742 F.2d 1388, 1392 & n. 4 (Fed.Cir.1984); *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1534 (Fed.Cir. 1983)); *RCA Corp,* 730 F.2d at 1444.[9]

The '257 patent, entitled "Ethylene Polymerization with Conditioned Alumina–Molybdena Catalysts" deals predominantly with the polymerization of ethylene (*see* Bailey, Tr. at 2074) although it does contain two express references to the polymerization of propylene. (*Id.*) The patent describes and claims the polymerization of ethylene, propylene and mixtures of ethylene and propylene at relatively low temperatures and pressures to form polymerization products from which a solid, high molecular weight fraction can be recovered. (*See* DTX 62, claim 1.) "[T]he inventive process comprises the conversion of ethylene to high molecular weight normally solid polymers by contact with a catalyst comprising essentially a reduced molybdenum oxide combined with an active adsorptive alumina of the type of gamma-alumina." (DTX 62, col. 1, line 42 to col. 2, line 1; *see id.,* col. 3, lines 9–13 ("Propylene alone has been polymerized by the employment of the catalysts ... in low yield to extremely high molecular weight, rubber-like polymers in addition to oils and grease-like solids."))

The patent specifies that the inventive process is effected at temperatures between 75°C and about 325°C, preferably between 130°C and 260°C. (DTX 62, col. 2, lines 1–3). Similarly, pressures between roughly atmospheric and 5000 p.s.i.g. (pounds per square inch per gram) or higher should be used, although the preferred pressure is between 200 p.s.i.g. and 2000 p.s.i.g., or about 1000 p.s.i.g. (*Id.*) Aromatic hydrocarbons, such as benzene, toluene or xylene, are used as liquid reaction mediums and solvents. (*Id.,* lines 14–19). The liquid medium favorably influences both the rate of the ethylene conversion and the rate of removal of the solid materials produced by the catalytic conversion which tend to accumulate on and within the catalyst. (*Id.,* lines 7–16). Finally, the patent teaches that the "inventive process is

8. As Phillips notes (PB at 49), the Pretrial Order, D.I. 211, indicates that Defendants planned to raise a third argument with regard to the '257 patent, namely, that certain experimental work conducted at Standard constituted a "prior invention" sufficient to invalidate the '851 patent under section 102(g). That contention is not addressed by Defendants in their post-trial brief, nor is it supported by any proposed findings of fact or conclusions of law. Defendants' section 103 argument is dismissed under Obviousness, *infra.*

9. Defendants argue that the '257 patent "was not involved directly in any of the prior proceedings in [the Interference]." (DB at 55). Regardless of the level of involvement of the '257 patent before the Patent Office and Judge Wright in the Interference, it was cited as prior art in the PTO during the proceedings which led to the issuance of the '851 patent. The deference due the PTO, therefore, is appropriate in this instance. Phillips has not argued that Defendants are barred by issue preclusion from litigating the viability of the '257 patent as a prior art reference.

characterized by extreme flexibility both as regards operating conditions and as regards the products producible thereby. Thus, the present process can be effected over extremely broad ranges of temperature and pressure." (*Id.*, lines 33–38).

The '257 patent's specifications contain only two references to the polymerization of propylene alone. (Bailey Tr. at 2074).[10] Dr. Bailey testified that the descriptions of propylene polymerizations were "very similar to what was in the prior art for the propylene polymers that were produced by the acid catalyst[s]", *i.e.*, rubber-like, soluble, noncrystalline polymers. (Bailey, Tr. at 2078). The prior art referred to by Bailey consists of an article by Fontana (PTX 1706), the Hersberger patent (U.S. Letters Patent No. 2,474,670 issued June 28, 1949) (PTX 1704), and the Thomas patent, (U.S. Letters Patent No. 2,387,784, issued October 30, 1945) (PTX 1703).

There are two catalysts employed in the '257 patent: either molybdenum oxide (MoO$_3$) supported on alumina or cobalt molybdate (CoO + MoO$_3$) supported on alumina. (DTX 62, col. 3, lines 19–34, col. 4, lines 23–34). Only one example in the '257 patent, Run 15, employs the cobalt molybdate catalyst. That Run was directed to the homopolymerization of ethylene. (DTX 62, col. 13, 16, lines 58–65). All of the other examples employ molybdena-oxide without cobalt. (*See* Bailey, Tr. at 2084–86). The patent describes this catalyst as "extremely active" and its product as a "tough, high molecular weight polyethylene resin." (DTX 62, col. 16, lines 62–65; *accord* Carmody, Tr. at 1202–03).

A companion application to the '257 patent was filed on the same day that the application which led to the '257 patent was filed. The claims in the '257 patent directed to the polymerization of propylene were originally contained in that companion application. After the Patent Office dictated that a clearer line of division be drawn between the two patent applications, the companion application was abandoned and the subject matter was transferred to what eventually became the '257 patent.[11]

There is no dispute that the products of the '257 processes are normally solid. It is also undisputed that the '257 patent does not mention the word "polypropylene", does not specifically refer to a product consisting of recurring propylene units, and does not directly note the crystallinity of the products produced by its processes.

#### a. *Express Disclosure*

Defendants argue that when the '257 patent application was filed in April, 1951, the state of the polymer art was such that the polymerized propylene product described in the patent was a new material. Conversely, Phillips contends that the product described is more like the prior art amorphous polypropylenes as they were known in 1951. All parties are in agreement that the state of the polymer art prior to the '257 application was a low molecular weight, tree-branched, amorphous polypropylene which exhibited no crystallinity.

In support of their argument, Defendants contend that the reference in the '257 patent to a melting or softening point when describing the "high molecular weight solid fraction" discloses that the fraction is in-

<hr>

10. Specifically,
 Propylene alone has been polymerized by the employment of catalysts of the present invention, in low yield to extremely high molecular weight, rubber-like polymers, in addition to oils and grease-like solids.
 A solution of the 34% propylene and benzene was prepared and passed downwardly through a bed of molybdena-alumina catalyst which has been activated to hydrogen treatment at 463°C and 150 p.s.i.g. hydrogen pressure for 1½ hours before use. It was found that propylene was converted to the extent of less than 1% in this operation to produce a polymer having a low molecular weight.

(DTX 62, col. 3, lines 9–13; *see* Bailey, Tr. at 2074–75; *Id.*, col. 21, lines 57–65; *see* Bailey, Tr. at 2076).

11. The '257 patent contains only process claims. Broad, independent claim 1 is directed to producing a solid polymer by contacting a normally gaseous olefin, either ethylene or propylene or mixtures of both, with an activated catalyst at the temperatures discussed *supra*. In claim 2, the catalyst is molybdenum trioxide. In claim 4, the catalyst is cobalt molybdate. In claim 7, the gaseous olefin is propylene.

deed crystalline. Specifically, the patent teaches that "[i]t is often desirable to select a polymerization temperature which is at least equal to the melting or softening point of the solid polymerization product." (DTX 62, col. 6, lines 67–70; *see id.*, col. 11, lines 35–44). Because a melting point is a characteristic of crystalline structures, Defendants argue that the '257 patent did in fact disclose, to one knowledgeable in the art, that the products produced by its methods were indeed crystalline, *i.e.*, exhibited crystallinity. (*See* Grubbs, Tr. at 1743; *accord* Bailey, Tr. at 310, 429–30).

Phillips, of course, disputes this reference as an indicia of crystallinity. As Phillips notes, the '257 patent does not disclose other possible indicia of crystallinity, such as density, solubility characteristics, infrared spectra or x-ray measurements that might have led one skilled in the art to conclude that the patentee had discovered what would have been, in 1951, a wholly new and different form of polypropylene. (*See* Bailey, Tr. at 2077). Phillips further asserts, as Dr. Bailey testified, that the reference to melting point refers to the patent's principal product, namely polyethylene, long known by 1951 to exhibit crystallinity and to have a distinct melting point. (Bailey, Tr. at 2429–31).

Read in the context of the specifications and claims, there is little doubt that the reference to melting point does, in fact, refer to the polymerization product of an ethylene feed. Indeed, in the same column which contains the reference to melting point, the patent teaches that "[t]he charg-

ing stock to the present polymerization process preferably comprises essentially *ethylene....* When the charging stock contains *propylene as well as ethylene*, both these olefins contribute to the production of resinous high molecular weight products." (DTX 62, col. 6, lines 32–40) (emphasis added). The reference to "melting point", when read in this context, contemplates polyethylene crystallinity. As such, given the dearth of other indicia of crystallinity and the reference to polyethylene crystallinity, I find that the '257 patent does not expressly teach polypropylene crystallinity.

Further, Defendants failed to point to any portion of the '257 patent which expressly discloses that any crystalline polypropylene formed by the processes consists essentially of recurring propylene units.

### b. *Inherent Disclosure*

The next issue for the Court is whether each of the elements of the claim of the '851 patent is found in the '257 patent under "principles of inherency." [12] In this regard, Defendants rely on several experimental runs completed in 1950 and 1953 in an attempt to show that the '851 patent does indeed read on the '257 patent.

In mid–1950, Alex Zletz determined that molybdenum oxide catalysts, useful in certain refining operations, were also effective polymerization catalysts for ethylene and propylene. (*See Standard Oil*, 494 F.Supp. at 398; DTX 169; *see* Peters, Tr. at 1299–1300). Donald Carmody, an associate of

---

12. The exact correlation required between the two patents is the subject of a heated legal dispute between the parties. To encapsulate, Phillips contends that "principles of inherency" as used in the context of anticipation dictates that Defendants prove that "under all circumstances, [the '257 patent] *necessarily and inevitably* produces crystalline polypropylene." (PB at 53). Defendants counter that rather than inherency, the legal issue is whether the '257 patent "describes" the product of the claim in the context of a prior art reference. (DRB at 26). Interestingly, Defendants fail to even cite, much less elaborate upon *Kalman, supra,* or any of its progeny.

Of course, strictly speaking, neither statement of the law is correct. The issue is whether *all of the elements* of the claim of the '851 patent are

disclosed in the '257 patent, either expressly or under principles of inherency, or whether the claim of the '851 patent was "previously known or embodied" in the '257 patent. *Kalman,* 713 F.2d at 771; *see W.L. Gore,* 721 F.2d at 1554.

As the Federal Circuit noted in *W.L. Gore,* "we are not persuaded that the 'effect' of the processes disclosed in Smith and Sumitomo, an 'effect' undisclosed in those patents, would be always to inherently ... produce products meeting all of the claim limitations. Anticipation of inventions set forth in product claims cannot be predicated on mere conjecture respecting the characteristics of products that might result from the practice of processes disclosed in references." 721 F.2d at 1554 (noting *Application of Felton,* 484 F.2d 495, 500 (C.C.P.A.1973)).

Zletz at Standard's Whiting, Indiana Exploratory Research Division, who was also involved in the polymerization of olefins, conducted a series of experiments using the more active reduced cobalt molybdate on alumina catalyst with both ethylene and propylene. (*See Standard Oil*, 494 F.Supp. at 398; DTX 175–76). Carmody undertook experiments involving propylene on September 28 and 29, 1950, (*see Standard Oil*, 494 F.Supp. at 398) and Defendants rely on the products of these two runs, EP–34 and EP–35, as evidence that the '257 patent inherently anticipates the '851 patent.[13] The parties agree that Carmody's EP–34 and EP–35 runs were conducted in accordance with the disclosure of the '257 patent. (*See* Bailey, Tr. at 2126–42; Carmody, Tr. at 1230–32; Grubbs, Tr. at 1750, 1762–64).

The recovered solid products from Runs EP–34 and EP–35 were submitted for infra-red analysis.[14] In infrared analysis, a sample of a product is subjected to infrared radiation at all wavelengths. Some of the wavelengths are absorbed by the sample. A detection device then reads those infrared wavelengths that are transmitted without being absorbed by the sample. (Wiles, Tr. at 379–84; *see generally* PTX 1796 (schematic)). The spectrometer (or spectro-photometer) then prints a spectrum or "trace" of the sample's chemical composition with wavelength recorded on the horizontal axis and percent transmission (or absorbence, *i.e.*, optical density) on the vertical axis. (Wiles, Tr. at 381–82; *see* PTX 1791).[15]

Molecules vibrate when they are exposed to radiation and they absorb some of that radiation. The molecular structure of the sample examined can be determined by reading the infrared trace to determine what absorption bands are present. Particular groups of atoms absorb certain wavelengths of radiation and, as such, if a particular absorption band is present in the trace, that chemical structure is present in the sample. (Wiles, Tr. at 380–81). Likewise, if the characteristic absorption band for a given chemical structure is *not* present, chemists deduce that that chemical structure is *not* present. (Wiles, Tr. at 381; *see Standard Oil*, 494 F.Supp. at 377–78). Because both positive and negative inferences can be drawn from a trace, infrared analysis, akin to a chemical fingerprint, provides a dramatic identification tool for the chemist. (Wiles, Tr. at 383; Painter, Tr. at 1532–33).[16]

13. It is worth noting that Standard relied upon *both* EP–34 and EP–35 as actual reductions to practice in the interference proceeding before Judge Wright. *See Standard Oil*, 494 F.Supp. at 397–402. Judge Wright affirmed the Board of Patent Interference's finding that Carmody's products did not consist essentially of recurring propylene units. *Id.* at 402.

Carmody conducted numerous experiments in addition to EP–34 and EP–35. The first Carmody experiment (EP–6) was designed to check Zletz's data for the polymerization of ethylene with a molybdenum oxide on alumina catalyst. (DTX 175 at 11). The second experiment (EP–7) used a cobalt molybdate on alumina catalyst in an ethylene polymerization. (DTX 175 at 13). The percent conversion of ethylene in both experiments showed, consistent with the disclosure of the '257 patent, that the cobalt molybdate on alumina catalyst was the "more active" of the two catalysts. (Carmody, Tr. at 1202–03). As such, Carmody proceeded to polymerize propylene with the more active catalyst. After the first experiment with a propylene feed (EP–19), Carmody determined that a larger batch reaction vessel might produce a greater solid fraction of polymer. (Carmody, Tr. at 1208; DTX 175 at 28). Carmody then designed a series of five experiments (EP–32, EP–33, EP–34, EP–35 and EP–36) in which the only reaction variable was temperature. (*See* Carmody, Tr. at 1210; DTX 175 at 42–47; DTX 176 at 14).

14. Of all the experiments conducted with a propylene feed and the more active cobalt molybdate on alumina catalyst, only the solid products of Runs EP–34 and EP–35 were submitted for infra-red analysis.

15. Data is recorded and conveyed in terms of wave numbers (*i.e.*, wavelengths, cm$^{-1}$) or microns ($10^{-6}$ meters). Where practicable, the Opinion will refer to measurements recorded in microns. Both measurements are methods of showing the same data and the presence of particular groups giving rise to a given absorption band shown up in precisely the same wave length region under either method of measurement. (Wiles, Tr. at 382).

16. Infrared analysis is also good for qualitative analysis because the intensities of the bands are proportional to the amount of material present. The intensities are proportional to the functional chemical group giving rise to the band. (Painter, Tr. at 1533).

It is undisputed that the characteristic absorption bands for crystalline polypropylene appear in the ranges near 7.25, 8.6, 10.03, 10.27 and 11.85 microns.[17] (Wiles, Tr. at 393–96; PTX 1785; *see Standard Oil*, 494 F.Supp. at 378). It is likewise undisputed that crystalline polypropylene does not absorb radiation at 13.7 or 13.9 microns. (*See Standard Oil*, 494 F.Supp. at 378; *cf.* Wiles, Tr. at 405, 406–09; Painter, Tr. at 1538).

The absorption band at 7.25 microns indicates the presence of methyl groups ($CH_3$). (Wiles, Tr. at 394; Painter, Tr. at 1535). The absorption band at 8.6 microns and the band at 10.27 microns are indicative of isolated methyl groups, *i.e.*, the methyl group is not attached to the adjacent carbon atoms. (Wiles, Tr. at 394–96).[18] The absorption bands at 10.03 and 11.85 microns are referred to as "helicity" bands because they indicate the presence of a helical configuration in the sample.[19] (Wiles, Tr. at 395–97). Both the 10.03 and 11.85 bands are thus sensitive to and indicative of crystallinity. (*See* Wiles, Tr. at 395–96 and Bailey, Tr. at 179–83; *cf.* Painter, Tr. at 1535–36).[20]

In the section 146 action, the Court found that the products of both Run EP–34 and Run EP–35, were *normally solid*. *Standard Oil*, 494 F.Supp. at 399–400. Phillips does not presently dispute that finding. When he recorded his experimental data and observations, Carmody himself noted that the products of the Runs were solid. For EP–34, Carmody described the product as "solid" and "rubbery, non-tacky", (DTX 175, p. 44; Bailey, Tr. at 2132; *Standard Oil*, 494 F.Supp. at 399–400), and he described the product of EP–35 as "solid" and "somewhat sticky to touch." (DTX 175, p. 45; Bailey, Tr. at 2136; *Standard Oil*, 494 F.Supp. at 400).

There is, however, substantial disagreement about the remaining two elements of the claim. On the record before him, Judge Wright found that the products of the two Runs did *not* consist *essentially of recurring propylene units*. 494 F.Supp. at 402.[21] Judge Wright also found, based upon the uncontradicted testimony of Doty, that EP–34 and EP–35 did produce products which had a *substantial crystalline content*. *Id.* at 403.[22]

**17.** The characteristic absorptions appear in the range of these particular micron measurements. As such, the characteristic bands are at times listed as 7.25, 8.56, 10.02, 10.29 and 11.91. (Painter, Tr. at 1533–34; PTX 11). For purposes of this Opinion, the figures are interchangeable.

**18.** *See also* PTX 1767B and *supra* at 1285.

The methyl groups ($CH_3$) are pendant, *i.e.*, hanging off the main chain (*see* Wiles, Tr. at 394–95) and isolated because they are not fastened to adjacent carbon atoms.

The methyl groups are isolated from one another by the intervening $CH_2$ groups. The 8.6 and 10.27 micron bands indicate this non-adjacent arrangement of methyl groups. (Wiles, Tr. at 395–96).

**19.** The polymer chain for polypropylene exhibits a helical configuration. That is to say, the three dimensional chain is in reality a coil. (Wiles, Tr. at 395). This is because all of the methyl groups will be on the same side of the chain but, because of steric hindrance, they will move to get as far away from one another as possible. (*See* Bailey, Tr. at 179–83). This causes the twisting of the chain. (*Id.*; Wiles, Tr. at 396–97). Steric hindrance is the interference caused by electric or steric repulsion by atoms of the same element. (*See* Bailey, Tr. at 113–16). Steric hindrance is akin to magnetic at-

traction and repulsion, *i.e.*, likes repel while opposites attract. (*Id.* at 116).

**20.** Dr. Painter testified that the 10.02, 10.29 and 11.91 bands are "particularly sensitive" to crystallinity. (Painter, Tr. at 1536). He associated the former two bands with vibrations emanating from the polymer backbone while he labeled the third a "$CH_2$ rocking" band. (*Id.* at 1535).

**21.** Briefly, Judge Wright found that infrared absorptions in the 13.7 and 13.9 micron range indicated long sequences of methylene units. He also found that the presence of those sequences is inconsistent with recurring propylene unit structure. The court found that the maximum methylene to methyl ratio allowable while still meeting the limitation of consisting *essentially* of recurring propylene units was 1.105. The testimony relied upon by Judge Wright indicated that the ratio in both EP–34 and EP–35 was above 1.5 and perhaps as high as 1.6. *Standard Oil*, 494 F.Supp. at 402. Methylene to methyl ratio ($CH_2/CH_3$) is a measurement of ethylene content. (*See* PTX 1348A).

**22.** Judge Wright noted that his finding did *not* imply that the products of EP–34 and EP–35 consisted essentially of recurring propylene units. He opined that "[a]pparently, propylene

On the present record, the dispute centers on the presence or absence of recurring propylene units and whether the solid polypropylene component consists "essentially" of those units. To be sure, the parties frequently state their arguments in general terms of whether there is a substantial crystalline polypropylene content but the proofs are directed at the issue of whether recurring units are present. To summarize, Phillips argues that the products of EP–34 and EP–35 cannot consist essentially of recurring propylene units because they are, in point of fact, copolymers of propylene and ethylene with such a substantial ethylene content, *i.e.*, methylene sequences, so as to preclude a determination that they consist *essentially* of recurring propylene units.

Conversely, the lynchpin of Defendants' reliance upon the '257 patent is their argument that the solid polymer fractions recovered in Runs EP–34 and EP–35 were mixtures of crystalline polypropylene and random ethylene/propylene copolymer. (*See* Grubbs, Tr. at 1764).[23] The argument has three premises: (1) there is a substantial isotactic polypropylene component in each of the solid fractions; (2) there is likewise a substantial ethylene content in each of the two fractions; and (3) the methodology employed in isolating the solid fraction as well as the literature indicate

that both isotactic polypropylene and ethylene in such large amounts simply cannot coexist in a copolymer. In other words, because of the presence of both of these two chemical structures, the solid fraction cannot be an ethylene/propylene copolymer and hence must be a mixture of crystalline polypropylene and ethylene/propylene copolymer. If it is indeed a mixture, the polypropylene, according to Defendants, would consist essentially of recurring propylene units and the ethylene would be in a separate copolymer. The Court will consider Defendants' argument as to both EP–34 and EP–35.

### 1) *EP–34*

The solid fraction from EP–34 was submitted by Carmody for infrared analysis (*see* DTX 213) and a partial spectrum of a sample was obtained by Dr. Raymond Hopkins of Standard in 1950. (DTX 217).[24] There is no dispute that the trace (DTX 217) exhibits absorptions at about 8.63, 10.-05, 10.29 and 11.85 microns, all characteristic of crystalline polypropylene. (Painter, Tr. at 1537–38; DTX 217).[25] There is likewise no dispute that the trace also exhibits absorptions in the 13.73 and 13.89 micron ranges associated with the presence of recurring methylene sequences, *i.e.*, ethylene content. (Painter, Tr. at 1538; DTX 217).[26]

samples will absorb infrared radiation in the 10.03 and 11.85 micron regions when the polymer contains some segments of as few as ten propylene units arranged in a recurring fashion. Absorption in this region therefore does not eliminate the possibility that long methylene sequences might interrupt these segments." *Standard Oil*, 494 F.Supp. at 403 n. 299 (citations omitted).

**23.** Defendants concede that the so-called mixture theory regarding the solid portions of EP–34 and EP–35 was not argued by any of the parties in the section 146 action before Judge Wright. (DRB at 28).

**24.** The sample was obtained on a single beam instrument which recorded absorption peaks in the 7.5 to 15.0 micron range. (Painter, Tr. at 1537). As such, the spectrum is "partial" inasmuch as it does not extend to the 7.25 range, which is indicative of the general presence of methyl groups.

**25.** As noted *supra*, the absorptions fall within a range. Hence the 8.63 correlates to 8.56, 10.05 to 10.02 and 11.85 to 11.91 micron bands. (*See* Painter, Tr. at 1537–38). Four of five characteristic bands are thus present with the fifth being off the scale. (*Id.* at 1538).

**26.** Specifically, the band at 13.73 microns is associated with three methylene units *in a row* ($-CH_2-CH_2-CH_2$), while the 13.89 micron band is associated with the presence of five or more methylene units *in a row* (... $CH_2-CH_2-CH_2-CH_2-CH_2$ ...). (Painter, Tr. at 1538). Ethylene is a mono-olefin composed of two carbon atoms and four hydrogen atoms, variously:

$$(C_2H_4); \quad (CH_2 = CH_2); \quad \text{or} \quad \begin{matrix} H & H \\ | & | \\ H-C = C-H. \end{matrix}$$

Hence, three methylene sequences in a row can result from a molecule of ethylene between two units of propylene:

Dr. Paul Painter, Defendants' expert in infrared spectrography, testified that based on his interpretation of the spectrum for EP-34, his calculation of the percent ethylene content contained in the solid fraction, and his review of the steps taken by Carmody to prepare and isolate the solid fraction, the solid fraction was indeed a mixture of crystalline isotactic polypropylene and ethylene/propylene copolymer. (Painter, Tr. at 1546–51). Painter did concede that *based upon spectrum alone,* one cannot conclude that the solid product is, in fact, a mixture as contrasted with a homogeneous "block" copolymer. (Painter, Tr. at 2734–35, 2738, 2742–43).

a) *Percent Crystalline Polypropylene*

Painter testified that the solid polymer fraction of EP-34 contained between 30 and 35% isotactic polypropylene. (Painter, Tr. at 1560, 1563). In reaching that conclusion, Painter relied on papers by Luongo (DTX 452) and Sibelia, et al. (DTX 507). To generalize, both papers teach that the percent of isotactic polypropylene (or the percent atactic polypropylene, which when subtracted from 100%, leaves percent isotactic) can be obtained by determining the ratio between the 10.27 and 10.03 bands.[27] The closer the ratio to 1.0, the larger the percentage of crystalline polypropylene

$$[CH{-}CH_2{-}CH_2{-}CH_2{-}CH$$
$$CH_3 \qquad CH_3\,].$$

(Painter, Tr. at 1539; *see* PTX 1834). The one unit of methylene from the propylene and two units of methylene from the ethylene lead to three methylene units in a row. (Painter, Tr. at 1539). For the sequences of five units, there would be two ethylene units, *i.e.,* four methylene units, plus one from the propylene leading to five. (*Id.*)

**27.** Sibelia teaches that the absorbence ratio (10.03 microns/10.27 microns) for 100% isotactic polypropylene is 1.00, meaning that the 10.27 and 10.03 peaks are identical in height (or depth) measured from a baseline drawn between the two crests. The ratio for 0% isotactic polypropylene, *i.e.,* 100% atactic polypropylene, is 0.180, meaning that the 10.27 band is substantially larger. (DTX 507, table 1).

Luongo's figure four sets out a graph which plots the ratio of 10.27 to 10.03 bands (10.27 microns/10.03 microns) from 1.0 to 6.0, as the vertical axis and percent atactic polypropylene as the horizontal axis. According to Luongo,

present in the sample. In Dr. Painter's opinion, there was a "substantial amount" of polypropylene crystallinity in EP-34 which is evident from "just eyeballing the ratio of the 10.05 and 10.29 micron bands." (Painter, Tr. at 1563).

Phillips' infrared expert, Dr. Wiles, was of the opinion that the ratio of the 10.05 to 10.29 bands was "considerably less than one." (Wiles, Tr. at 1948). As such, Dr. Wiles concluded that the trace evidenced a copolymer of propylene and ethylene which is "very rich" in ethylene. (*Id.*) Further, according to Wiles, even if there were only a small amount of crystalline polypropylene present, the ratio of the 10.05 to the 10.29 band would still be at or approaching 1.0. (Wiles, Tr. at 1946).[28]

The paper of Luongo tends to support Painter's conclusion that in mixtures of atactic and isotactic polypropylene, the ratio will be much less than 1.0 when there is a substantial atactic component. Although he disagreed with Painter, Wiles never advanced an opinion regarding the percentage of crystalline polypropylene present in EP-34. He merely disagreed that the spectrum evidenced a mixture and was of the opinion that the spectrum was indicative of a random copolymer. Wiles noted that in EP-34 it was "entirely feasible" that se-

the ratio of 1.0 equals 0% atactic, or 100% isotactic, while a ratio of nearly 6.0 equals 100% atactic, or 0% isotactic polypropylene. (DTX 452, fig. 4). This is born out in figure 3 which sets forth spectra for four different samples of known isotactic polypropylene content. (*Id.,* fig. 3C).

Luongo concluded:

Of particular interest ... are the bands at 974 [10.27] and 995cm−1 [10.03]. In the 100% isotactic spectrum both bands are of the same intensity, whereas in the 100% atactic spectrum, the 995cm−1 [10.03] band is only a shoulder, while the intensity of the 974cm−1 [10.27] remains the same.

(DTX 452 at 305).

**28.** Defendants urge that Wiles' conclusion is incorrect because, while the ratio of these two bands approaches 1.0 in 100% isotactic polypropylene, in a mixture of crystalline isotactic polypropylene and atactic polypropylene, the ratio would not be 1.0 because the contribution of the two materials are additive, *i.e.,* "[t]he final spectrum is the average, weighted composite reflecting the overall composition of the mixture...." (DRB at 29).

quences of propylene units long enough to show helicity, *i.e.*, to show an absorption at 10.02 microns, were present, (Wiles, Tr. at 1991), but that the infrared spectrum of EP–34 provided no evidence that independent, isolatable, purely crystalline polypropylene molecules were present. (*Id.* at 1990).

I accept Dr. Wiles testimony that the ratio of the 10.05 to 10.29 band is less that one. The evidence presented does not strongly indicate the degree of crystalline polypropylene present or indeed whether there is any present at all. Defendants have failed to prove that there was a substantial crystalline polypropylene content in Run EP–34.

### b) *Percent Ethylene Content*

Painter calculated the percent ethylene content of EP–34 at 37% (Painter, Tr. at 1545; DTX 458).[29] Wiles was in substantial agreement with the methodology and the resulting figure. (Wiles, Tr. at 1950, 1993). Relying on the 37% ethylene figure, Defendants contend that such a large amount of ethylene could not be *randomly* distributed in the solid product of EP–34 because the spectrum clearly shows absorptions in the range attributed to crystalline polypropylene. (Painter, Tr. at 1555–57). In essence, Painter concluded that in samples with ethylene content of greater than 20% by weight that is randomly incorporated into the polymer chain, there is no polypropylene crystallinity because there are insufficient sequences of ethylene units remaining to crystallize into polypropylene. (Painter, Tr. at 1556–57; *see* DTX 455; DTX 506).[30] Painter noted that there is no evidence of polyethylene crystallinity in EP–34. (Painter, Tr. at 1544–45).

Dr. Wiles testified that the 37% ethylene content in EP–34 would be consistent with a high ethylene content copolymer. (*See* Wiles, Tr. at 1949). The significant absorptions at 13.7 and 13.9 microns are indicative

of long sequences of three and five or more methylene units respectively. (Wiles, Tr. at 408, 1949–50). The clear import of Dr. Wiles' testimony is that the presence of these long methylene units is inconsistent with the presence of essentially recurring propylene units.

On this point, I find Dr. Wiles' testimony more credible. Defendants admit that there is no polyethylene crystallinity exhibited in the spectrum for EP–34. As such, their argument is that because there is so much ethylene, it must be in an ethylene/propylene copolymer which is then, in turn, mixed with crystalline isotactic polypropylene. (*But see* Wiles, Tr. at 1994–97).

Dr. Wiles was of the opinion that there simply was no evidence to indicate that the solid product of EP–34 was a mixture. Terming the mixture theory a "shot in the dark", he noted that "[t]here is no such spectrum that anyone has ever produced that—like this one, EP–34, Exhibit 217, that derives from a mixture of the kinds of materials [Defendants] are talking about." (Wiles, Tr. at 1994–95). He further indicated that in a mixture of 25% crystalline isotactic polypropylene and 75% ethylene/propylene copolymer, he would *not* expect to see absorptions at either 10.05 or 10.29 microns, both of which appear in DTX 217. (*See* Wiles, Tr. at 1997–98). Thus, Wiles concluded that because the ratio of the 10.02 and 10.29 micron bands is considerably less than one in EP–34 and there is a significant absorption at 13.7 and 13.9 microns, indicating long sequences of methylene units, and there is a 37% ethylene content but no eythlene crystallinity, the solid product of EP–34 could not be a mixture. (Wiles, Tr. at 1947–50).

Further, Phillips' expert in polymerization, Dr. Bailey, testified that because the EP–34 solid fraction was soluble in xylene at room temperature, the product was not a mixture. (Bailey, Tr. at 2266–67, 2454–55). Reasonable molecular weight crystalline

---

29. Painter relied on a paper by Gardner (DTX 456) which provides a methodology for calculating percent ethylene content in copolymers with more than 20–25% ethylene content. (*See* Painter, Tr. at 1540, 1545; Wiles, Tr. at 1895, 1950).

30. Painter indicated, relying on an article by Drushel (DTX 455) that in a sample with 76.5% by weight propylene and 23.5% by weight ethylene, there is "practically no polypropylene crystallinity." (*See* Painter, Tr. at 1555–56; DTX 455, figure 6; *see also* Painter, Tr. at 1552–55).

polypropylene is *insoluble* in xylene at room temperature, whereas Carmody's solid fraction was soluble in xylene at room temperature. (*Id.* at 2266, 2455).[31]

As such, I conclude that Defendants failed to prove that Run EP–34, carried out in accordance with the processes of the '257 patent, produced a product consisting essentially of recurring propylene units. The evidence indicates the product is more likely a rubbery, ethylene-rich copolymer of ethylene and propylene.

### 2) *EP–35*

An infrared spectrum from a single beamed instrument was also obtained for the solid polymer fraction from EP–35. (DTX 219; Painter, Tr. at 1568).[32] Dr. Painter testified that the spectrum of EP–35 exhibited absorption peaks at about 7.25, 8.56, 10.02, 10.29 and 11.91 microns, characteristic of crystalline polypropylene (Painter, Tr. at 1564), and that there is "very little" absorption in the 13 to 14 micron range for ethylene content. (*Id.* at 1566–57). At the time that the spectrum was taken, the analyst calculated a methylene to methyl ratio of 4.0. (DTX 175; DTX 180, at 9).[33] This calculation indicates a degree of ethylene content.

In mid–1953, a second spectrum (DTX 228)[34] was obtained on the solid fraction from EP–35 on a more refined double beamed instrument. Dr. Painter stated that the absorption in the ethylene range for EP–35 as recorded on DTX 228 was "clearly less" than for EP–34. (Painter, Tr. at 1573). Dr. Painter testified that the second spectrum showed the same five absorption peaks for crystalline polypropylene. (Painter, Tr. at 1569–70). He also testified that unlike the earlier spectrum, the 1953 spectrum showed one weak broad absorption in the 13 to 14 micron range centered near 13.68 microns. (Painter, Tr. at 1570, 1635–36, 1639, 1689, 2678–79).

Dr. Wiles disputed Dr. Painter's interpretation of the tracing in the 13 to 14 micron region for the second EP–35 spectrum and concluded that there were indeed two bands, one at 13.7 microns and one at 13.9 microns. (*See* Wiles, Tr. at 1900, 2002–03). Further, Judge Wright noted that both Standard Oil's and DuPont's experts recognized absorptions at 13.7 microns and 13.9 microns in the section 146 action. (*See Standard Oil*, 494 F.Supp. at 400–02).

#### a) *Percent Crystalline Polypropylene*

Dr. Painter testified that the solid fraction of Run EP–35 contained 35 to 40% crystalline, isotactic polypropylene. (Painter, Tr. at 1576). As in EP–34, Dr. Painter relied upon the Luongo paper in reaching this conclusion. (*Id.* at 1575–76). Dr. Painter was of the opinion that the extent of polypropylene crystallinity exhibited in Run EP–35 was "substantial." (*Id.* at 1576).

Dr. Wiles, however, was unable to draw a conclusion as to the degree of crystalline polypropylene present in the solid product

---

**31.** Defendants dispute Dr. Bailey's conclusion by arguing that Carmody's failure to affirmatively record the observation of any precipitate after cooking the xylene solution of EP–34 (and EP–35) but prior to adding antisolvent is not an indication of the solubility of the solid fractions in xylene at room temperature. (DRB at 33). They contend that tests performed by Dr. Painter to obtain solutions containing low concentrations of precipitated commercial crystalline isotactic polypropylene in xylene at room temperature "show that one could *not see* the 'precipitated' polymer by the naked eye at such low concentrations." (*Id.* noting DTX 518A–518F; Painter, Tr. at 2697–98; 2705–11; Grubbs, Tr. at 2829–34). This is because the crystals are single lamellae crystals and are thus difficult to see. (DTX 528, 529; Painter, Tr. at 2698–2705). Nonetheless, Defendants have failed to prove that these experiments are indicative of the solution that Carmody obtained during his runs or that Carmody's failure to record the observation of a precipitate resulted because of the low concentrations.

**32.** DTX 219 contains two spectra. The spectrum traced in red is that of Run EP–35. (Painter, Tr. at 1566).

**33.** By comparison, the methylene to methyl ratio calculated for EP–34 was 4.2. (DTX 180 at 9).

**34.** DTX 228 was taken on a more advanced instrument (Painter, Tr. at 1572) and is more complete than DTX 219. (Wiles, Tr. at 1925). Painter places "much more confidence" in DTX 228 (Painter, Tr. at 1572) and Wiles indicated that the spectrographer has "no choice" but to use the more complete spectrum. (Wiles, Tr. at 1425).

of EP–35. He testified that the spectrum run in 1953 indicated very severe oxidation. (Wiles, Tr. at 1925–28). A band occurred in the 3 micron range indicating the presence of hydroperoxide and another occurred in the 5.8 micron range representing ketone. (*Id.*) Both of these chemical compounds are "always formed" when polypropylene is oxidized. (*Id.%*)

Wiles stated that as oxidation occurs, the crystallinity of polypropylene *increases.* (*Id.* at 1929–30). As such, in a "significantly oxidized" polypropylene sample, the ratio of the 10.03 micron band to the 10.27 micron band is not an effective way of identifying the crystallinity of the sample. (*Id.* at 1930). Therefore, Dr. Wiles indicated that "[t]here is no way of knowing" the accuracy of DTX 228 as a trace of the *original* preoxidation solid product of EP–35. (*Id.; see* PTX 1479).[35] Prior to oxidation, the ratio would have been "very low" because the severe oxidation made the ratio artificially high. (Wiles, Tr. at 1946). Dr. Wiles again found no evidence of isotactic polypropylene and no evidence of recurring propylene units and, hence, disputed Defendants' mixture theory. (Wiles, Tr. at 1943–47).

Not surprisingly, Dr. Painter disagreed with Dr. Wiles' conclusion that DTX 228 was not an accurate way of evaluating EP–35. (Painter, Tr. at 2691–97). In brief, Painter testified that in EP–35 he would not expect, on a transmission spectrum, to observe any substantial difference in the ratio of the 10.03 micron band to the 10.27 micron band after oxidation. Painter, Tr. at 2696). Because the spectrum was obtained by transmission which looks at the sample as a whole, it is difficult to detect changes in ratios of bands. In other words, rather than looking at the oxidized portion only, for example, the surface of the sample, the transmission looks at the entire sample, thus mitigating the effect of the oxidation. If surface areas are oxidized, they are small compared to the bulk of the sample. (*See* Painter, Tr. at 2693–96). Further, Dr. Painter noted that the ratio of the 10.03 and 10.27 bands was "approximately the same" for DTX 219 and 228. He also noted that the oxidation of polypropylene occurs at room temperature. (*Id.* at 2697). There is no evidence that at the time EP–35 was made there were stabilizers or anti-oxidants to stem the oxidation process. (*Id.*) As such, one would expect more oxidation in the 1953 spectrum than in the 1950 spectrum. (*Id.*) Yet, these bands are roughly the same in both spectra. (*Id.*)

Again, I credit the testimony of Dr. Wiles that the ratio of the 10.05 and 10.29 bands is less than one. I likewise find that the presence of oxidation makes a calculation of the amount of crystalline polypropylene present, if any, at least difficult but certainly conjectural. Defendants have failed to prove that there was a substantial amount of crystalline polypropylene exhibited in run EP–35.

#### b) *Percent Ethylene Content*

The percent ethylene content of the solid product of EP–35 is the subject of fervent dispute. Dr. Painter calculated the percent ethylene content at 8%. (Painter, Tr. at 1574; *see* DTX 458).[36] Dr. Wiles disputed Dr. Painter's methodology and concluded that the 14.4% ethylene content figure would provide a minimum calculation of the ethylene content. (Wiles, Tr. at 1900–01). He estimated that the ethylene content could be as high is 20% but no higher. (*Id.* at 1914). In point of fact, Dr. Painter ultimately testified that the ethylene con-

---

**35.** The spectrum for DTX 219 does not extend to the ranges which indicate oxidation. (Wiles, Tr. at 2011–12). As such, it is not clear when the oxidation occurred. (*Id.*)

**36.** Specifically, Dr. Painter considered the 8% figure to be the most accurate of the three figures that he calculated. The first figure of 7.7% was reached using the "corrected" Brame method; the second figure of 14.4% was reached using Brame's conclusion as to where the second band in the methylene region occurred (Painter did not see that band); and the ostensibly "more accurate" figure of 8% was extrapolated from the Gardner method. (*See,* Painter, Tr. at 1574–75; DTX 458). A third method, the Paxson and Randall, or Phillips method, (DTX 457) was inappropriate because it relates to low ethylene content samples—less than 5% ethylene. (*See* Painter, Tr. at 1542; Wiles, Tr. at 1895–98).

tent was "more than 5[%], up to 15[%], certainly less that 20[%] and less than EP–34." (Painter, Tr. at 1682). As such, both experts agreed that 20% was the ceiling for ethylene content.[37]

Dr. Painter indicated throughout his testimony that he was seeking to establish an approximation of ethylene content, *i.e.,* a "rough ball park estimate" rather than an accurate account to three significant digits. *(See, e.g.,* Painter, Tr. at 2677).

### 1)) *The Gardner Method*

As noted *supra,* in calculating percent ethylene content, Dr. Painter relied on a paper by Gardner (DTX 456) which provides for a methodology for calculating percent ethylene content in copolymers having more than 20–25% ethylene content. Gardner calibrated the bands in the spectrum by using a known composition, ethylene/propylene copolymer, and related the intensities of bands in a sample to those of the standard composition. *(See* Painter, Tr. at 1541; DTX 456). Thus, Dr. Painter used the 13.9 micron peak and extrapolated the proportion of total methylene amounts present. Because Gardner did not use standards with ethylene content below 20%, Dr. Painter was forced to extrapolate Gardner's curve downward and assumed that it would hold true below 20%. (Painter, Tr.

at 1681). According to Painter, the extrapolation could result in minor error but the figure is reasonable and provides, at the least, an upper limit. (Painter, Tr. at 1682; *see id.* Tr. at 2676–79).[38]

Dr. Wiles contended that because the Gardner method does not take into account the 13.7 micron band, any sequences of 3 methylene units in a row are not accounted for and hence a major source of ethylene is not considered in the calculations. (Wiles, Tr. at 1893–94). Wiles also concluded that because the figures in Gardner's report failed to report a 13.7 band, the standard material likewise had no 3 methylene unit sequences. (*Id.* at 1894–95). Because, in his opinion, EP–35 does exhibit a 13.7 micron band, the Gardner approach provides an inaccurate quantitative analysis of ethylene content. Finally, he noted that Gardner's paper used 25% ethylene content samples and no lower-ethylene content samples. (*Id.* at 1895). As such, the method is inappropriate for a copolymer with less than 25% ethylene. (*Id.*)[39]

There is little question that the Gardner method, while perhaps allowing an estimate of ethylene content, could provide only a rough approximation for EP–35. Indeed, Dr. Painter admitted that he only sought a "rough ballpark figure" and ulti-

---

**37.** Curiously, as contrasted with the solid product of Run EP–34, where Defendants argued that a high percentage of ethylene *a fortiori* indicated a mixture of crystalline polypropylene and random ethylene/propylene copolymer, in interpreting the ethylene content of the solid product of EP–35, Dr. Painter initially concluded that an ethylene content *29%* lower than the 37% he found was present in Run EP–34. For Run EP–34, Defendants argued that 37% ethylene was inconsistent with the presence of crystalline polypropylene and hence, because crystalline polypropylene was present according to Painter, the ethylene could not be randomly mixed with the polypropylene. The literature relied upon by Dr. Painter indicates that 20% ethylene content destroys polypropylene crystallinity. Yet, he testified initially that the ethylene content of Run EP–35 was only 8%. Thus, if Painter's calculations are correct, in EP–35, Defendants are left to argue either (1) there is so little ethylene that it is randomly distributed throughout recurring propylene units; or (2) from all of the evidence, EP–35 is a mixture.

**38.** To summarize Defendants' argument:

The proportionality factor linking the intensity of the 13.9 micron band to the *total* methylene content changes with composition as the relative proportion of sequences of 5 or more units. Consequently, the curve relating the intensity of the 13.9 micron band to total ethylene content is not entirely linear with composition, but curves somewhat. Gardner simply plotted the measured intensity of the 13.9 micron band against the *total ethylene content of known samples,* thus obtaining an empirical correlation (Painter 1594a–94b, 2676–78) and then found that the log of the experimentally fixed relationship between the 13.9 micron band and total ethylene content was linear with composition. This allowed Dr. Painter to extrapolate this straight line to obtain an estimate of the ethylene content of EP–35.

(DRB at 32 n. 46).

**39.** Additionally, Painter himself saw no absorbence at 13.9 microns. (*See* Painter, Tr. at 1636, 1689). He thus used Brame's calculation of the 13.9 absorbence in applying the Gardner method.

mately conceded that the ethylene content was in the "range" of 5 to 15%. I conclude that Dr. Painter's calculation of 8% is of little value in supporting Defendants' theory.

### 2)) *The Brame Method*

Dr. Painter applied the Brame method[40] to two different interpretations of the EP-35 spectrum. (*See* DTX 458). For the first calculation, Dr. Painter "corrected" Brame's analysis as given in the section 146 action by using only the weak broad 13.7 micron band in the methylene region. (*See* Painter, Tr. at 1573–75; Wiles, Tr. at 1900–01; DTX 458). This calculation led to a 7.7% ethylene content. The second figure, 14.4%, was arrived at through a consideration of both the 13.9 and 13.7 bands because Brame himself found two bands in that portion of the spectrum. (*See* Painter, Tr. at 1573–75; *Standard Oil*, 494 F.Supp. at 401 n. 285.)

Dr. Wiles concluded that Dr. Painter's recalculation of the $CH_2/CH_3$ ratio using *both* the 13.7 and 13.9 micron bands was "almost correct." (Wiles, Tr. at 1906). According to Dr. Wiles, the 14.4% figure was a minimum value of ethylene content. (*Id.*) He noted that on DTX 228 at the 9.2 micron (1080 cm–1), vertical calibration line, there is, for want of a better word, a "glitch" where a machine setting was altered. (*Id.* at 1906–07). As such, a direct comparison of the peaks to the left of the glitch with those to the right is "dangerous." (*Id.* at 1906–08). As it happens, the 13.7 and 13.9 bands occur to the right of the glitch, while the 8.56 micron band occurs to its left.[41] According to Wiles, the 8.56 micron band was traced while the machine was at a higher setting. He estimated the 8.56 band to be 20% larger than the 10.29 band. (*Id.* at 1914). Because the 8.56 is in the denominator of the $CH_2/CH_3$ ratio, that ratio is 20% too low. (*Id.*) Hence, Wiles concluded that 14.4% was a floor and 20% was a ceiling for ethylene content with the actual percentage close to 20%. (*See* Wiles, Tr. at 1906, 1914). In effect, Wiles used the methyl band at 10.29 microns in the ratio because the glitch distorted the 8.56 band. (*Id.* at 1917–18).

Dr. Bailey likewise testified that unlike products containing a crystalline polypropylene fraction, the EP–35 product was soluble in xylene at room temperature, indicating that EP–35 is *not* a mixture. (Bailey, Tr. at 2266–67, 2454–55).

I conclude that EP–35 had an ethylene content between 14.4 and 20%. Because EP–35 exhibits no polyethylene crystallinity (Wiles, Tr. at 1943–46), I conclude that it is more likely that the ethylene is randomly incorporated in an ethylene/ propylene copolymer. Like EP–34, the ratio of the 10.-02 and 10.29 micron bands is less that 1.0 and there are bands at 13.7 and 13.9 microns indicating methylene sequences of three and five or more. In short, the product of Run EP–35 does not consist essentially of recurring propylene units. Again, Defendants have failed to carry their burden on this issue.

### 3)) *Other Experiments*

#### a)) *Maury*

In June and July, 1955, Dr. L.G. Maury of Hercules performed several polymerizations of propylene using molybdena and molybdate catalysts. (DTX 144, 145). A

---

**40.** The Brame method involves a calculation of the methyl to methylene ($CH_2/CH_3$) ratio in the sample. In other words, the approach involves the comparison of the 8.56 micron band related to isolated methyl groups and the 13.7 and 13.9 micron bands attributable to three and five unit sequences of methylene. A conversion table for $CH_2/CH_3$ ratio and % ethylene by weight appears at page 47 of the Glossary, D.I. 206.

**41.** The 10.29 band, associated with isolated methyl groups also falls to the right of the glitch. In a normal trace, the 10.29 band should be approximately equal to or slightly greater than the 8.56 band. (Wiles, Tr. at 1909). Wiles knew

of no exceptions to this in real spectra of polypropylenes. (*Id.* at 1910). In EP–35, the 10.29 band is clearly the smaller peak, both in height and width. (*Id.* at 1912). As such, Wiles was of the opinion that "the ratio of methylene to methyl obtained by Dr. Brame and obtained much more recently by Dr. Painter is going to be on the low side because in the denominator of that ratio is the absorbence of the ... 8.56 micron band ... which was traced in the chart when the machine setting was at ... a higher value. That is why I keep saying 14.4[%] is a minimum value. The actual value is higher than that." (*Id.* at 1912–13).

weekly summary from July 5, 1955, authorized by Dr. E.J. Vandenberg, noted that the results of the polymerizations produced "a small amount of crystalline polypropylene [which] was isolated from a reaction conducted according to the teachings of [the '257 patent]" using the cobalt molybdate catalyst. (DTX 149 at 1, 6).

Phillips contends that contrary to Vandenberg's indications, the Maury runs were not carried out in accordance with the '257 patent. According to Phillips, Maury deviated from the catalyst activation teachings by allowing the catalyst to cool overnight under hydrogen. (See DTX 145 at 72, DTX 144 at 16). This allegedly allowed water to form on the catalyst in contravention to the '257 patent's teaching that water should be avoided. (See DTX 62, col. 6, lines 53–61).[42]

Defendants have produced no scientific analysis such as infrared or x-ray tests to substantiate Dr. Vandenberg's contemporaneous conclusion that the product was indeed crystalline polypropylene, let alone crystalline polypropylene within the meaning of the claim. Without reaching the issue of whether the Maury experiments were, in fact, conducted within the teachings of the '257 patent (an issue on, which again, Defendants have failed to point to record evidence), I conclude that Dr. Vandenberg's conclusions do not assist in establishing that the '257 patent inherently anticipates the '851 patent.[43]

#### b)) Zletz

In support of its legal theory that in order to anticipate under principles of inherency, the '257 patent must "necessarily and inevitably" produce a product within the claim of the '851 patent, Phillips relies upon two runs, AZ–14 and AZ–20, conducted by Zletz in August and September, 1950. (See PTX 405 at 93, 117; PTX 1849; see Bailey, Tr. at 2087).[44] It is undisputed that both runs were conducted in accordance with the teachings of the '257 patent. (See id.; see also Bailey, Tr. at 2106; 2116).[45]

#### (i) Run AZ–14

In Run AZ–14, Zletz employed 15 g. of a 7.5% molybdena on alumina catalyst, the preferred (PTX 405 at 93, 117; PTX 1849; DTX 62, col. 3, lines 23–25; Bailey, Tr. at 2090) but less active catalyst of the '257 patent. (Carmody, Tr. at 1202–03).[46] Consistent with the description of the product of propylene in the '257 patent, Zletz described the product of Run AZ–14 as being a "rubbery solid." (PTX 405 at 98; DTX 62, col. 3, lines 9–13; Bailey, Tr. at 2105, 2114). Zletz submitted the AZ–14 product for infrared analysis and reported a methylene to methyl ratio ($CH_2/CH_3$ ratio) of 7.2 (PTX 405 at 110; PTX 409; Peters, Tr. at 1376–77), indicative of a very high ethylene content. By contrast, a product composed entirely of recurring propylene units has a

---

42. Phillips also notes that Maury's notebook entries for the catalyst activation step do not indicate any alteration of technique in order to avoid the formation of water. (See DTX 144 at 9).

43. Defendants failed to mention the Maury experiments in their opening brief and refer to them in a footnote in their reply brief. (See DRB at 34 n. 50).

44. Judge Wright found that Zletz's polymers did not meet the limitations of the Count. Standard Oil, 494 F.Supp. at 398. Further, "[s]ince Zletz's runs produced products that were no more satisfactory than those of Carmody ...," Judge Wright focused solely on Carmody's runs. Id. Judge Wright also noted that at trial Standard did not rely on the runs as an actual reduction to practice because they were totally uncorroborated. (Id.) In the instant action, Defendants simply raise no argument on the briefs and

point to no evidence in the record concerning these products. Rather, they argue that unsuccessful experiments wherein remote products are obtained go only to the weight of the evidence and do not defeat anticipation under section 102(e). (DRB at 28 n. 40).

45. Dr. Bailey did note that "cycling" was not expressly taught by the '257 patent. (Bailey, Tr. at 2093). By cycling, Bailey referred to the heating of the catalyst for activation and reducing it with hydrogen—pressuring, holding, depressurizing, evacuating and then repeating. (Id. at 2091–92). Grubbs indicated that sequential activation was within the skill of the art. (Grubbs, Tr. at 1817).

46. Carmody concluded, after experimentation, that the cobalt molybdate on alumina catalyst was "somewhat more active" than the molybdena aluminia catalyst for the polymerization of ethylene. (Id.; see DTX 176).

**1306**

methylene to methyl ratio of 1.0. (*See* Wiles, Tr. at 392–93; PTX 1767A, 1767B).

The infrared spectra of the AZ–14 product exhibited significant absorption in the 13–14 micron region, indicative of long methylene sequences, and establish that the product is either "largely" polyethylene or a copolymer of ethylene and propylene which is dominated by its ethylene content and which does not, therefore, consist essentially of recurring propylene units. The infrared spectra do not exhibit a pair of resolved absorption bands near 10.02 and 10.29 microns, thus indicating that the AZ–14 product does not exhibit substantial polypropylene crystallinity. (Wiles, Tr. at 1950–60, 1967; PTX *see* 1362A–D).

Run AZ–14 was carried out within the process teachings of the '257 patent and the resulting polyethylene or ethylene-dominated copolymer of ethylene and propylene was not within the claim of the '851 patent. (Bailey, Tr. at 2087, 2105–06; *see* Wiles, Tr. at 1955–56, 1959, 1967).

### (ii) *Run AZ–20*

As in Run AZ–14, in Run AZ–20, Zletz employed 15 g. of a molybdena on alumina catalyst, which Dr. Bailey indicated was apparently identical to the one used in AZ–14 and is the preferred (PTX 405 at 117, 1849; DTX 62, col. 3, lines 23–25; Bailey, Tr. at 2116–17) but less active catalyst of the '257 patent.

Consistent with the description of the product of propylene in the '257 patent, Zletz described the unextracted polymer remaining adhered to the catalyst as being "rubbery" and also described the product recovered in the third fraction as being a "sticky solid." (PTX 405 at 118–19, 1849; DTX 62, col. 3, lines 9–13; Bailey, Tr. at

2123–24). Zletz submitted two fractions of Run AZ–20 for infrared analysis. Dr. Hopkins reported methylene to methyl ($CH_2/CH_3$) ratios of 8, indicative of very high ethylene content as well as his observation that the "spectra [were] identical to that of AZ–14." (PTX 435; Peters, Tr. at 1391–92).

The infrared spectra for the AZ–20 product show significant absorption in the 13–14 micron region, indicative of "very long" methylene sequences, establishing that the product is either "virtually entirely" polyethylene or a copolymer of ethylene and propylene which is dominated by its ethylene content and does not, therefore, consist essentially of recurring propylene units. The infrared spectra do not exhibit a pair of absorption bands near 10.02 and 10.29 microns, thus indicating that the AZ–20 product does not exhibit substantial polypropylene crystallinity. (Wiles, Tr. at 1961–67; *see* PTX 1362E, F).[47]

Run AZ–20 was carried out within the process teachings of the '257 patent and the resulting polyethylene or ethylene-dominated copolymer of ethylene and propylene is not within the claim of the '851 patent. (Bailey, Tr. at 2087 2105–06, 2115–25).[48]

### c. *Chemistry*

The final dispute over anticipation by the '257 patent centers on Phillips' assertion that the catalysts employed in the Carmody experiments foster concurrent competing reactions in addition to propylene polymerization, including disproportionation,[49] ethylene polymerization and alkyla-

---

**47.** PTX 1362E and F also contain the handwritten notation "polyethylene—Zletz" in addition to the handwritten word "polypropylene." (*See* Wiles, Tr. at 1962–63).

**48.** Dr. Bailey testified that for both AZ–14 and AZ–20, the product recovered was indeed representative of the product referred to in the '257 patent. The patent described the product as rubbery and so did Zletz. Propylene was the feed used in Run AZ–14 and Run AZ–20. Dr. Bailey concluded that "since [Zletz] use[d] the same adjective, and the conditions appear to be

within the teachings of how to run the polymerization according to the patent, that combined with his description, [it] sounds like he got the material described in the patent." (Bailey, Tr. at 2106; *see* DTX 1849; Bailey, Tr. at 2087, 2105–06, 2123–25).

**49.** Disproportionation of propylene converts two molecules of propylene to one molecule of ethylene and one molecule of 2-butene. (*See* PTX 116; Bailey, Tr. at 2107, 2137; Grubb, Tr. at 1762). $2(C_3H_6)$ thus becomes $C_2H_4$ and $C_4H_8$.

tion.[50] According to Phillips, these competing reactions lead to the formation of either polyethylene or ethylene/propylene copolymers rich in ethylene content. (*See* Bailey, Tr. at 2137, 2148–49, 2158).

### 1) *Disproportionation*

In point of fact, there is little, if any, dispute that the molybdena and cobalt molybdate catalysts disproportionate propylene under the catalyst activation procedures and reaction conditions of the Zletz patent. (*See, e.g.,* Bailey, Tr. at 2107–12, 2125–26, 2158, 2254–55; Grubbs, Tr. at 1795, 2818, 2821–27; Peters, Tr. at 1414–15; Carmody, Tr. at 1249; *see also* DTX 509; PTX 1568).[51] Defendants admit that the cobalt molybdate catalyst will cause disproportionation under certain conditions. (*See* DRB at 33).

Dr. Grubbs indicated that because there is ethylene present in the solid products of Runs EP–34 and EP–35 (relying upon the testimony of Dr. Painter), it is reasonable to assume that *some* disproportionation occurred. (Grubbs, Tr. at 1763–64). Dr. Bailey similarly contended that disproportionation occurred in Carmody's experiments. (*See Standard Oil*, 494 F.Supp. at 401 n. 283; Bailey, Tr. at 2137; *see also* Bailey, Tr. at 2105–08 (disproportionation in AZ–14 and AZ–20)). According to Grubbs, because of disproportionation, it is not unusual to charge propylene in the feed of an experiment and wind up with polyethylene or ethylene/propylene copolymer as the re-

sultant product. (*See, e.g.,* Grubbs, Tr. at 1795).

Phillips' argument is straightforward. Disproportionation occurs at the outset of the reaction. Thus, propylene is immediately broken into ethylene and 2–butene. Because ethylene polymerizes more rapidly than propylene,[52] the ethylene is more rapidly incorporated into the polymer chain. As such, the chemical reaction fosters ethylene/propylene copolymers because the development of long sequences of ethylene prevents the polymerization of long sequences of recurring propylene units.

Defendants counter that there is an induction period[53] before disproportionation begins when the polymerization of propylene occurs. Thus, long sequences of recurring propylene units can, in fact, form before any disproportionation occurs, *i.e.,* before any ethylene is produced.

The main dispute, therefore, is over precisely when the disproportionation commences. Phillips points to no testimony by Dr. Bailey in support of its contention that disproportionation occurs immediately. Several articles do indicate that when employing the catalysts and under the conditions set forth therein, disproportionation occurs virtually immediately. (*See* PTX 1568; DTX 509, 150).

On the other hand, Dr. Grubbs, who has published a number of papers dealing with disproportionation (*see* DTX 404), indicated in general terms that "past studies" estab-

**50.** Alkylation is the chemical attachment of molecules of propylene to molecules of aromatic compounds like xylene and benzene. (*See generally,* Bailey, Tr. at 2137–50).

**51.** The propensity of the molybdena catalyst to disproportionate propylene to ethylene and 2–butene is confirmed in two reports. A report summarizing experimental work by Dr. Nozaki at Shell in 1958 indicates that ethylene was detected in the exit gases during the polymerization of propylene over a molybdenum oxide on alumina catalyst. (DTX 142 at 5; Bailey, Tr. at 2253–59). Likewise, a report summarizing experimental work by Dr. Eleuterio of DuPont in 1956 indicates that Eleuterio concluded that the molybdena on alumina catalyst "makes propylene-ethylene copolymers." (PTX 1491 at 1; *see* Bailey, Tr. at 2294–96; 2298–2303). Eleuterio also detected ethylene as an exit gas. (DTX 1491 at 10).

**52.** There was general agreement between Bailey and Grubbs that ethylene reacts faster than propylene, although there was no explicit agreement as to precisely how much faster. (*See* Grubbs, Tr. at 1839; Bailey, Tr. at 2105–08). Grubbs would not agree that in Runs EP–34 and EP–35 ethylene was 5 to 10 times more reactive than propylene. (Grubbs, Tr. at 2863). Dr. Bailey indicated that ethylene is generally 7 to 10 times more reactive than propylene. (Bailey, Tr. at 2107).

**53.** Generally speaking, an induction period is when active catalyst sites are being prepared on the catalyst surface, *i.e.,* metal is interacting with the olefin to prepare the active catalyst. (*See* Grubbs, Tr. at 1766).

lish that there can be significant induction periods before disproportionation occurs. (*See* Grubbs, Tr. at 1765–66).[54] Yet, when pressed on cross-examination, Grubbs could point to no specific papers and instead relied upon Peters' experiment P-1.[55] (Grubbs, Tr. at 2864–66). "P-1 is a situation where we have a cobalt molybdate catalyst which is treated with propylene and it produces crystalline polypropylene." (*Id.* at 2866). Likewise, in reaching his conclusion that disproportionation occurred only after an induction period, Grubbs circuitously relied on his overall premise that the products of EP-34 and EP-35 were mixtures. (*Id.* at 1767). His inference was that *because the products were mixtures,* they were a product of a heterogeneous reaction. (*Id.*) According to Grubbs, if alternatively, the disproportionation and polymerization had followed the same time course, then the resulting products would have been homogeneous, *i.e.*, ethylene/propylene copolymers. (*Id.*) In essence, Grubbs concluded that because of his opinion that the resulting product was a mixture, when active propylene was introduced to the catalyst, there was initially a polymerization producing crystalline polypropylene. Subsequently, disproportionation would produce ethylene which would then form ethylene/propylene copolymer. (*Id.*) The result would be a mixture of crystalline polypropylene and random ethylene/propylene copolymer. (*Id.*) Of course, Grubbs' use of the ultimate conclusion that he was seeking to reach as the basis for reaching a conclusion which ostensibly supports that ultimate conclusion is a questionable exercise in deduction. The evidence at trial did not indicate that crystalline polypropylene could not be formed due to disproportionation when using the Zletz catalysts but it did tend to show that ethylene/propylene copolymers are formed by the Zletz catalysts. The evidence regarding the existence of an induction period and whether a substantial amount of crystalline polypropylene could

be formed within that induction period is equivocal.

Based on all of the evidence, I conclude that some disproportionation does indeed occur in the Zletz process. While the evidence as to the length of an induction period is equivocal, it is clear that the presence of disproportionation decreases the amount of propylene available for polymerization and hence decreases the amount of polypropylene which *could* be produced under the Zletz catalysts.

### 2) Ethylene Polymerization

As noted *supra,* there was a general agreement between Grubbs and Bailey that ethylene polymerizes roughly five to ten times faster than propylene over the catalysts of the '257 patent. (*See, e.g.,* Grubbs, Tr. at 2863; Bailey, Tr. at 2107). Phillips thus argues that after disproportionation, the ethylene is incorporated in polymer chains more rapidly and in greater relative amounts than propylene. Hence, the polymer produced cannot consist essentially of recurring propylene units.

Clearly, the catalysts do polymerize ethylene. Both EP-34 and EP-35 undisputably contain measurable ethylene content. Phillips' argument flows from its disproportionation argument and, I conclude, as *supra,* that the evidence adduced does not indicate that crystalline polypropylene could not be formed but it does show that ethylene/propylene copolymers are formed by the Zletz catalyst. More succinctly, Defendants have proven no more than the probability of a copolymer.

### 3) Alkylation

In the presence of propylene and aromatic compounds like benzene and xylene, the molybdena and cobalt molybdate catalysts produce alkylated aromatic compounds, such as isopropylbenzene and isopropylxylene. (*See* DTX 62, col. 11, lines 71–73; DTX 175 at 56, 67; PTX 1872; Carmody, Tr. at 1248–49; Peters, Tr. at 1414;

---

**54.** Grubbs indicated that the history of the catalyst will affect the length of the induction period. (Grubbs, Tr. at 1833–34).

**55.** Peters' experiments are discussed *infra* under Defendants' contentions on Obviousness.

Bailey, Tr. at 2081–82, 2137–50, 2158).[56] Like disproportionation, the alkylation reaction consumes propylene in a manner that does not produce a propylene polymer. (Bailey, Tr. at 2149). As such, the amount of propylene monomer relative to ethylene monomer and alkylated aromatics is reduced. (*Id.* at 2149–50).

I conclude that the chemical reactions fostered by the Zletz '257 patent indicate that ethylene/propylene copolymers are produced by the patent's process. While the existence of these chemical reactions does not conclusively prove that crystalline polypropylene could not be formed under the patent, nonetheless the presence of these reactions establishes that the Zletz catalysts polymerize ethylene more rapidly than propylene and cause propylene to alkylate, thus decreasing the amount of propylene for polymerization in a given experiment.

Defendants must prove by clear and convincing evidence that the '851 patent reads on the '257 patent either expressly or under principles of inherency. The '257 patent plainly does not expressly teach the invention crystalline polypropylene. Further, analysis of both of Carmody's runs relied upon by Defendants indicates that crystalline polypropylene is not revealed in the '257 patent under principles of inherency. Defendants have failed to prove a substantial polypropylene fraction in either run. The presence of substantial amounts of ethylene in each run tends to indicate that crystalline polypropylene is not present. Further, the competing reactions fostered by the Zletz catalysts cast doubt on the efficacy of that catalyst in polymerizing propylene. In short, Defendants have failed to carry their burden of proving that the products of Runs EP–34 and EP–35 consisted essentially of recurring propylene units within the meaning of the claim of the '851 patent.

For all the reasons set forth above, I find that Defendants have failed to prove by clear and convincing evidence that the '851 patent reads on the '257 patent either expressly or under principles of inherency.

**B. Double Patenting**

During the course of pretrial proceedings, all Defendants, except for El Paso, moved for summary judgment on the issue of double patenting. The motions were decided by Judge Schwartz who held there was no double patenting. *Phillips Petroleum Co. v. United States Steel Corp.*, 604 F.Supp. 555 (D.Del.1985) (summary judgment opinion).

At trial, Defendants sought to introduce additional testimony on the same issue but Phillips objected citing the pretrial order. (D.I. 211). By that document, Defendants had stipulated that no additional evidence would be introduced on the issue. The Court sustained the objection and indicated that the introduction of additional evidence on the issue after the parties specifically agreed not to do so would be patently unfair. (Tr. at 692–96.) The Court saw no reason to disturb what it considered a final resolution of a question of law. The Court, however, allowed a proffer of what would have been introduced. (Tr. at 696). On that same basis, the Court also allowed testimony on the issue from Dr. Long. (Tr. at 913, *et seq.*)

In their post-trial briefs, Defendants have again raised the issue of double patenting. They contend, as they did earlier, that the '851 patent is invalid because it is either (1) the same invention, or (2) an obvious variation of the invention of claim 16 of U.S. Patent 2,825,721 ("the '721 patent"). They also claim now that Judge Schwartz's opinion is in error because he had assumed that "fractionation" as found in the specification of the '721 patent is an additional step beyond that of "recovering a resulting solid polymer" and that the "solid polymer" was therefore something different from the crystalline polypropylene of the '851 patent. (DB at 35). They also allege that Judge Schwartz's misunderstanding of "fractionation" led him to believe it was an additional step in the

---

**56.** This reaction is known as a Friedel–Craft reaction. (*See* Bailey, Tr. at 2081–82; 2146).

Defendants do not address alkylation in their briefs.

recovery of the solid polymer and, as such, the extra step was the difference between the two patents. They further allege that Judge Schwartz's decision on an "obvious variant" basis misconstrued the existing law by utilizing "dicta" in *Carman Industries, Inc. v. Wahl*, 724 F.2d 932, 940 (Fed. Cir.1983).

Although the Court had previously ruled that Defendants would be bound by the pretrial order, it is now apparent that the expanded trial record presents a different basis for ruling on the double patenting issue. The Court will accede to Defendants' request to rule on the double patenting issue.

The '851 patent and the '721 patent derive from a common application filed January 27, 1953. *Phillips Petroleum*, 604 F.Supp. at 558. That parent application and subsequent applications disclosed a chromium oxide catalyst and the production of polypropylene. Subsequent to the filing of the application, there was a protracted period of litigation, including interference proceedings, a section 146 action and then an appeal to the Third Circuit. Eventually, the case found its way back to the Patent Office where U.S. Steel filed a protest alleging double patenting on the same basis that Defendants are now raising. The Patent Office denied the protest. The parties once again raised the same issue before Judge Schwartz and he also decided the issue against Defendants.

Basically, Defendants contend that the '851 patent merely extends the term of the '721 patent thus constituting double patenting in violation of 35 U.S.C. § 101. They contend that the '851 patent represents either the "same" invention or an obvious variation of claim 16 of the '721 patent.

■ In any attack on the validity of a patent, we must begin with the presumption that the patent is valid. 35 U.S.C. § 282. In double patenting cases, the burden of proving otherwise is a heavy one. *Carman Industries, Inc.*, 724 F.2d at 940. *American Hoist*, 725 F.2d at 1360. The test for determining whether double patenting exists comprises a two part analysis;

*i.e.*, whether the patent in question is the "same" invention and, if not, whether the patent is an obvious variation of the other. *Application of Vogel*, 422 F.2d 438, 441 (C.C.P.A 1970).

As indicated in *Studiengesellschaft Kohle mbH v. North. Petrochem.*, 784 F.2d 351 (Fed.Cir.1986), the method for determining the "same invention" may take several different forms. In adopting the prior case law of the Court of Customs and Patent Appeals, the court indicated that double patenting has been variously decided based on "differences in claimed subject matter; on different statutory classes; on the existence of noninfringing uses; on differences in the breadth of the claims; and on the absence of cross-reading (whether the claims of one patent can be infringed without infringing the other). The criterion depended on the facts of the case." *Id.* at 355.

Applying these principles to the case at hand, it is clear that the product claim of the '851 patent is not the same invention as the process claim of the '721 patent. They claim different subject matter and different statutory classes. The sole claim of the '851 patent defines a new composition of matter, crystalline polypropylene. Claim 16 of the '721 patent, on the other hand, reads as follows:

A process which comprises polymerizing polypropylene at a polymerization temperature in the range of 150 to 250°F with a catalyst comprising, as the sole essential effective catalytic ingredients thereof, chromium oxide supported on silica alumina, said catalyst containing at least 0.1 weight per cent hexavalent chromium at the initial contacting of hydrocarbon with said catalyst, and recovering a resulting solid polymer.

There are two different things being claimed, with each being drawn to different inventive concepts.

Further, the catalyst of claim 16 can be made and sold without infringing the '851 patent. Indeed, one could infringe the '851 patent and not infringe claim 16 of the 721 patent. Defendants, for instance, admit that they literally infringe the '851 patent

because their products contain crystalline polypropylene. Yet, none of them use the '721 patent catalyst. Instead they use the Ziegler–Natta catalyst. Finally, claim 16 would permit the use of other monomers along with propylene so long as a solid polymer was produced. The production of coolymers would not infringe the '851 patent. *Phillips Petroleum,* 604 F.Supp. at 565. For all these reasons, Defendants' claim of same invention type double patenting is rejected.

In considering the question of obvious variation, the patent disclosure may not be used as prior art. *Application of Vogel, supra,* at 441; *In re Kaplan,* 789 F.2d 1574, 1579 (Fed.Cir.1986). This is not meant to infer that the disclosure may not be used at all. It may, for instance, be used as a dictionary to learn the meaning of the terms in a claim. It would not be appropriate, however, to indiscriminately use all the generalities of the disclosure. It is only that which is related to and supportive of the claim of the invention that may be used to determine the scope of the claim. *Cf. Application of Vogel, supra,* at 442. For it is the claim that is of importance in determining "what inventions the claims define." *Application of Sarett,* 51 CCPA 1180, 327 F.2d 1005, 1013 (1964).

Claim 16 of the '721 patent claims a process for the polymerization of propylene. As a result of using the process, one may recover a solid polymer. The claim does not specify what the polymer is. As a matter of fact, the claim is not directed to the resulting product. It is oriented to the process. In order to follow Defendants' argument on how the product of the '851 patent would be an obvious variation of claim 16, one would have to (1) read the disclosure at column 2, lines 32 to 55 of the '721 patent, (2) with that information one of ordinary skill in the art would deduce that the raffinate or insoluble portion left from the extraction with n-pentane or methyl isobutyl ketone was solid crystalline propylene and then (3) incorporate that in claim 16. But claim 16 does not purport to claim a product. It claims a process. To follow Defendants' position would be as unwarranted an expansion of claim 16, which refers only to a polymerization process for a "solid polymer" as was the attempt in *Vogel* to use the generalities in the disclosure relating to "meat" to expand the claim which refers to "pork." *Application of Vogel,* 422 F.2d at 442:

> *These assertions do not support the patent claims.* The patent claims recite "pork" and "pork" does not read on "meat." To consider these broad assertions would be using the patent as prior art, which it is not. The specification then states how the process is to be carried out with pork. This portion of the specification supports the patent claims and may be considered.

*Id.* at 442.

Finally and most importantly, it would also amount to using the disclosure as prior art.

Having restricted the use of the disclosure so that claim 16 stands unmodified as a polymerization process that results in a solid polymer that contains propylene, Defendants have produced no evidence to support their position on the obvious variation portion of double patenting. Defendants have not demonstrated that it would have been obvious to a person of ordinary skill in the art that solid crystalline polypropylene of claim 1 of the '851 patent would have been obvious from the solid polymer of claim 16 of the '721 patent. Plainly, the '851 patent does not have the effect of extending the term of the '721 patent.

Finally, having reached the same conclusion as Judge Schwartz in an obviously less expansive fashion, the Court does not mean to indicate an abandonment or rejection of the summary judgment decision. The Court accepts and incorporates that opinion to supplement this one with only one clarification. If the use of the word "fractionation" was construed to mean a process separate and apart from "recovery", then this Court would modify that interpretation to reflect only the following. This Court understands fractionation to mean the isolation or recovery of various raffinates. Any reference to fractionation as not being

a part of claim 16 means only that the product of the disclosure in column 2, lines 32–45 of the '721 patent should not be used to expand claim 16. In other words, the disclosed fractionation *and* its resultant product, solid crystalline polypropylene, may not be read to expand the process of claim 16 to include also a claim to a product. It is enough that the claimed process produces a solid polymer.

## C. Obviousness

■■■■■ Defendants next argue that the '851 patent is invalid for obviousness under 35 U.S.C. § 103.[57] In making that assertion, they rely *solely* upon the Zletz '257 patent and two experiments conducted by Edwin Peters, a colleague of Dr. Carmody at Standard. The first, Run P–1, took place between April 30, 1953, and June 1, 1953, while the second, Run P–9, was conducted on July 20, 1953. There is some dispute as to whether the runs were conducted in accordance with the teachings of the '257 patent.

As noted *supra,* the '851 patent is presumed valid. 35 U.S.C. § 282. The burden is on Defendants to prove invalidity with facts supported by clear and convincing evidence. *See, e.g., Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve,* 796 F.2d 443, 446 (Fed.Cir.1986); *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 872 (Fed.Cir. 1985) (noting *SSIH Equipment S.A. v. U.S. Intern. Trade Com'n,* 718 F.2d 365, 375 (Fed.Cir.1983)).[58] Under section 103, the

Court must determine whether "the subject matter as a whole *would have been* obvious at the time the invention was made...." 35 U.S.C. § 103; *Hybritech,* 802 F.2d at 1379.

Obviousness is a question of law based on factual inquiries established by the Supreme Court in *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966). *See Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1566–68 (Fed. Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987); *Loctite,* 781 F.2d at 872; *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1137–38 (Fed.Cir. 1985).[59]

The Federal Circuit explained the fact and law aspects of a section 103 determination in *Panduit.* The Court must look at facts such as "what a prior art patent as a whole discloses; what it in fact disclosed to workers in the art; what differences exist between the entire prior art, or a whole prior art structure, and the whole claimed invention; what the differences enabled the claimed subject matter as a whole to achieve; that others for years sought and failed to arrive at the claimed invention; that one of those others copied it; that the invention met on its merits with outstanding commercial success." *Panduit,* 810 F.2d 1566. Having determined those facts, the Court must then step backward in time and into the shoes worn by the ghost, *i.e.,* the man of ordinary skill in the art "when

**57.** Section 103 provides in relevant part:
A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.
Patentability shall not be negatived by the manner in which the invention was made. 35 U.S.C. § 103.

**58.** Within the presumption of patent validity in section 282 is a presumption of nonobviousness which must be overcome by clear and convincing evidence. *Perkin–Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 894 (Fed.Cir.1984) (noting *American Hoist,* 725 F.2d at 1358–59; *Raytheon Co. v. Roper Corp.,* 724 F.2d 951, 960

(Fed.Cir.1983), *cert. denied,* 469 U.S. 835, 105 S.Ct. 127, 83 L.Ed.2d 69 (1984)).

**59.** The *Graham* Court listed the three factual inquiries of moment: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; and (3) the level of ordinary skill in the art. *Graham,* 383 U.S. at 17, 86 S.Ct. at 693; *Loctite,* 781 F.2d at 872. Additionally, "against that background, the obviousness or non-obviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unresolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or non-obviousness, these inquiries may have relevancy." *Graham,* 383 U.S. at 17–18, 86 S.Ct. at 694.

the invention was unknown and just before it was made." *Id.* "In light of *all* the evidence, the decisionmaker must then determine whether the patent challenger has convincingly established, 35 U.S.C. § 282, that the claimed invention as a whole would have been obvious at *that* time to *that* person. 35 U.S.C. § 103. The answer to that question partakes more of the nature of law than of fact, for it is an ultimate conclusion based on a foundation formed of all the probative facts." *Id.*[60]

### 1. Scope and Content of the Prior Art

The scope of the prior art which must be considered is that which is "reasonably pertinent to the particular problem with which the inventor was involved." *Lindemann*, 730 F.2d at 1460 (quoting *Stratoflex*, 713 F.2d at 1535). There is some dispute as to the appropriate scope and content of the prior art. Phillips urges that the representative prior art disclosed amorphous, tree-branched noncrystalline polypropylene and, that prior to 1953, this was the only known propylene polymer. (Bailey, Tr. at 171–72; 191–201). Dr. Bailey testified that prior to 1953, polymer chemists did not know whether the manufacture of crystalline polypropylene was even possible. (Bailey, Tr. at 200–01; *see Standard Oil*, 494 F.Supp. at 374). There were at that time, however, a few crystalline polymers, namely, nylon and polyethylene. (*See* Bailey, Tr. at 172). According to Phillips, the scope and content of the prior art includes the 1945 Thomas patent,[61] the 1949 Hersberger patent,[62] two 1952 articles by Fontana,[63] and the Zletz '257 patent.[64]

**60.** The Federal Circuit has made clear that the evidence of socalled secondary considerations:

must always when present be considered en route to a determination of obviousness. Indeed, evidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art was not. *It is to be considered as part of all the evidence, not just when the decision maker remains in doubt after reviewing the art.*

*Stratoflex*, 713 F.2d at 1538–39 (citations omitted) (emphasis added).

**61.** The 1945 Thomas patent, U.S. Patent No. 2,387,784 (PTX 1703), describes a representative noncrystalline polypropylene known in the art prior to 1953 which was prepared by using an aluminum chloride (Friedel–Crafts-type) catalyst: "[a]pproximately 65% of the propylene was found to have polymerized into a solid plastic polymer having a relatively high molecular weight of approximately 2,000 to 4,000." (PTX 1703 at 3, col. 1, line 74 to col. 2, line 3; Bailey, Tr. at 191–92, 2079–80a).

**62.** The 1949 Hersberger patent, U.S. Patent No. 2,474,670 (PTX 1704), entitled "Production of Propylene Polymers", describes another representative noncyrstalline polypropylene known in the art prior to 1953 which was prepared by using an aluminum chloride (Friedel–Crafts-type) catalyst:

At − 20°C a substantial amount of oily polymers are formed, together with more viscous or resinous polymers. At − 50°C the quality of oil polymers is much less and the average molecular weight of the polymer is above 1500. At still lower temperatures, *i.e.,* − 80°C, the polymer is resinous and semi-solid and of a molecular weight considerably greater than 1500.

(PTX 1704, col. 2, line 53 to col. 3, line 6; Bailey, Tr. at 192–93, 1080–80a).

**63.** The 1952 Fontana article entitled "Polyermization of 1–Alkenes with Promoted Aluminum Bromide" (PTX 1705), describes yet another representative noncrystalline polypropylene known in the art prior to 1953, which was also prepared by using an aluminum bromide (Friedel–Crafts-type) catalyst: "[t]he higher molecular weight polypropylene fractions are somewhat similar to high molecular weight polyisobutenes in physical properties." (PTX 1705, at 130–31; Bailey, Tr. at 194–96). It was known in the art that high molecular weight, amorphous polyisobutenes were solids. (Bailey, Tr. at 195).

The 1952 Fontana article entitled "Catalyzed Polymerization of Monoalkylethylenes—Promoted Aluminum Bromide Catalyst" (PTX 1706), described still another representative noncrystalline polypropylene known in the art prior to 1953, which was again prepared by using an aluminum bromide (Friedel–Crafts-type) catalyst: "[t]his would lead to the formation of multiply charged carbonium ions and also result in a tree-branched polymer structure." (PTX 1706 at 1695; Bailey, Tr. at 196–99).

**64.** According to Phillips, the '257 patent is also representative of the prior art in that the description of the product made from propylene is a "rubber-like" material, indicative of the noncrystalline polymers known in the art at that time. (DTX 62, col. 3, lines 9–13 and col. 21, lines 57–62. As noted *supra*, indicia of crystallinity, such as density, molecular weight, intrinsic viscosity or solubility characteristics do not appear on the face of the '257 patent. (Bailey, Tr. at 2077–78). Dr. Bailey also testified that

Conversely, Defendants argue that the Zletz '257 patent, *in and of itself,* represents the "appropriate" scope and content of the prior art. (*See* DRB at 35).[65] The Zletz patent has been discussed in detail, *supra,* under Defendants' section 102(e) defense. Defendants agree that the Thomas and Hersberger patents, as well as the Fontana articles, describe only low molecular weight, amorphous, non-linear, noncrystalline (so-called "tree-branched") polypropylenes. (Grubbs, Tr. at 2814–16; Carmody, Tr. at 1187; *see* Bailey, Tr. at 191–200). On the other hand, they argue that the '257 patent describes what was in 1951 a "new and different high molecular weight polypropylene fraction." (DRB at 35; *see* Grubbs, Tr. at 2816–17; Carmody, Tr. at 1205; Peters, Tr. at 1299).

The Court concluded, *supra,* that the '257 patent does not expressly or under principles of inherency teach the production of crystalline polypropylene within the claim of the '851 patent. Rather, the Zletz patent was directed primarily at the polymerization of ethylene and its descriptions of propylene polymerizations were "very similar to what was in the prior art [*i.e.,* the Hersberger and Thomas patents and the Fontana articles] for the propylene polymers that were produced by the acid catalyst[s]." (Bailey, Tr. at 2078). In other words, the description is indicative of rubber-like, soluble, noncrystalline polymers.

Defendants' argument attempts to narrow the focus of the Court's inquiry to the '257 patent. In effect, their position concedes that the product of the '851 patent's claim would not have been obvious to one of ordinary skill in the art from the Hersberger or Thomas patents and the Fontana articles. In point of fact, there is simply no dispute that the product of the '851 patent would not have been obvious to one of ordinary skill in the art relying on those references.

Nonetheless, the two patents and the two articles are relevant inasmuch as they indicate that before 1951, chemists were of the opinion that propylene polymerization resulted in an amorphous polypropylene. Defendants do not cite any portions of these references in providing guidance to one of ordinary skill in the art toward development of crystalline polypropylene falling within the claim of the '851 patent.[66]

## 2. Differences Between the Prior Art and the Claimed Invention

The critical issue for the resolution of the question of obviousness, as section 103 makes plain on its face, is whether the invention as a whole would have been obvious to one of ordinary skill in the art at the time the invention was made. 35 U.S.C. § 103; *Perkin–Elmer Corp.,* 732 F.2d at 894; *see Akzo,* 808 F.2d at 1481; *Vandenberg v. Dairy Equipment Co.,* 740 F.2d 1560, 1566 (Fed.Cir.1984). In so doing, the

---

the reference in the '257 patent to alkylation (DTX 62, col. 11, line 71, to col. 12, line 2), a typical Friedel–Crafts-type reaction, indicates that the Zletz catalyst acts in a manner similar to the prior art Friedel–Crafts-type catalysts which produced amorphous and tree-branched polypropylenes. (Bailey, Tr. at 2081–82).

**65.** The '257 patent issued in 1954 on an application filed in 1951. As such, the effective date of the '257 patent is indeed prior to the 1953 application of Phillips. *See* 35 U.S.C. § 102(e); *Hazeltine Research v. Brenner,* 382 U.S. 252, 255–56, 86 S.Ct. 335, 337–38, 15 L.Ed.2d 304 (1965); 3 D. Chisum, *Patents* § 3.07[1]; 2 D. Chisum § 5.03[3][b].

**66.** Defendants make no attempt to combine elements from the prior art references cited by Phillips. Of course, the Thomas and Hersberger patents and the Fontana articles are relevant

inasmuch as they indicate that before 1951, chemists were of the opinion that propylene polymerization resulted in an amorphous polypropylene. Defendants, as noted *supra,* do not, however, cite any portions of those patents or articles as providing guidance to one of ordinary skill in the art toward development of a crystalline polypropylene falling within the claim of the '851 patent.

Because Defendants do not assert these references in their obviousness contentions, the conclusion that the prior art taught an amorphous, non-crystalline product is *not* a decision on the obviousness of an asserted prior art reference without consideration of the *Graham* factual inquiries and objective factors of nonobviousness. *See, e.g., W.L. Gore,* 721 F.2d at 1553–55 (evidence pointing in the direction of *non* obviousness should nevertheless be considered because it may tend to "reassure" the decision maker).

Court must view the claims of the invention in their entirety. *See W.L. Gore,* 721 F.2d at 1550; *Schenck v. Nortron Corp.,* 713 F.2d 782, 785 (Fed.Cir.1983). Likewise, "[t]he *claims,* not particular embodiments must be the focus of the obviousness inquiry." *Jackson Jordan, Inc. v. Plasser American Corp.,* 747 F.2d 1567, 1578 (Fed. Cir.1984) (noting *Graham,* 383 U.S. at 17, 86 S.Ct. at 693). Further, the prior art references relied upon must be considered in their entirety as well. *See W.L. Gore,* 721 F.2d at 1550. Disclosures in the references that diverge from and teach away from the invention cannot be disregarded. *Id.* (noting *Application of Kuderna,* 57 CCPA 1078, 426 F.2d 385 (1970)).

The differences between the Thomas and Hersberger patents and the Fontana articles and the '851 patent are easily summarized. Those prior art references teach the production of noncrystalline amorphous polypropylene and not crystalline polypropylene. All four references employ a Friedel–Crafts catalyst which tends to alkylate aromatics. (*See, e.g.,* Bailey, Tr. at 2081–82).

The differences between the '257 patent and the claim of the '851 patent have been discussed in some detail, *supra,* in consideration of Defendants' defense under section 102(e). On its face, there is nothing within the '257 patent that teaches, discloses or suggests to one of ordinary skill in the art that its processes would have produced a product which is crystalline polypropylene consisting essentially of recurring propylene units. The '257 patent is primarily directed to the polymerization of ethylene. (*See* Bailey, Tr. at 2074). As noted *supra,* it does contain two references to the polymerization of propylene. (*Id.*)

As evidence that the processes of the '257 patent would indeed produce crys-

talline polypropylene consisting essentially of recurring propylene units, Defendants rely upon two experiments conducted by Peters at Standard in 1953, but *after* the January 27, 1953, Phillips application. They admit that the two Peters' experiments on which they rely are not prior art, and indeed, they did not rely upon Peters' work for purposes of their section 102(e) contentions.[67] Yet, they also contend that "on the differences between the disclosure of the Zletz '257 patent and the subject matter of the '851 patent claim, the evidence shows that, Peters, employing the disclosure of the '257 patent and ordinary skill in the art, made products from which a solid, xylene-insoluble crystalline polypropylene fraction was obtained." (DRB at 35) (citations to transcript omitted).

Section 103 plainly requires the Court to look at the differences between the patent in suit and the *prior art. See* 35 U.S.C. § 103; *accord Hybritech,* 802 F.2d at 1380 n. 4 (a "contemporaneous" development well after the filing date of the patent in suit is irrelevant for purposes of the hypothesis based on the *Graham* factual inquiries); *see* 2 D. Chisum § 5.05[7]. Inasmuch as Defendants clearly admit that the Peters' runs are *not* prior art, they are not relevant in comparing the differences between the prior art and the claim of the '851 patent.

**3. The Level of Ordinary Skill in the Art**

■ The Federal Circuit has listed several factors to be considered in evaluating the level of ordinary skill in the art: (1) educational level of the inventor; (2) the type of problems encountered in the art; (3) prior art solutions to these problems; (4) the rapidity with which inventions were

---

**67.** In their opening brief, Defendants state that: Experiments P–1 and P–9 were both conducted after the January 27, 1953 filing date for the 1953 Phillips parent patent application for the '851 patent. These runs are not relied on as prior art, *per se,* but rather as *evidence highly probative of the nature of the experiments a person of ordinary skill in the art would conduct in order to obtain the solid, high molecular weight polymer fraction from*

*propylene polymerization* described at column 3, lines 9 to 13 of the '257 patent. (DB at 69 n. 47) (emphasis added).

At trial, counsel indicated: "I agreed that those experiments were conducted after the January 27, 1953 date. If Phillips is entitled to that date for the date of the invention, those two experiments are not prior art." (Tr. at 1426–27).

made; (5) the sophistication of the technology; and (6) the educational level of active workers in the field. *Environmental Designs v. Union Oil Co. of Cal.*, 713 F.2d 693, 696 (Fed.Cir.1983), *cert. denied*, 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984), *noted in Afros, S.P.A. v. Krauss–Maffei Corp.*, 671 F.Supp. 1402, 1417–18, (D.Del.1987).

Further, despite the fact that the parties have stipulated to the educational and employment level of one of ordinary skill in the art, it is crucial to understand that the inquiry under section 103 is directed to the *hypothetical* person of ordinary skill in the art. As the Federal Circuit has noted in holding that the inventor's skill is not the relevant focus of the inquiry:

> The issue of obviousness is determined entirely with reference to a *hypothetical* "person having ordinary skill in the art." It is only that hypothetical person who is presumed to be aware of all the pertinent prior art. The actual inventor's skill is irrelevant to the inquiry, and this is for a very important reason. The statutory emphasis is on a person of *ordinary* skill in the art. Inventors, as a class, according to the concepts underlying the Constitution and the Statutes that have created the patent system, possess something—call it what you will—that sets them apart from the workers of *ordinary* skill, and one should not go about determining obviousness under § 103 by inquiring into what *patentees* (*i.e.*, inventors) would have known or would likely have done, faced with the revelations of references. A person of ordinary skill in the art is also presumed to be one who thinks along the line of conventional wisdom and is not one who undertakes to innovate, whether by patient, systematic research or extraordinary insights, it makes no difference which.

*Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 454 (Fed.Cir.1985); *see Kimberly–Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1449–54 (Fed.Cir. 1984).

The hypothetical person of ordinary skill in the art would have had a working knowledge of the chemical and physical properties of the polymers known to the art in 1953. He would have known polypropylene to be a tree-branched, amorphous and non-crystalline polymer. Further, as noted *supra*, Dr. Bailey testified that chemists at the time simply did not know whether the production of a crystalline polypropylene was even possible.

The problem facing the entire petroleum and plastics industry in the early 1950s was the polymerization of a crystalline form of polypropylene. (*See, e.g.*, Peters, Tr. at 1297). Various chemists in both Europe and the United States were experimenting with a host of catalysts in an attempt to polymerize a crystalline form of polypropylene. Dr. Carmody indicated that in the late 1940s, researchers at Magnolia Petroleum used Friedel–Crafts type catalysts to polymerize propylene but that no solids were obtained. (*See* Carmody, Tr. at 1187). In 1950, Zletz polymerized propylene and obtained a solid fraction using the molybdenum trioxide alumina catalyst. (Peters, Tr. at 1299–1300). In Europe, Ziegler and Natta were experimenting with titanium tetrachloride catalysts in the production of ethylene polymers. Natta eventually polymerized propylene to a crystalline solid using this catalyst in 1954. (Mark, Tr. at 509–11).

Once it became known that propylene could be polymerized to a solid, the focus of research was on the production of a crystalline solid rather than amorphous (referring to molecular structure) polypropylene. As such, the problem facing the industry on the eve of the Hogan and Banks invention was whether crystalline polypropylene was even producible. A subsidiary problem was, of course, how that product could be obtained, *i.e.*, using what type of a catalyst under what types of reaction conditions. Prior to 1953, the only polypropylene which chemists were able to produce was non-crystalline, amorphous material. (Bailey, Tr. at 191–200, 281–82). The concept of crystallinity in polymers was understood. For example, crystalline polyethylene was well known at the time. (*See* Bailey, Tr. at 171–72, 281–82, 2332). Despite this knowledge of crystallinity in oth-

er polymers, prior to the Hogan and Banks invention, there was no reason for polymer chemists to predict that crystalline polypropylene could even be produced. (*Id.* at 280–81, 281–86).

Further, the evidence at trial indicated that the state of the art was quickly changing in the early 1950s. The 1949 Thomas patent and the 1952 Fontana articles are indicative of a tree-branched amorphous polypropylene. Yet, by 1953, crystalline polypropylene was invented and polymer chemists were trying to perfect the product. Indeed, by 1954, Natta discovered a prototype of the catalyst which is still used today in the commercial manufacture of crystalline polypropylene. Thus, in the span of half a decade, the art changed dramatically.

The parties have stipulated that a hypothetical person of ordinary skill in the art of polymer chemistry at the time the invention of the '851 patent was made would have knowledge of and experience with the chemical and physical properties of polymers known prior to 1953 and the methods of their preparation and isolation. A person of ordinary skill in the art would be someone with: (1) a bachelor's degree in chemistry or chemical engineering combined with at least about five years of experience in the art, or (2) a Ph.D. in chemistry or chemical engineering combined with at least approximately two years of experience in the art. (Pretrial Order, D.I. 211 at 8, ¶ 3m). Under this level of skill, both Bailey and Peters would have qualified as persons of ordinary skill in the art in 1953 because they both possessed the requisite training and experience as of that date. (*See* PTX 1734; Bailey, Tr. at 2082; DTX 509; Peters, Tr. at 1296–1300). Dr. Carmody also qualified under this standard as of 1953. (*See* DTX 501).

### 4. Secondary Considerations

As noted *supra,* "evidence of secondary considerations may often be the most pro-

bative and cogent evidence in the record." *Stratoflex,* 713 F.2d at 1538; *see Vandenberg,* 740 F.2d at 1567; *Afros, S.P.A..,* 671 F.Supp. at 1418. The Federal Circuit has indicated that the objective evidence of nonobviousness may be entitled to more weight or less in any given case, "depending on its nature and relationship to the invention. It may be the most pertinent, probative, and revealing evidence available to aid in reaching a conclusion on the obvious/nonobvious issue. It should when present always be considered as an integral part of the analysis." *W.L. Gore,* 721 F.2d at 1555.

In the instant case, the parties have presented minimal evidence with regard to the *Graham* secondary considerations. Nonetheless, there is sufficient evidence in the record to evaluate the secondary considerations. The evidence of record and argument presented relates to commercial success, failure of others and contemporaneous independent invention.

#### a. *Commercial Success*

Commercial success can be a strong factor favoring nonobviousness. *Akzo,* 808 F.2d at 1481 (noting *Simmons Fastener Corp. v. Illinois Tool Works,* 739 F.2d 1573, 1575–76 (Fed.Cir.1984), *cert. denied,* 471 U.S. 1065, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985)). Of course, there must be a nexus "between the merits of the claimed invention and the evidence offered if that evidence is to be given substantial weight enroute to conclusion on the obviousness issue." *Stratoflex,* 713 F.2d at 1539 (noting *Solder Removal Co. v. United States Intern. Trade,* 582 F.2d 628, 637 (C.C.P.A. 1978)).

Crystalline polypropylene is one of the most widely used chemical compositions in commerce today. Worldwide demand is presently approximately fourteen billion pounds, with the United States' demand totalling nearly six billion pounds per year. (Mark, Tr. at 503.)[68] Experts from both sides were in general agreement that crys-

---

**68.** See *infra* under Infringement for a delineation of the uses of crystalline polypropylene in the marketplace.

tallinity is the characteristic which gives polypropylene its immense commercial value. (PTX 1858 at 3688; Mark, Tr. at 534–36; Bailey, Tr. at 2329–30; Powers, Tr. at 941; Porter, Tr. at 1127–28). Phillips thus argues that the required nexus between the claimed invention and its commercial success does in fact exist and that the immense commercial success is probative of nonobviousness.

Defendants note that it is also undisputed that the Marlex catalyst taught in the 1953 application has simply *never* been used commercially in the manufacture of crystalline polypropylene. (Bailey, Tr. at 297–98). Of course, the answer to this contention is that the *process* by which the *product* of the '851 patent is made is of little relevance. The fact that the Marlex catalyst is commercially useless does little to counter the nexus between crystallinity and the commercial success of the product from this product patent. By whatever process it is made, crystalline polypropylene consisting essentially of recurring propylene units is an immense commercial success and has a wide variety of applications.

Defendants also contend that what Hogan and Banks in fact invented was little more than a low molecular weight, brittle laboratory curiosity. Therefore, they argue that *none* of the commercial success of crystalline polypropylene is attributable to the 1953 application. The product of the 1953 application was indeed a low molecular weight product and Dr. Porter testified that while crystallinity is necessary for the commercial success of polypropylene, molecular weight is of equal or greater significance in its commercial success. (Porter, Tr. at 983; *see id.* at 983–85; Mayfield, Tr. at 862–64). Generally speaking, molecular weight impacts upon the moldability of the plastic product. (Porter, Tr. at 984; Powers, Tr. at 941–44).[69] As such, it is clearly important in the commercial production of plastic products. Plainly, some of the market success of crystalline polypropylene can be credited to higher molecular weights not attributable to the Hogan and Banks invention. Thus, the nexus between the patent and commercial success must be tempered somewhat. But Defendants presented no evidence of what commercial products would be without crystallinity.

The legal history of this case is also a relevant factor to be considered. Whichever party received the patent for crystalline polypropylene would undoubtedly have enjoyed immense commercial success. Regardless, Defendants must concede that the product within the claim of the '851 patent, without reference to the 1953 application, enjoys huge market success and that the success is clearly tied to the '851 patent.

### b. *Failure of Others*

Phillips asserts that prior to 1953, polymer chemists were uncertain that crystalline polypropylene could even be manufactured. (*See* Bailey, Tr. at 100–01). They contend that is strong evidence favoring nonobviousness. Because so many other research chemists were attempting to polymerize propylene unsuccessfully, the inference Phillips seeks to draw is that in the midst of general failure, Hogan and Banks succeeded in developing a revolutionary new product. "This uncertainty as to the eventual existence of a process for manufacturing crystalline polypropylene is strong evidence of the nonobviousness of the product. *Application of Hoeksema*, 399 F.2d 269, 274 (C.C.P.A.1968)." (PB at 73).

Clearly, as Defendants note, the issue is not so simply resolved. The protracted legal battles over crystalline polypropylene and the presence of multiple parties throughout belies the notion that Phillips' invention came in a milieu of total failure. At least four other parties, namely Montecatini, DuPont, Standard Oil and Hercules, the participants in the interference, polymerized crystalline polypropylene in the early to mid 1950s.

Nonetheless, the fact is that *prior* to Hogan and Banks, no one was able to invent crystalline polypropylene and they

**69.** For a discussion on the importance of molecular weight, *see infra* under Infringement.

were awarded priority for the patent. While in a certain sense the evidence indicates a horse race to the finish line, Hogan and Banks, nevertheless, won the race (in court). To say simply that other polymer chemists were developing similar products at roughly the same time is to ignore the fact that at the time of the discovery, Hogan and Banks' product was revolutionary and beyond what polymer chemists knew could be achieved.

#### c. Contemporaneous Independent Development

Finally, as noted *supra,* Defendants seek to rely on two experiments by Edwin Peters in mid–1953 as evidence of obviousness. In *In re Merck & Co., Inc.,* 800 F.2d 1091 (Fed.Cir.1986), the Federal Circuit noted that the Board of Interferences did not err in relying upon the contemporaneous *independent* invention of others in support of its holding of obviousness. *Id.* at 1098 (emphasis added). "[T]he additional, although unnecessary, evidence of contemporaneous invention was probative of 'the level of knowledge in the art at the time the invention was made.'" *Id.* (citing *In re Farrenkopf,* 713 F.2d 714, 720 (Fed.Cir. 1983); *see* D. Chisum §§ 5.03[3][g]; 5.05[7] ("Evidence that a number of other persons, working under the same state of the prior art, arrived at the same or similar solutions to that embodied in a patent claim has been relied upon in a number of decisions as tending to show that the claim solution was obvious.") (Citations omitted.) Phillips predictably argues that Defendants are merely seeking to backdate Peters' work to the 1951 filing date of the Zletz application or, at the least, to prior to the January 27, 1953, application date for Hogan and Banks. (PB at 74). In short, they contend that Defendants are attempting to slip a non-prior art reference into the record through the back door. Phillips also contends that Peters' runs are irrelevant because obviousness cannot be predicated on that which is only inherent in the prior art, citing *Application of Spormann,* 53 CCPA 1375, 363 F.2d 444, 448 (1966).

Common sense dictates that if an alleged infringer is able to show that products similar to those claimed in the patent-in-suit were developed independently and simultaneously, those "inventions" would be probative of the level of knowledge in the art at the time of the patent-in-suit's invention. Of course, unlike a reference under anticipation, "simultaneous invention" is not preclusive or conclusive; it is but one of the factors considered by the Court en route to the legal conclusion on the obviousness issue. *See Reeves Brothers, Inc. v. U.S. Laminating Corp.,* 417 F.2d 869, 872 (2d Cir.1969). Further, "[i]n order to rise to the level of an independent contemporaneous conception that is evidence of obviousness, the independent conception must be something that is intentionally developed, not happened upon by accident." *Dennison Mfg. Co. v. Ben Clements and Sons, Inc.,* 467 F.Supp. 391, 421 (S.D.N.Y.1979).

Although the Court must focus on the hypothetical person of ordinary skill in the art, Defendants attempt to substitute Peters for the hypothetical person and argue that *a fortiori* because Peters was someone within the ordinary skill of the art as construed for the obviousness inquiry and because his Runs P–1 and P–9 allegedly produced crystalline polypropylene within the claim of the '851 patent, that patent is obvious. In short, Defendants implicitly contend that the hypothetical person of ordinary skill in the art exists in fact and is personified by Edwin Peters.

#### 1) The Peters' Runs

Runs P–1 and P–9 were conducted by Peters in April–June, 1953 and July, 1953, respectively. (*See* DTX 181A; Peters, Tr. at 1394). At the request of his supervisor, Dr. Evering, before Peters began his experiments, he conducted an extensive study spanning one and one-half years of the confidential records of a large number of polymerization experiments of both propylene and ethylene conducted by Drs. Zletz, Carmody and others at Standard using the Zletz molybdena and cobalt molybdate catalysts (PTX 1446; Peters, Tr. at 1303–04, 1363–65; *see Standard Oil,* 494 F.Supp. at 407–08). During his study, Peters identified the problems experienced by previous Standard researchers in their attempts to

polymerize propylene over the Zletz catalyst. (Peters, Tr. at 1395; *see Standard Oil*, 494 F.Supp. at 407–08). Peters' experimental log indicated for P–1 that:

> [a] new problem is being initiated. The problem is to find a way to polymerize propylene to heavy polymer, solid or semi-solid polymer over solid-type catalysts. This problem is an extension of the polyethylene work. In this work, we were able to obtain small yields of solid polypropylene over molybdena/alumina [$MoO_3$–$Al_2O_3$], cobalt molybdate [$CoO$–$MoO_3$–$Al_2O_3$] catalysts. The polymer will be used as a V.I. improver for lubricating oils.

(Peters, Tr. at 1395; DTX 181A at 1). One of the primary purposes of that review was to determine the best conditions to permit one to obtain large amounts of the solid, high molecular weight polymer fraction from propylene polymerization for the purposes of a more complete characterization. (Peters, Tr. at 1306, 1395). To that end, on the basis of all of the work done by Zletz and Carmody, Peters determined that the cobalt molybdate catalyst was the more active catalyst and thus better suited for his purposes. (*See* Peters, Tr. at 1306).

At trial, both Dr. Painter and Dr. Grubbs testified that the solid products of both P–1 and P–9 were indeed crystalline polypropylene within the claim of the '851 patent. (Painter, Tr. at 1581, 1585; Grubbs, Tr. at 1791; *see generally* Painter, Tr. at 1577–89).[70] In its briefs, Phillips has pointed to no record evidence disputing that testimony. Further, in the interference proceeding, Judge Wright found, based on the testimony before him, that Peters' xylene-insoluble products were normally solid, *Standard Oil*, 494 F.Supp. at 399–400, polypropylenes consisting essentially of recurring propylene units, *id.* at 402–03, with substantial crystalline polypropylene content. *Id.* at 403–04. Finally, Peters was informed in 1953–54 by analysts at Standard Oil that the xylene-insoluble solid residues from P–1 and P–9 were crystalline polypropylene. (Peters, Tr. at 1344–45; DTX 199, 232). As such, I find that the xylene-insoluble portions of Runs P–1 and P–9 were crystalline isotactic polypropylene within the claim of the '851 patent.

### a) *P–1*

The major contention among the parties concerns whether Peters did in fact merely follow the '257 patent or rather added his own substantial variations to it. Phillips asserts that Peters failed to follow the teachings of the '257 patent in several significant ways. First, regarding catalyst activation, Phillips argues that Peters deviated from the '257 patent's teachings by (1) employing hydrogen pressure up to 800 p.s.i.g, which Phillips contends is "much higher" than the "usual" 50–500 p.s.i.g. range suggested in the '257 patent, (*see* DTX 62, col. 5, lines 27–31; Bailey, Tr. at 2163); and (2) allowing the catalyst to cool overnight and stand for seventy-two hours under hydrogen pressure after activation, thereby continuing to reduce the catalyst and forming water on the catalyst in contradistinction to the '257 patent's teach-

---

**70.** Dr. Painter also testified that the ethylene content was not measurable based upon his review of the infrared spectra (DTX 229, 235, 401) and his conclusion that there was no discernible absorption in the 13 to 14 micron range. (Painter, Tr. at 1579). Further, assuming Brame's earlier "observation" of an absorption in that range of the spectra, Painter calculated an ethylene content of 0.6% and 1.3% respectively for sample 1–1 in P–1 and P–9 based on that assumption with which he disagreed. (Painter, Tr. at 1579, 1584–85; DTX 458; *see* DTX 235, 401). Painter reached the same figures using the Phillips method. (*See* DTX 458). Painter calculated the percent ethylene for the xylene soluble portion of P–9 at 3.7% using the "Corrected Brame" approach and 2.0% using the Phillips method. (*See* Painter, Tr. at 1588; DTX 458). Thus, Painter concluded that at most, a trace of ethylene was present in both solid products. (*See* Painter, Tr. at 1579, 1585–86).

Dr. Grubbs indicated that little disproportionation occurred in these experiments (Grubbs, Tr. at 1837, 1860) although the measurable ethylene content in the xylene-soluble fraction from P–9 indicates that some disproportionation occurred in that experiment. Notwithstanding the extent or duration of any disproportionation, Dr. Grubbs concluded that based on the reported densities, the solubility characteristics, insoluble in xylene at room temperature, and the infrared spectra, the xylene-insoluble residues from P–1 and P–9 were crystalline, isotactic polypropylene. (Grubbs, Tr. at 1791).

ings. (DTX 62, col. 6, lines 53–61; Bailey, Tr. at 2163–65). Second, with respect to reaction conditions, Phillips posits that Peters deviated from the '257 patent by (1) failing to use a diluent; (2) carrying out the polymerization at room temperature (75–79°F/24–26°C), far below the broadest temperature range taught or suggested in the '257 patent; and (3) carrying out the polymerization reaction over twenty-seven days, a time far exceeding the broadest range of time taught or suggested in the '257 patent. (*See* DTX 62, 181A; PTX 1852; Bailey, Tr. at 2165–67). For both P–1 and P–9, Dr. Grubbs testified that the catalyst composition, activation, polymerization conditions and method of isolation for the solid fraction were all carried out within the teachings of the '257 patent. (Grubbs, Tr. at 1776–89; Peters, Tr. at 1347–55).

I find that Peters deviated from the express teachings of the '257 patent with regard to polymerization pressure by employing hydrogen pressure up to 800 p.s.i.g. This was much higher than the "usual" 50–500 p.s.i.g. range suggested by the '257 patent. (*See* DTX 62, col. 5, lines 27–31; Bailey, Tr. at 2163). The patent's reference to broad ranges of pressure reflect the 50–500 p.s.i.g. range. The patent does state that pressure may range to 3000 p.s.i.g. or more, "but for practical purposes is usually in the range of about 50 to 500, *e.g.*, about 200 psig." (DTX 62, col. 5, lines 27–31).

Peters also allowed the catalyst to cool overnight and stand an additional seventy-two hours under the hydrogen pressure. (*See* Bailey, Tr. at 2163–65). According to Phillips, this procedure is in direct contravention of the '257 patent. Dr. Bailey testified that storing the Zletz catalyst, here cobalt molybdate on alumina, under hydrogen could continue to reduce it, thus forming water. (*See* Bailey, Tr. at 2164–65). As noted *supra*, the patent specifically teaches that the formation of water should be avoided. (*See* DTX 62, col. 6, lines 53–

61). As such, Zletz and Carmody stored catalysts in a vacuum in order to mitigate continued reduction and the resultant formation of water. (*See* Bailey, Tr. at 2165). Under a vacuum, no reduction takes place and hence water is not formed. (*Id.*) Continued reduction changes the activity of the catalyst. (*Id.* at 2165).

Nonetheless, Dr. Grubbs testified that storage overnight under hydrogen was a commonly accepted and logical step to take after activation. (*Accord* Grubbs, Tr. at 1778, 1853–54, 1857). Dr. Grubbs also indicated that the catalyst was "probably reduced mostly" prior to the storage overnight under hydrogen. (Grubbs, Tr. at 1854). Thus, in P–1, he opined that "by the time the activation was ended, after the third cycle there was a considerable amount of water that had been removed already. I assume that the reduction was complete at that stage." (*Id.* at 1855). Peters indicated that in his opinion the procedure was within the teachings of the '257 patent and necessary in order to avoid the production of water on the activated catalyst. (*See* Peters, Tr. at 1349–50, 1405; 1422–23). In his mind, storage under hydrogen pressure was necessary because, as the catalyst cooled, it would be under decreasing pressure. Without hydrogen pressure, a vacuum could develop in the system with the potential for a leak that could then draw in air—a mixture of oxygen and water—which could ultimately deactivate the catalyst. (Peters, Tr. at 1422; *see* Grubbs, Tr. at 1853–54). Peters plainly did attempt to avoid the formation of water and I credit his testimony that after a long reduction at high temperature, no substantial amount of water would be formed during the storage under hydrogen at low temperatures. (*See* Peters, Tr. at 1307–12).

Peters also deviated from the teaching of the '257 patent by polymerizing the propylene at room temperature. (*See* Bailey, Tr. at 2165–67).[71] The '257 patent teaches that

---

71. Phillips also challenges Peters' failure to use a diluent in this run. The '257 patent clearly teaches that a diluent is "preferable." (*See* DTX 62, col. 8, lines 9–13; Bailey, Tr. at 2166). But,

the patent does not teach that it is required. In point of fact, it states: "[u]sually it is preferred to employ inert liquid organic materials such as hydrocarbons, particularly aromatics . . . as re-

the range of temperatures to be used is 75°–325°C with the preferred range of 130°–260°C. (See DTX 62, col. 6, lines 62–74). Room temperature is roughly 50°C below the lowest temperature indicated and over one hundred degrees celsius below the lowest temperature in the preferred range. Dr. Bailey testified that the '257 patent does not expressly teach that the polymerization at room temperature is not appropriate or that anything "bad" would result from polymerization at room temperature. (See Bailey, Tr. at 2441–42). The patent itself indicates that the inventive process can be affected over extremely broad ranges of temperature and pressure. (DTX 62, col. 2, lines 36–38). But, Dr. Grubbs noted that 40°C is without the specific teachings of the '257 patent. (Grubbs, Tr. at 2871–72). The reference to extremely broad ranges for the inventive process could well refer to the 250° range set forth in the patent (75°C–325°C) and the 130° gap in the preferred range.

Dr. Grubbs testified that the combination of the teaching of the broad ranges of temperature and pressure and another teaching that lowering the polymerization temperature tends to increase the molecular weight of the polymer indicates that the polymerization temperature used by Peters is within the '257 patent's teachings. (Grubbs, Tr. at 1780–81; see Peters, Tr. at 1315). In Grubbs' opinion, the reaction temperature was "in accord with the general teachings of the '257 patent." (Id. at 1780).

Peters testified that his reasons for using room temperature were twofold: (1) room temperature is easy to control; and (2) based on the work of Carmody and Zletz as noted in his report, the lower the polymerization temperature, the higher the molecular weight of the polymer, "so that what I wanted to do was get the most amount of [high] molecular weight polypropylene that I could." (Peters, Tr. at 1315).

Peters also carried out the polymerization reaction for a period of twenty-seven *days*, far in excess of even the broadest range taught in the '257 patent. (DTX 62, col. 7, lines 59–64; Bailey, Tr. at 2167). The patent teaches a range from one-half to ten hours, "usually between one and four hours." *Id.* Peters' run lasted roughly six hundred forty-eight hours.

I find that in Run P–1, Peters deviated from the teachings of the '257 patent as to the pressure, temperature and duration of the propylene polymerization.

b) *P–9*

In P–9, Peters again deviated from the '257 patent by using a hydrogen pressure of 800 p.s.i.g. Phillips also argues that Peters deviated from the activation procedure taught in the '257 patent by allowing the catalyst to cool under hydrogen pressure, leading to the continued reduction of the catalyst and the formation of water on the catalyst. I conclude, as in P–1, that the cooling overnight under pressure was in accordance with the teachings of the '257 patent.

5. **Conclusion**

This is an unusual case. At the core, Defendants' obviousness defense rests on one patent and, more specifically, on two experiments conducted with an eye toward that patent. Through artful advocacy, Defendants have attempted, in effect, to backdate the Peters' experiments to prior to January, 1953, and then to use those experiments as prior art. They buttress this argument by contending that since Peters would have qualified in 1953 as a person of ordinary skill in the art and did, in fact, make a product which falls within the claim of the '851 patent, *a fortiori* the Peters' runs are indicative of obviousness. They likewise acknowledge that the Peters runs were not prior art. In order to justify their argument, they argue that the runs are relevant to establish the level of knowledge in fact at the time of the 1953 application,

action media in the present process." *Id.* At room temperature, the advantage of using a diluent fades because the propylene feed itself is liquid. Hence, I find that the failure to use a

diluent is not a deviation from the '257 patent separate and distinct from the temperature deviation.

but they then argue that Peters followed the teachings of the '257 patent, an argument directed more toward a section 102(e) defense rather than obviousness under section 103. Using the '257 patent as a framework under the level of knowledge in the art at that time, it would not have been obviousness to one of ordinary skill in the art that solid crystalline polypropylene within the meaning of the count could be produced.

In viewing the '851 patent in light of the prior art to the 1953 application, it is clear that the prior art teaches amorphous, non-crystalline, tree-branched polypropylene. Prior to 1953, it simply was not clear to people of ordinary skill in the art that crystalline polypropylene was even producible, much less how one would go about producing that product.

Phillips urges that the '257 patent, relied upon exclusively by Defendants, actually teaches away from the '851 patent and hence is strong evidence of nonobviousness. *See W.L. Gore,* 721 F.2d at 1550 (citing *Application of Kuderna,* 57 CCPA 1078, 426 F.2d 385 (1970)). Considered in its entirety, the '257 patent discloses a method for polymerizing ethylene with some references to the polymerization of propylene. Dr. Bailey indicated that nothing in the '257 patent indicated that it was any different from the tree-branched amorphous polypropylenes known in the art in 1952. (*See* Bailey, Tr. at 2077–82). As discussed above, indicia of crystallinity, such as density, molecular weight, intrinsic viscosity or solubility characteristics do not appear on the face of the '257 patent. (Bailey, Tr. at 2077–78). Further, the Zletz patent refers to alkylation of aromatics (DTX 62, col. 11, line 71, to col. 12, line 2), a typical Friedel-Crafts-type reaction. According to Dr. Bailey, this is evidence that the Zletz catalysts act in a manner similar to the prior art Friedel–Crafts–type catalysts which produced amorphous, tree-branched polypropylenes. (Bailey, Tr. at 2081–82). I accept the testimony of Dr. Bailey on this issue and conclude that the revolutionary new invention crystalline polypropylene was not obvious from the prior art.

It is undisputed that Peters did produce a product within the claim of the '851 patent. While they argue strenuously that Peters followed the '257 patent, Defendants also submit his work as a "contemporaneous independent invention" to the 1953 application. Interestingly, Defendants seek to downplay the significance of the extensive one and one-half year study and synthesis of the Zletz and Carmody work undertaken by Peters. (*See* Peters, Tr. at 1303). In a footnote, they argue that because the Peters runs did follow the teachings of the '257 patent, the research period is irrelevant. (DRB at 52 n. 37). That study is hardly irrelevant. Prior to the study, neither Zletz nor Carmody was able to produce crystalline polypropylene within the claim of the '851 patent.

Moreover, as noted above, Peters simply did not follow the '257 patent in several areas. He deviated as to reaction temperature, length of polymerization and pressure in P–1 and as to temperature and pressure in P–9. Peters was seeking to produce a high molecular weight solid polymer fraction for an analysis of its characteristics. His one and one-half year study pointed to areas where he could improve upon the processes employed previously by Zletz and Carmody at Standard.

In 1970, the Board of Patent Interferences considered the argument raised by several participants in the interference that Peters' use of a low polymerization temperature and a liquid propylene feed were not attributable to Zletz and Carmody. The Board concluded:

> Baxter et al. urge that the use of low temperature and liquid propylene in the polymerization by Peters were features not foreseen by Zletz and Carmody in the process, that Peters made a necessary contribution and that, if there is any invention disclosed, there is misjoinder for failure to include Peters as an inventor. However, we regard these matters as within the skill of the art. As pointed out above, the record shows that in 1950 Zletz wrote a letter stating that high temperature tends to produce low molec-

ular weight polymer and that to produce the polymer desired, it becomes necessary to adjust the temperature and pressure to those levels best adapted for making the particular polymer product. (DTX 254 at 82). Nonetheless, despite this knowledge conveyed in a letter, neither Zletz nor Carmody was able to produce crystalline polypropylene within the claim of the '851 patent. So, if the premise is that with the level of knowledge in the art at the time and using Zletz's patent as a reference, Peters was able to produce solid crystalline polypropylene, the facts belie such a conclusion. Certainly Zletz's and Carmody's (admittedly persons of ordinary skill in the art) failures support the inference that Peters' work went beyond the obviousness of the level of art at the time in question. This implicitly acknowledges that Peters went beyond the work of Carmody and Zletz.

Judge Wright found that Peters did not simply follow the teachings of the '257 patent. *See Standard Oil*, 494 F.Supp. at 407–08. He noted that:

Peters was assigned to report on the experiments employing Zletz's catalyst only after "a large number of experiments had been done by Evering's group on the polymerization of olefins ... using the Zletz catalyst *under varying reaction conditions.*" These experiments were in fact so extensive that it took Peters nearly a year to organize and submit his report. *This subsequent experimentation and the corresponding changes made in Zletz's procedures* indicate that the conception was not sufficiently complete to support the idea that Peters's work was merely the reduction to practice of Zletz's conception.

*Id.* (emphasis added). Defendants contend that Judge Wright did not reach the issue of whether Peters did or did not follow the teachings of the '257 patent. Nonetheless, the fact that Peters made changes in the Zletz procedure sufficient to support a conclusion that his work was not simply a reduction to practice of Zletz's conception indicates that Peters went beyond the Zletz work. Indeed, in 1950, as previously noted, while following the teachings of the '257

patent, neither Zletz nor Carmody produced a product within the claim of the '851 patent.

Peters' runs came in the period from three to six months *after* the Phillips' 1953 application. He was able to produce crystalline polypropylene on two occasions allegedly using the '257 patent as an outline but only after supplying independent information garnered through an extensive review of experiments at Standard which took him over one year to synthesize and report. The '257 patent is a process patent for producing polymers. Yet, a comparison of the Carmody and Zletz work in 1950 with the Peters work in 1953 indicates that vastly different products were produced in that three year period. Defendants simply do not rely upon either the Zletz runs or the Carmody runs in their obviousness defense. Thirty-four years after Runs P–1 and P–9, Defendants seek to reconstruct the circumstances of Peters' experiments, utilizing those aspects favorable to their defense and ignoring the repeated failures at Standard using the same patent.

Phillips argues that Defendants are using hindsight to pick and choose portions of the Zletz patent and only a part of the story as to the development of crystalline polypropylene at Standard Oil in order to paint a favorable mosaic of the '257 patent as a reference under obviousness. While that may not be the precise tack taken by Defendants, it is clear that they have attempted to paint the '257 patent in a light more favorable to their contentions.

By analogy to sections 101 and 112, the Zletz patent did not describe to the man of ordinary skill in the art in 1953 how to go about producing crystalline polypropylene. A person of ordinary skill in the art would not find crystalline polypropylene to be an obvious product of that patent, nor would one be led to produce that product as a result of the '257 patent. Only after one and one-half years of extensive research and synthesis was Peters able to produce crystalline polypropylene. His additions were more in the line of inventive genius based on scientific research and experimentation rather than simple deduction in light

of the level of knowledge in the art at that time.

Based on a review of the credible evidence of the factors set forth in *Graham, supra,* the Court finds and concludes that Defendants have not met their burden of proving by clear and convincing evidence that the claim of Phillips' '851 patent would have been obvious to one of ordinary skill in the art.

## D. Section 101, 112

### 1. Utility and Enablement

■ Defendants next raise the related issues of utility under 35 U.S.C. § 101 and written description under section 112. Utility is a fact question. *See Moleculon Research Corp. v. CBS, Inc.,* 793 F.2d 1261, 1268 (Fed.Cir.1986) (noting *Cross v. Iizuka,* 753 F.2d 1040, 1044 n. 7 (Fed.Cir.1985)), *cert. denied,* — U.S. ——, 107 S.Ct. 875, 93 L.Ed.2d 829 (1987); *Raytheon,* 724 F.2d at 956. Enablement is a question of law. *Moleculon,* 793 F.2d at 1268 (noting *Cross,* 753 F.2d at 1044 n. 7; *Raytheon,* 724 F.2d at 960 n. 6). They argue that the '851 patent is not entitled under 35 U.S.C. § 120 to the January 27, 1953, filing date of the first application because that application failed to disclose a useful composition of matter as required by sections 101 and 112. On this issue, Defendants candidly admit that they have a heavy burden of proof because both Judge Wright and the Third Circuit found that the requisites of sections 101 and 112 were satisfied in the section 146 proceeding. (*See* Tr. at 1503–08).

Section 101 provides in relevant part that "[w]hoever invents or discovers any new and *useful* process, machine, manufacture, or composition of matter, or any *useful* improvement thereof, may obtain a patent therefor...." 35 U.S.C. § 101 (emphasis added). To be "useful" under section 101, the invention must (1) be operable and capable of use, *i.e.,* it must perform a designated function; (2) achieve some minimum human purpose; and (3) that purpose must not be illegal, immoral or contrary to public policy. 1 D. Chisum § 4.04[1], *noted in Moleculon Research Corp. v. CBS, Inc.,* 594 F.Supp. 1420, 1429 (D.Del.1984), *aff'd in part, vacated in part and remanded,* 793 F.2d 1261 (Fed.Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 875, 93 L.Ed.2d 829 (1987) (on remand, *Moleculon Research Corp. v. CBS, Inc.,* 666 F.Supp. 661 (D.Del. 1987)). In short, the product or process must be operable, *i.e.,* it must be capable of being used to effect the object proposed. 1 D. Chisum § 4.04[1]; *accord Brenner v. Manson,* 383 U.S. 519, 534–35, 86 S.Ct. 1033, 1041–42, 16 L.Ed.2d 69 (1966); *Cross,* 753 F.2d at 1046.

■ In determining utility, the claims of the invention must be interpreted in order to define the invention to be tested for utility. *Raytheon Co.,* 724 F.2d at 956.[72] Courts impose a heavy burden on a defendant in an infringement suit who contends that the patent lacks utility because it will not operate as disclosed. *See Carpet Seaming Tape Licensing v. Best Seam Inc.,* 694 F.2d 570, 578 (9th Cir.1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 78, 78 L.Ed.2d 89 (1983); *E.I. Du Pont de Nemours v. Berkley & Co., Inc.,* 620 F.2d 1247, 1260 (8th Cir.1980); *Sherman Indus., Inc. v. Proto–Vest, Inc.,* 219 U.S.P.Q. 256, 261 (D.N.J.1983) *noted in* 1 D. Chisum § 4.04[5]. Indeed, as the Federal Circuit has noted:

> [T]he fact that an invention has only limited utility and is only operable in certain applications is not grounds for finding lack of utility. *Raytheon Co. v. Roper Corp,* 724 F.2d 951, 958–59, 220 U.S.P.Q. 592, 598 (Fed.Cir.1983); *Carpet Seaming Tape Licensing Corp. v. Best Seam, Inc.,* 694 F.2d 570, 578, 216 U.S.P. Q. 873, 880 (9th Cir.1982). Some degree of utility is sufficient for patentability. *E.I. du Pont de Nemours & Co. v. Berkley and Co.,* 620 F.2d 1247, 1260 n. 17, 205 U.S.P.Q. 1, 10 (8th Cir.1980). Further, *the defense of non-utility cannot be sustained without proof of total incapacity. Id.*

---

72. The Court has interpreted the claims to contain no limitations outside of the wording of the claim. *See* decision under Infringement *supra.*

*Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 762, (Fed.Cir.1984) (emphasis added).

Section 112 provides in relevant part that "[t]he specification shall contain a written description of the invention, and the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the [relevant] art ... to make and use the same...." 35 U.S.C. § 112. As the statute clearly indicates, the relevant focus under section 112 is on one of ordinary skill in the art. Further, the enablement requirement does not preclude some experimentation, so long as that experimentation is not "unduly extensive." *Atlas Powder Co.*, 750 F.2d at 1576.

There is a close relationship between the enablement aspect of section 112 and the utility requirement of section 101. 2 D. Chisum § 7.03[6]; *see Standard Oil*, 494 F.Supp. at 385 (noting *Brenner v. Manson*, 383 U.S. 519, 86 S.Ct. 1033). As the Court of Customs and Patent Appeals opined, "surely Congress intended § 112 to presuppose *full satisfaction* of the requirements of § 101. Necessarily, compliance with § 112 requires a description of how to use a presently useful invention, otherwise an applicant would anomalously be required to teach how to use a useless invention." *Application of Kirk*, 54 C.C.P.A. 1119, 376 F.2d 936, 942 (1967), *quoted in Standard Oil*, 494 F.Supp. at 385; *see* 2 D. Chisum § 7.03[6]; *see also Brenner, supra.*

### a. *The Interference Proceedings*

For the purposes of determining priority, the Board of Patent Interferences held that the utility disclosure in Phillips' 1953 application was insufficient under section 101. The utility disclosure in issue reads "the solid polymer and copolymers of the invention have utility in applications where any of the solid plastics are used." (DTX 15 at 4; Billmeyer, Tr. at 1443–44).

On the appeal pursuant to section 146, Judge Wright reversed the Board and found that the disclosure satisfied the requisites of sections 101 and 112 for a constructive reduction to practice. *See Standard Oil*, 494 F.Supp. at 385, 432–35.[73] Judge Wright credited Dr. Fox's testimony that in 1952 the disclosure would have indicated to a person skilled in the art of polymer science that the polymer could be used where polymer plastics are used. (*Id.* at 435; *see* PTX 1405 at 891–93). Fox indicated that the Young's modulus[74] of polymer plastics in commerce in 1952 was in the range of $10^{11}$ to $10^9$. (*Standard Oil*, 494 F.Supp. at 435; *see* PTX 1405 at 891–93). Additionally, the 1953 application disclosed that the product was "thermally stable, a property essential to utility as a molded plastic." (*Standard Oil*, 494 F.Supp. at 435; *see* PTX 1405 at 3894).[75] Finally, Dr. Fox testified that the solidity, density and viscosity measurements contained in the 1953 application indicated that "it was so similar to other commercial plastics as to be highly useful." (*Standard Oil*, 494 F.Supp. at 435; *see* PTX 1405 at 894–95).[76]

---

**73.** Judge Wright also held as to actual reduction to practice that Phillips had "failed to prove that its scientists knew enough about their product to conclude that it was useful as a solid plastic." *Standard Oil*, 494 F.Supp. at 418. Phillips did prove that its scientists recognized enough about the new polymer to conclude that it was useful as a wax modifier. *Id.*

**74.** The Young's modulus, or modulus of elasticity, is a quantitative measure of the relative stiffness of a material as determined from a stress-strain curve. A material with a high modulus of elasticity is stiff. A material with a low modulus of elasticity is not stiff. D.I. 211 at 28.

**75.** The application disclosed that the decomposition temperature of polypropylene was 700°F (360°C). According to Dr. Fox, this indicated

that the product is stable at temperatures normally used for molding. *Standard Oil*, 494 F.Supp. at 435; (*see* PTX 1405 at 3894). The melting point is 240°–300°F. Temperatures used for molding are roughly 50°F above the melting point and the Phillips' product was stable at those temperatures. *Id.*

**76.** Specifically, Dr. Fox concluded that "there is no question that from this material you could mold a button, a poker chip, a rod, a sheet— there is no question that you could extrude filaments ... and such filaments could be used, for example, as insulation for noise and for heat." *Standard Oil*, 494 F.Supp. at 435; (*see* PTX 1405 at 3898).

On appeal, the Third Circuit affirmed Judge Wright's findings and conclusions as to utility in the context of a constructive reduction to practice. *See Standard Oil,* 664 F.2d at 373–76. Noting that in *Brenner, supra,* the Supreme Court "accepted the Patent Office's rejection of the contention that there was a sufficient showing of utility because a related compound had demonstrated utility, since there was no showing that the compound yielded by the process at issue would have characteristics and effects similar to the other compound," the court concluded that the Phillips utility disclosure differed from the disclosure in *Brenner* in several respects. *Id.* at 374. There was an assertion of actual, rather than merely potential, benefit and the disclosure was directed to the immediate practical utility of Phillips' product. *Id.*[77]

The Third Circuit concurred with Judge Wright that the utility disclosure was adequate. *Id.* at 374–76. More specifically, the court noted that Dr. Fox testified that polymer chemists in 1952 would have understood that a solid polymer with application where solid plastics are used "could be used as existing polymer plastics were then being used, i.e., that it was a moldable material of high Young's modulus for which many specific applications were known to exist." *Id.* at 374–75. Fox further testified that:

> If you mentioned plastic [in 1952] to a polymer chemist, there would be three things that would stand out in his mind: You talk about an industrial product, a synthetic polymer; you are talking second about a material which is rigid in the sense that a metal bar or a glass plate is rigid as opposed to a fluid or an easily extensible rubber-like material; and the third thing he would think of is that this material is capable under some conditions of being soft and able to flow, and you can mold it, under those conditions, into a desired shape, desired dimensions, shape, and then under certain other conditions, for example, if you heated it to soften it to mold it, then on cooling it would retain the shape of the molded article and would become rigid, in that sense form stable and hard to deform.
>
> Those are the three characteristics that a polymer scientist would have immediately thought of if you talked about material that might be used as a plastic in 1952.

*Id.* at 375 n. 21 (citations omitted). Dr. Fox testified that any brittleness in the Phillips' polypropylene could be corrected easily with plasticizers. *Id.* at 375. Moreover, he indicated that even if the polypropylene was brittle, many useful applications would still remain. *Id.*

Finally, the court stated that "[i]t is recognized that the required utility disclosure can be met if the disclosed properties of the invention indicate the material is useful for specific purpose." *Id.* (noting *Ciric v. Flanigen,* 511 F.2d 1182, 1185 (C.C.P.A. 1975); *Application of Folkers,* 52 C.C.P.A. 1269, 344 F.2d 970, 974 (1965)). Dr. Fox's testimony regarding the properties of the Phillips product indicated that the disclosure of utility was adequate. *Id.* at 375–76. Dr. Fox testified that:

> The properties described in Page 30 and 31 first of all describe the material as a solid material, and therefore a high Young's modulus. And that's the kind of material that you need for applications as commercial plastics. Describes a

---

**77.** The court also rejected Montedison and DuPont's arguments that Phillips' utility statement was too vague to be an adequate disclosure of substantial utility. *Id.* In so doing, the court rejected the parties' reliance upon *Anderson v. Natta,* 480 F.2d 1392 (C.C.P.A.1973) and *Petrocarbon Limited v. Watson,* 247 F.2d 800 (D.C. Cir.1957), *cert. denied,* 355 U.S. 955, 78 S.Ct. 540, 2 L.Ed.2d 531 (1958). The court noted that contrary to the product description of "plastic-like" relied upon as a disclosure of utility in *Anderson,* the Phillips' application had an affirmative statement of utility. *Id.* Likewise, in *Petrocarbon,* while the application was for a process producing polymers forming films, no use for the films was disclosed. *Id.* Further, while the application stated that the polymers were useful because of certain disclosed characteristics such as thermal stability and resistance to liquids, there was no indication of how those properties might contribute to the utility of the polymer. *Id.* "In contrast, the Phillips application contained both a statement of utility and disclosure of the properties of solid polypropylene." *Id.*

melting point in the range of 240 to 300, which means that it can be heated and softened and you can mold it. And, incidentally, that melting point is higher than the glass temperatures or melting points of the commercial polymers of the day such as polyethylene and poly—the melting point of polyethylene and the glass temperature of polystyrene, for example, and therefore would lend itself to applications at higher temperatures as a plastic than the common plastics such as polyethylene and polystyrene of 1952.

You expect to use the crystalline polypropylene as a plastic at higher temperatures than you could use polystyrene of the day or polyethylene in 1952, because they have lower melting points or glass temperatures.

The density is in a range where you're talking about a lightweight material. That's beneficial. And you have intrinsic viscosities indicating that you have molecular weights in the range of commercial plastics materials. So the properties described in the paragraph on Page 31 suggest that this would be a very interesting and useful plastic indeed.

*Id.* at 375 (citations omitted).

### b. *Defendants' Arguments*

The Federal Circuit has noted that lack of practical utility cannot co-exist with infringement and commercial success. *Raytheon Co.*, 724 F.2d at 959. In *Raytheon*, the court held that:

A correct finding of infringement of otherwise valid claims mandates as a matter of law a finding of utility under § 101. *See e.g., E.I. du Pont de Nemours & Co. v. Berkley & Co., supra,* 620 F.2d at 1258–61, 205 USPQ at 8–11; *Tapco Products Co. v. Van Mark Products Corp.,* 446 F.2d 420, 428, 170 USPQ 550, 555–56 (6th Cir.), *cert. denied,* 404 U.S. 986, 92 S.Ct. 451, 30 L.Ed.2d 370 (1971). The rule is not related, as Raytheon argues, to whether a defendant may simultaneously assert non-utility and non-infringement; a defendant may do so. The rule relates to the time of decision not to the time of trial, and is but a common sense approach to the law. If a party has made, sold, or used a properly claimed device, and has thus infringed, proof of that device's utility is thereby established. People rarely, if ever, appropriate useless inventions.

*Id.*[78]

As discussed *infra,* in the instant case, Defendants have stipulated to literal infringement and the Court has found, *infra,* that the defense of non-infringement under the reverse doctrine of equivalents is unavailing. As such, the Court finds utility under section 101.

Assuming *arguendo* that Defendants are not estopped from asserting lack of practical utility, the Court nonetheless finds that the 1953 application does reflect a practical utility for the polypropylene and concludes that the patent discloses how to use the product of the claim as required by section 112.[79]

---

[78]. Likewise, as to commercial success, the court opined that:
 [p]roof of ... utility is further supported when, ... the inventions set forth in [the] claims ... have on their merits been met with commercial success. *See, e.g. Medtronic, Inc. [v. Cardiac Pacemakers ], supra* [721 F.2d 1563], at 1582 [Fed.Cir.1983]; *Wilden Pump v. Pressed & Welded Products Co., supra,* 655 F.2d [984] at 988, 213 USPQ [282] at 285 [9th Cir.1981]; *CTS Corp. v. Piher International Corp.,* 527 F.2d 95, 105, 188 USPQ 419, 428 (7th Cir.1975), *cert. denied,* 424 U.S. 978, 96 S.Ct. 1485, 47 L.Ed.2d 748 (1976). *Raytheon,* 724 F.2d at 959.

[79]. *See* DRB at 39–40. Of course, section 101 is impliedly a part of section 112. *See Brenner, supra; In re Kirk, supra.* The Federal Circuit,

as noted *supra,* has indicated that the defense of lack of utility in an infringement case "cannot be sustained without proof of total incapacity." *Envirotech,* 730 F.2d at 762 (noting *E.I. du Pont,* 620 F.2d at 1260 & n. 17). I find that Defendants have failed to prove total incapacity of the product of the 1953 application and the '851 patent. Defendants argue that, assuming that they were at all useful as solid plastics, the polymers disclosed in the 1953 application "could only have been used in a *very limited number of unidentified* solid plastics applications...." (DB at 76). As noted above, Judge Wright found that Phillips did not appreciate any utility as solid plastics but only as wax modifiers. *Standard Oil,* 494 F.Supp. at 418. Nonetheless, here, Defendants have failed to prove total incapacity with facts supported by clear and convincing evidence. *See Moleculon*

Defendants raise two broad arguments in attacking the enablement disclosure of the '851 patent. First, they contend that the disclosure in the application is legally insufficient. Second, they assert that the underlying factual bases for Judge Wright's (and by implication the Third Circuit's) conclusions on the utility issue are unsound.

### 1) Disclosure of the 1953 Application Is Insufficient as a Matter of Law

According to Defendants, the disclosure did not provide a person of ordinary skill in the art in 1953 with an indication of the specific use to which the products claimed would have been put. (DB at 76). Further, "[t]he reference to applications 'where any of the solid plastics are used' ... did not serve to distinguish between the many, wide-ranging plastics applications which existed in 1952." (*Id.*)

The gist of the argument is that in lieu of an affirmative statement of specific utility, Phillips could not satisfy the disclosure requirement by merely comparing the products of the patent to other solid plastics of known utility. *See Anderson v. Natta*, 480 F.2d 1392 (C.C.P.A.1973); *Application of Kirk*, 376 F.2d 936. "The insufficiency of such a disclosure is exacerbated by the fact that this simple statement was an attempt to collectively compare all of the solid polymers disclosed in the 1953 application to all of the 'solid plastics' of commerce in 1952." (DB at 77).

Defendants argue that the Third Circuit's distinction of *Anderson v. Natta* rested on a "purely semantic distinction." The court noted that in the 1953 application, unlike the product description of "plastic-like" in *Anderson*, there is an af-

firmative statement of usefulness "where any of the solid plastics are used." *Standard Oil*, 664 F.2d at 374. In *Anderson*, Ziegler relied on a German priority application as a constructive reduction to practice over a year prior to the filing date of the patent application. The Court of Customs and Patent Appeals affirmed the Board's decision not to award priority as of the date of the German application because it failed to comply with the requirements of sections 101 and 112. *Anderson*, 480 F.2d at 1398.

The only teaching in the specification that could suggest utility for products of the process was that they are "plastic-like" copolymers. *Id.* at 1399. The court concluded that:

> We think such a general description of the character of the polymer products would not convey to one skilled in the art any particular usefulness. Anderson's [another party to the Interference] fashioning of his products went further in lending one skilled in the art to practical utility, but we have already held that to be insufficient. We accordingly find no error in the board's conclusion that "plastic-like" polymers have no apparent utility....

> We hold that Ziegler has no support for the count on the basis of either the U.S. application or the German application as a result of the failure of either application to disclose utility for products of a process encompassed by the count and the absence of any persuasive evidence that such utility would have been apparent.

The Court also rejected Ziegler's argument that the products described in the

---

*Research*, 793 F.2d at 1269 (noting *Envirotech*, 730 F.2d at 762).

Evidence presented at trial confirmed that the solid product of the 1953 application (and low intrinsic viscosity crystalline polypropylene) has practical utility as a solid plastic. Dr. Long, for example, was able to compression mold his 1985 reproductions of the solid polypropylene which he produced in accordance with the teachings of the 1953 application, into tensile bars used in performing tensile strength tests. (Long, Tr. at 611–13). Mr. Mayfield also successfully injection molded a comb out of crystal-

line polypropylene of 0.7 intrinsic viscosity, indicating that relatively low intrinsic viscosity crystalline polypropylene can be injection molded even with conventional injection molded equipment designed specifically for present day commercial polypropylene. (Mayfield, Tr. at 876–81, 910–11; DTX 334D). Of course, the utility need not be commercially useful or marketable. *Barmag Barmer Maschinenfabrik AG v. Murata Mach.*, 731 F.2d 831, 838 (Fed.Cir. 1984); *Imperial Chemical Indus., PLC v. Henkel Corp.*, 545 F.Supp. 635, 645 (D.Del.1982).

German application were structurally similar to polyethylene, a product of known utility. *Id.* The Board found that the previously unknown polymers of the count were not necessarily similar to polyethylene; Ziegler had himself characterized them as new. *Id.* The court found no error in the Board's holding that "there is no basis for one skilled in the art to have assumed that products described . . . would have the same utility as previously known products." *Id.*

I conclude that the description of utility in the 1953 application is specific enough so as not to be insufficient as a matter of law under *Anderson*. Indeed, the statement is affirmative and does not merely refer to usefulness in comparison to other similar products known to be useful. *Cf. Anderson*, 480 F.2d at 1399; *Application of Kirk*, 376 F.2d at 942 (noting *Application of Adams*, 50 C.C.P.A. 1185, 316 F.2d 476, 478-80 (1963) (Martin, J., concurring and dissenting)).

### 2) *Underlying Factual Basis for Judge Wright's Decision Incorrect*

▮▮▮▮ Defendants next argue that both Judge Wright and the Third Circuit erred in relying on the testimony of Dr. Fox on the issue of utility.[80] They argue

that rather than aiding the court in understanding what the disclosure would mean to one of ordinary skill in the art, the Fox testimony impermissibly supplemented the actual disclosure in the 1953 application. Alternatively, they assert that even if the Fox testimony was properly admitted and relied upon by the courts, it was incorrect and hence fails to support Phillips' claim of utility. To this end, Defendants produced an expert, Dr. Fred W. Billmeyer, to contest Dr. Fox's testimony in the section 146 action.

It is axiomatic that the use of expert testimony is often required to aid the court in understanding what a disclosure means or meant to one of ordinary skill in the art. *Accord, Moeller v. Ionetics, Inc.*, 794 F.2d 653 (Fed.Cir.1986); *Seattle Box Co. v. Indus. Crating & Packing, Inc.*, 731 F.2d 818, 826 (Fed.Cir.1984), *appeal after remand*, 756 F.2d 1574 (Fed.Cir.1985). In order to prove that the claim fails for lack of an enabling disclosure, Defendants must show that the disclosure would not enable one of ordinary skill in the art to use the claimed invention. *See Moleculon Research*, 793 F.2d at 1269 (noting *Atlas Powder*, 750 F.2d at 1576).

---

**80.** Phillips introduced both the District Court and Third Circuit opinions into evidence. (*See* PTX 1739; 1740). Phillips also sought to introduce the trial testimony of Dr. Fox in the section 146 action. (*See* PTX 1405). Defendants apparently objected to the introduction of Dr. Fox's testimony. (*See* Tr. at 2613; DI. 228). Phillips offered the testimony under Federal Rule of Evidence 804(b)(1) as former testimony, an exception to the hearsay rule, and ostensibly for the non-hearsay purpose of showing what evidence was before Judge Wright. (*See* Tr. at 2613-119; *see also* PB at 102-04). At trial, counsel for El Paso did not object to the non-hearsay purpose, (*see* Tr. at 2614), provided that El Paso was permitted to supplement the record to place the testimony in context. (*See* Tr. at 2615-16). Counsel for the other Defendants objected under Federal Rules of Evidence 804(b)(1) and 403. (*See* Tr. at 2616-18).

Further, Defendants brought out the testimony of Dr. Billmeyer to attack the factual bases for Dr. Fox's testimony. The Court has some concern about the position that the Fox testimony is inadmissible to prove the truth of the matters asserted while then proceeding to attack the truth of those matters.

Rulings on evidence are of a procedural nature and hence governed by Third Circuit law.

*See Panduit Corp. v. All States Plastic Mfg., Co.*, 744 F.2d 1564, 1574-75 (Fed.Cir.1984). In considering this matter, the Court has *not* been aided by any discussion from Defendants.

On its face, Federal Rule of Evidence 804(b)(1) requires that the witness be unavailable, *see* Fed.R.Evid. 804(a), and that the Defendants or predecessors in interest had "an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Fed.R.Evid. 804(b)(1). Dr. Fox is deceased and hence clearly unavailable. (*See* Peters, Tr. at 1101; Fed.R.Evid. 804(a)(4)). Further, there is little doubt that the parties to the section 146 action had a similar motive and opportunity for cross-examination. The issue thus becomes whether they were predecessors in interest. I conclude that they were. *See Lloyd v. American Export Lines, Inc.*, 580 F.2d 1179, 1187 (3d Cir.1978); *Standard Oil*, 494 F.Supp. at 421 n. 462. Finally, I cannot conclude that the probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues or undue delay. *See* Fed.R.Evid. 403. Hence, I conclude that PTX 1405 is admissible.

Dr. Billmeyer testified that Dr. Fox's testimony before Judge Wright was fundamentally flawed. As noted *supra*, Dr. Fox testified regarding several utility-related properties disclosed in the 1953 application. Billmeyer attacked the factual bases of Fox's testimony and, as such, the factual bases of Judge Wright's conclusions.

Judge Wright held, as noted *supra*, that the statement disclosed by Phillips "might" be sufficient to disclose a utility and, alternatively, that the disclosure of "sufficient information" regarding the product's Young's modulus, thermal stability and molecular weight would satisfy the requirement. *Standard Oil*, 494 F.Supp. at 385–86. Phillips argues that it is sufficient because one skilled in the art would have recognized that because solid plastics were used for molding, the claimed product could be used to make molded articles.

### a) *Young's Modulus*

No data is given on Young's modulus on the face of the 1953 application. (DTX 15; Billmeyer, Tr. at 1441–43). As noted *supra*, Dr. Fox testified that the solid plastics of commerce in 1952 had a Young's modulus in the range of $10^{11}$ to $10^9$. (*Standard Oil*, 494 F.Supp. at 435; PTX 1405 at 891–93; Billmeyer, Tr. at 1445–47). Defendants urge that Dr. Fox's testimony regarding Young's modulus was in error because the range of Young's modulus for the "solid plastics of commerce" in 1952 was much broader than the range established by Dr. Fox.

Billmeyer disagreed with Fox that one could infer from the 1953 application that the product would be useful for molding articles. According to Billmeyer, the solid plastics of commerce in 1952 included many important commercial polymers with a Young's modulus nearly 100 times less than the lower limit of Fox's range. (Billmeyer, Tr. at 1441–52, 1470–71; *see* DTX 463, 464, 500). Vinyl polymers are examples of such low modulus products. (*Id.*) These low Young's modulus products are unsuitable for molding purposes. (*See* Billmeyer, Tr. at 1470–71). As such, according to Defendants, because Dr. Fox's testimony did not reflect the full range of Young's modulus known in 1952, the disclosure of "solid plastics of commerce" did not necessarily imply usefulness for molding. Defendants further note that the term "solid" does not in and of itself mean that a polymer has a high Young's modulus, contrary to Dr. Fox's testimony, which the Third Circuit noted at page 375 of its Opinion. (*See* Billmeyer, Tr. at 1474–75). Thus, the disclosures in the application would be meaningless to one skilled in the art in 1953. (Billmeyer, Tr. at 1470–71).

Dr. Bailey, on the other hand, agreed generally with Dr. Fox's conclusion that the reference in the 1953 application to solid plastics would have indicated to one skilled in the art products with a Young's modulus of $10^9$ to $10^{11}$ dynes per $cm^2$. (Bailey, Tr. at 2305–06; *see* PTX 1405 at 891–93). Bailey indicated, concurring with Dr. Fox, that there were two types of "solid" plastics known in 1952, namely, the so-called organic glasses [81] and crystalline polymers. (*See* PTX 1405 at 773–79, 891–93) Bailey testified that organic glasses are stiff and have Young's moduli in the $10^{10}$ to $10^{11}$ dynes per $cm^2$ range. (*Id.* at 2309; *see* PTX 1405 at 891–93). He also concurred with Dr. Fox's testimony that the crystalline polymers known at the time of the 1953 application, such as polyethylene, had Young's moduli in the $10^9$ to $10^{10}$ dynes per $cm^2$ range. (*Id.* at 2310: *see* PTX 1405 at 891–93). The modulus of such polymers would be increased by orienting the molecules. (Bailey, Tr. at 2310).

Bailey further indicated that there were other polymers known in 1953 that were softer, between rubbers and organic glasses, such as polyisobutylene, which is a viscous liquid, (*Id.* at 2311), and polyvinyl acetate which is soft at room temperature. On cross-examination, Dr. Billmeyer indicated that some of the polymers of com-

---

81. Bailey testified that Fox referred to plastics like polystyrene and polymethyl methacrylate as "organic glasses." (Bailey, Tr. at 2308). Organic glasses are noncrystalline but they possess a "high glass transition" so that they behave like glass, *i.e.*, like window glass, they are stiff and moldable but they are also brittle and can shatter. (*Id.* at 2308–09).

merce at that time with Young's modulus below those stated by Fox contained plasticizers used to reduce the tensile modulus. (Billmeyer, Tr. at 1491–92). According to Bailey, these plastics have a lower Young's modulus and are *not* solid plastics in the sense that that term is used in the 1953 application. (*Id.; see* PTX 1859; *see also* Bailey, Tr. at 2311–16).

Therefore, Dr. Bailey concluded that the Young's modulus for the product of the 1953 application fell well within the range of modulus values known for *solid* plastics in 1952. Likewise, the solid product prepared by Dr. Long for the trial from the teachings of the 1953 application and the representative Himont product have modulus values within the $10^9$ to $10^{11}$ range. (Bailey, Tr. at 2316–20).

Much of Phillips' argument centers on the fact that there were solid plastics in commerce in 1953 with Young's modulus in the range of $10^9$ to $10^{11}$ and that the Phillips' product fell within that range. The real issue is whether the disclosure of utility "where any of the solid plastics are used" is sufficient. While the utility disclosure in the 1953 application may not be so clear as to "necessarily exclude" the plastics of lower Young's modulus like polyisobutylene, as Phillips contends, nonetheless the patent application does refer to applications where "solid plastics" are used.

b) *Molecular Weight*

Billmeyer testified that he has never known of a commercial plastic used for molding with an intrinsic viscosity of 0.1, the lower range that Fox testified was appropriate for molding. (Billmeyer, Tr. at 1441). In Billmeyer's experience, such low molecular weight materials were so brittle as to crumble on handling. (*Id.*) The Third Circuit noted that the addition of plasticizers could solve any brittleness problem (*Standard Oil*, 664 F.2d at 375), but Billmeyer contended that the plasticizers available in 1952 were only capable of correcting brittleness in polar polymers,

whereas the product of the 1953 application was non-polar. (Billmeyer, Tr. at 1473–74). In short, Defendants urge that the 1953 application failed to teach a sufficiently high molecular weight to indicate an absence of brittleness and that one skilled in the art in 1952 would not have known that the new product should be softened by plasticizers.

Dr. Bailey indicated that plasticizers such as diethyl or diallylphthalate used in softening polar polymers, would not be useful in non-polar hydrocarbons but that it was known within the skill of the art in 1952 that non-polar hydrocarbons could be softened and toughened. (Bailey, Tr. at 2322–24). Specifically, Bailey testified that lower molecular weight polypropylene or high molecular weight atactic polypropylene could be used to soften the product, (Bailey, Tr. at 2323, 2393–2400; PTX 1405 at 780, 1108), although it is not clear that this process would have been known to one skilled in the art in 1952.[82] Bailey also indicated the polyisobutylene had been used as a plasticizing agent for polyethylene prior to 1952. (Bailey, Tr. at 2451–54) The use of plasticizers in general to soften brittle materials was known in 1952. (Bailey, Tr. at 2322; Porter, Tr. at 2553–58; PTX 1846, 1845).

Defendants' evidence, on the whole, did nothing to counter the conclusion that brittle plastics had useful application in 1952. (*See Standard Oil*, 664 F.2d at 375). Polystyrene is an example of a brittle plastic which had achieved a degree of commercial success by 1953 and which is still used today in making styrofoam cups and insulation. (*See* Mark, Tr. at 533; Billmeyer, Tr. at 1501; Bailey, Tr. at 2324–25; PTX 1149 at 40–47; PTX 1405 at 1106, 1111–13).

c) *Thermal Stability*

As noted *supra,* Judge Wright found that the polymers described in the 1953 application were thermally stable at molding temperatures. *Standard Oil,* 494 F.Supp. at 435. Defendants attack the reli-

---

**82.** Dr. Porter indicated that adding a rubbery material to polymers improves their toughness while decreasing their modulus. (Porter, Tr. at 2553–54; *see also id.* at 2555–58 (addition of rubbery additives could soften and toughen product reproduced by Dr. Long); Long, Tr. at 2788).

ability of Dr. Fox's testimony based on thermal stability tests. They argue that:

The purported tests of thermal stability disclosed in the 1953 application did not indicate that the polymers disclosed therein would have been thermally stable at their molding temperatures as such tests, in order to have produced reliable results, would have had to have been conducted substantially in the absence of oxygen, whereas the fabrication of polymers into molded articles was done in the presence of substantial amounts of oxygen, which presence, as was known in 1953, caused such polymers to more readily decompose at molding temperatures.

(Billmeyer, Tr. at 1453–64; DTX 15 at 24–25; DTX 465, 466).[83]

Dr. Billmeyer acknowledged that thermal degradation through oxidation[84] could be avoided through the use of antioxidants. (Billmeyer, Tr. at 1479–80; *see* DTX 465). Further, a skilled polymer chemist in 1952 would have known that the addition of antioxidants to polymers mitigated oxidation. (Billmeyer, Tr. at 1480; *see id.* at 1482–84). The 1953 application itself discusses the temperature ranges for thermal degradation. (*See* DTX 15 at 24–25). As such, the 1953 application taught one skilled in the art in 1953 that the solid polymer disclosed in the application would be thermally stable at normal polymer fabrication temperatures. Dr. Billmeyer did not state that the use of antioxidants in the crystalline polypropylene would not be known to one of ordinary skill in the art in 1952 or used by him in conjunction with the Phillips' solid polymer product.

For all of the reasons set forth above, I find and conclude that Defendants have failed to carry their burden of proof by clear and convincing evidence that the 1953 application is defective under sections 101 and 112.

### 2. Best Mode

■■■ "[T]here is no objective standard by which to judge the adequacy of a best mode disclosure. Instead, only evidence of concealment (accidental or intentional) is to be considered. That evidence, in order to result in affirmance of a best mode rejection, must tend to show that the quality of an applicant's best mode disclosure is so poor as to effectively result in concealment." *Matter of Application of Sherwood,* 613 F.2d 809, 816 (C.C.P.A.1980), *quoted in DeGeorge,* 768 F.2d at 1324; *Datascope Corp. v. Kontron, Inc.,* 611 F.Supp. 889, 894 (D.Mass.1985), *aff'd,* 786 F.2d 398 (Fed.Cir.1986). "The purpose of the best mode requirement 'is to restrain inventors from applying for patents while at the same time concealing from the public preferred embodiments of their inventions which they have in fact conceived.'" *DeGeorge,* 768 F.2d at 1324 (quoting *Application of Gay,* 50 C.C.P.A. 725, 309 F.2d 769, 772 (1962)); 2 D. Chisum § 7.05[1]. The best mode requirement deals with that contemplated by the inventor at the time of the filing, not the best mode in an absolute sense. 2 D. Chisum § 7.05[1]. As such, not complying with the subjective best mode requirement "amounts to concealing the preferred mode contemplated by the applicant at the time of filing." *Application of Gay,* 309 F.2d at 772–73, *noted in DeGeorge,* 768 F.2d at 1324.[85] Compliance with the requirement is satisfied when the inventor discloses his preferred embodiment. *Application of Gay,* 309 F.2d at 772, *noted in DeGeorge,* 768 F.2d at 1324–25. Best mode is a question of fact. *DeGeorge,* 768 F.2d at 1324 (noting *McGill Inc. v. John Zink Co.,* 736 F.2d 666, 676

---

83. The tests demonstrated that the solid polymer was thermally stable to a temperature of 700°F, which is substantially higher than the disclosed polymer melting point of 240–300°F. (DTX 15 at 24–25).

84. On cross-examination, Dr. Billmeyer noted two types of thermal degradation: heat degradation and oxidation in the presence of heat. (Billmeyer, Tr. at 1478–79).

85. Hence, in order to prove that the best mode requirement is not satisfied, "it must be shown that the applicant knew of and concealed a better mode than he disclosed." *Hybritech,* 802 F.2d at 1384–85 (noting *DeGeorge,* 768 F.2d at 1324; *Sherwood,* 613 F.2d 809).

(Fed.Cir.), *cert. denied*, 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984)).

Defendants argue that (1) none of the solid polymer fractions relied upon by Phillips as actual reductions to practice in the section 146 action were disclosed in the 1953 application (*See Standard Oil*, 494 F.Supp. at 411–12); (2) three experiments conducted by Hogan and Banks prior to filing the 1953 application yielded higher average weight percentage insoluble residue than reported in the 1953 application; and (3) all of the examples in the 1953 application were deleted from the 1956 continuation-in-part application, with specific examples from the first polypropylene polymerizations by Hogan and Banks inserted in their place. As such, according to Defendants, Hogan and Banks either accidentally or intentionally concealed the best mode.[86] Defendants must carry their burden of persuasion by clear and convincing evidence. *See* 35 U.S.C. § 282.

In brief, Defendants argue that several additional propylene polymerizations that were carried out at Phillips prior to the filing of the 1953 application were not reported to the Patent Office. These runs produced higher amounts of the desired insoluble solid polymer fractions which were isolated from the total polymerization products and by-products obtained at roughly the same rate of conversion of propylene to polypropylene. In short, there were a number of polymerization experiments which yielded, at equal conversions, "substantially greater amounts" of the insoluble solid polymer fraction. In the 1953 application, the percentage for the methyl isobutyl ketone ("MIBK") insoluble fraction ranged from 0.5% to 10.2% (DTX 15 at 18–22; 479 at 51–53). The overall average of insoluble residue for the experiments reported was 4.7%. (DTX 15 at 18–22).[87] Three other undisclosed runs conducted by Phillips produced insoluble fractions of 13.9%, 11.4% and 13.4%, an average of 12.7% insouble residue, nearly three times the average weight soluble residue reported in the 1953 application.[88] (*See* DTX 479 at 53–55; DTX 52 at 5–7). Further, in 1956, the results of these runs were not added to the continuation-in-part application. (DTX 13A).[89] Defendants contend that the undisclosed experiments were conducted for a reaction time of 12 hours as compared to 6 hours as disclosed in the experiments reported in Tables XI and XII and the general reaction time listed in the 1953 application. Further, lower reaction temperatures were used, *e.g.*, 950°F as compared to 1020°F–1300°F used in the disclosed experiments. (*See* DTX 15 at 9, 18–22; DTX 52 at 5–7). As such, "[t]he substantially higher percent MIBK insoluble yields obtained in the withheld runs were (or should have been) a clear indication to Phillips that the longer reaction

---

**86.** In the section 146 action, Montedison argued that (a) the 1953 application did not disclose any of the four runs relied on by Phillips as reductions to practice; (b) the application did not teach the proper practice for preventing poisoning by moisture or that moisture was indeed a catalyst poison; and (c) the application did not teach what substances served as catalyst poisons. *Standard Oil*, 494 F.Supp. at 434–35. Judge Wright rejected (a) because of a failure of proof by Montedison. There was no proof that Hogan and Banks "knew" that any of the four runs produced materially better results than the procedures specified in the application nor was there any proof of intentional concealment. As to (b) and (c), Judge Wright held that Hogan and Banks were not required to describe information already well known to polymer chemists. *Id.*

**87.** The only information contained in the 1953 Phillips application specifically relating to the weight percentage of the insoluble polypropy-

lene fraction obtained by Phillips is that described in Tables XI, XII, XIV and XV on pages 18, 19, 21 and 22. (DTX 15).

**88.** According to Robert Banks, one of the inventors listed on the '851 patent, these results were contained in a standard progress report which was circulated to the patent division at Phillips. (DTX 479 at 55–57). Banks also indicated that he did not know why the data was not included in the 1953 application. (*Id.* at 55).

**89.** In the 1956 continuation-in-part application, Phillips deleted all of the examples from the 1953 application and added specific descriptions of Hogan and Banks' first polypropylene polymerization experiments. Phillips argues that Hogan and Banks did disclose the use of a titanium catalyst in Example IV of the 1956 continuation-in-part application in order to comply with the best mode requirement. (*See* DTX 13A at 16–18).

time and lower catalyst activation temperature used therein were important factors" and taught a better method of making and using the invention. (DRB at 39).

Defendants also argue that Phillips disclosed the effect of varying the catalyst activation temperature in the 1953 application. The 1953 application indicates that at temperatures below 1020°F, the MIBK insoluble yield was negligible. (DTX 15 at 17–18, Table XI). Table XI also indicates that the "activity of the catalyst increased over the range of 750 to 1500°F. (Id.) But the yields of the undisclosed experiments were higher using a lower catalyst activation temperature.

Defendants argue that Phillips has offered "no explanation" in response to these three contentions. They assert that because Hogan and Banks knew of the higher yielding experiments and, either accidentially or intentionally, failed to disclose them to the Patent Office, the '851 patent is invalid for failure to disclose the best mode.

Phillips provides little substantive argument on the best mode issue. Rather, Phillips simply contends that Defendants merely found some experiments done in the early 1950s that were not placed in the application and then proceed to argue that Phillips has failed to explain the reason for their absence when it is Defendants' burden to prove failure to disclose the best mode.

Phillips asserts that Tables XI, XII, XIV and XV "show the effects of varying the catalyst activation temperature, the effects of reusing the catalyst after repeated regenerations, the effects of varying the operating temperature, and the relationship between the propylene concentration in the feed and propylene conversion and percent MIBK insolubles." (PB at 89).[90] Thus, Phillips contends that this data and other disclosures in the application would allow one of ordinary skill in the art to select

appropriate operating conditions needed to produce the product of the 1953 application. (Id.) "Under these circumstances, it is completely irrelevant that Hogan and Banks did not disclose the results of any particular experiment when the application as a whole teaches how to adjust all the various factors in the polymerization to obtain whatever results are desired." (Id. at 89–90).

Of course, whether Phillips has offered an explanation or not is only material if Defendants have met their burden of production. If they have not, then Phillips need offer no rebuttal because Defendants will have failed to carry their burden of persuasion.

In this instance, Defendants have presented no trial testimony in support of their best mode defense. The deposition testimony of Banks simply corroborated the existance of the three unreported experiments. Defendants' evidence shows that three experiments which yielded a higher weight percentage MIBK insoluble solid product after polymerization with a catalyst activated at 950°F were not included in either the 1953 or 1956 applications.[91]

Nonetheless, the state of the record leaves the Court with the alternative of speculating as to the importance of the variations pointed to by Defendants. No expert testimony was offered as to the effect of the undisclosed information on the product disclosed by the 1953 application. Likewise, no testimony was offered to indicate that the variations in catalyst activation temperature would not be within the skill of the art in 1953. No testimony was offered to establish that all of the conditions of these experiments were within the teachings of the 1953 application. While failing to include examples that produce a better product could be the basis for invalidation under section 112, see, e.g., Engelhard Industries, Inc. v. Sel–Rex Corpora-

90. Defendants argue that Phillips thought that these varying conditions were of sufficient import to discuss their effect in the 1953 application. (DRB at 39).

91. Defendants do not support or expand their argument regarding the experiments relied upon as actual reductions to practice in the section 146 action or their argument that all of the examples of the 1953 application were deleted in the 1956 continuation-in-part application.

*tion,* 253 F.Supp. 832, 836–37 (D.N.J.1966), Defendants still must carry their burden of persuasion by clear and convincing evidence. I conclude that they have failed to prove by clear and convincing evidence that the disclosures in the 1953 and 1956 applications concealed the preferred mode of producing the product claimed.

### E. Inequitable Conduct

■ Defendants argue that even if the '851 patent is valid, it is unenforceable because Phillips engaged in inequitable conduct before the PTO. One who comes before the PTO seeking a patent owes the highest duty of candor in dealing with the PTO. *See, e.g., Hycor Corp. v. Schlueter Co.,* 740 F.2d 1529, 1538 (Fed.Cir.1984). That duty is breached and inequitable conduct occurs where an applicant misrepresents or withholds material information with the intent to mislead. *Id. See also J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.,* 747 F.2d 1553, 1559 (Fed.Cir.1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). As the Federal Circuit has noted, inequitable conduct is broader than common law fraud. *J.P. Stevens,* 747 F.2d at 1559; *American Hoist,* 725 F.2d at 1363–64. It encompasses both affirmative acts of commission as well as acts of omission. *Id.*

■ One who asserts that inequitable conduct has occurred carries a heavy burden of proof. *Kansas Jack, Inc. v. Kuhn,* 719 F.2d 1144, 1151 (Fed.Cir. 1983). Inequitable conduct must be established by "clear, unequivocal and convincing evidence." *Orthopedic Equip., Inc. v. All Orthopedic Appliances,* 707 F.2d 1376, 1383 (Fed.Cir.1983); *Driscoll v. Cebalo,* 731 F.2d 878, 884 (Fed.Cir.1984). It is not sufficient to simply show that an applicant misrepresented or withheld information. *Hycor,* 740 F.2d at 1538–39; *American Hoist,* 725 F.2d at 1364. Instead, one alleging inequitable conduct must make a threshold showing: (1) that the information misrepresented or withheld was material; and (2) that the applicant acted with the requisite intent. *Orthopedic Equipment,* 707 F.2d at 1383. *See also Akzo,* 808 F.2d

at 1481; *J.P. Stevens,* 747 F.2d at 1559–60; *Hycor,* 740 F.2d at 1538; *Driscoll,* 731 F.2d at 884 (Fed.Cir.1984); *Kansas Jack,* 719 F.2d at 1151.

A threshold showing of materiality is established by satisfying the standard set forth in Patent and Trademark Office Rule 1.56(a): whether there is a substantial likelihood that a reasonable examiner would have considered the omitted or misrepresented information important in deciding whether to allow the application to issue as a patent. *Atlas Powder,* 750 F.2d at 1577–78; *J.P. Stevens,* 747 F.2d at 1559.

■ One asserting inequitable conduct as a defense must also make a threshold showing of intent. *Atlas Powder,* 750 F.2d at 1578; *J.P. Stevens,* 747 F.2d at 1560. Intent need not be proven by direct evidence. *Id.; see also, Hycor,* 740 F.2d at 1540; *Kansas Jack,* 719 F.2d at 1151. Instead, intent may be established by a showing of acts "the material consequences of which are presumably intended by the actor." *Kansas Jack,* 719 F.2d at 1144; *see also, Atlas Powder,* 750 F.2d at 1578; *J.P. Stevens,* 747 F.2d at 1560; *Hycor,* 740 F.2d at 1540. Nor need the evidence demonstrate deliberate scheming by the actor. *Atlas Powder,* 750 F.2d at 1560; *J.P. Stevens,* 747 F.2d at 1560. Proof of gross negligence (*i.e.,* where the actor, judged as a reasonable person in his position, should have known of the materiality of the misrepresented or withheld information) is sufficient. *Id. See also Kansas Jack,* 719 F.2d at 1151. Simple negligence, oversight or an erroneous judgment made in good faith, on the other hand, are insufficient. *Atlas Powder,* 750 F.2d at 1578; *J.P. Stevens,* 747 F.2d at 1560; *Hycor,* 740 F.2d at 1540; *Orthopedic Equipment,* 707 F.2d at 1383.

■ If the threshold showings of materiality and intent are made, the court must then balance the two elements together to determine whether inequitable conduct has occurred. *N.V. Akzo v. E.I. DuPont de Nemours,* 810 F.2d 1148, 1153 (Fed.Cir.1987); *J.P. Stevens,* 747 F.2d at 1560; *Hycor,* 740 F.2d at 1539; *American Hoist,* 725 F.2d at 1364. The less material

the misrepresented or withheld information, the greater the degree of intent which must be proven. *Akzo v. DuPont,* 810 F.2d at 1153; *American Hoist,* 725 F.2d at 1363. Conversely, a lesser degree of intent must be proven when the information has a high degree of materiality. *Id.* If, after weighing the elements together, the Court concludes that inequitable conduct has occurred, the patent must be declared unenforceable. *J.P. Stevens,* 747 F.2d at 1560.

## 1. Factual Background: The Development of Crystalline Polypropylene

In order to examine Defendants' claims that Phillips engaged in inequitable conduct before the PTO, it is necessary to briefly review the development of crystalline polypropylene.

### a. *The Early Work at Phillips*

In June, 1951, J. Paul Hogan and Robert L. Banks, two researchers at Phillips, were involved in a project to find a catalyst which would convert propylene to gasoline. (DTX 479 at 6–7). On June 5, 1951, they conducted an experiment using a catalyst composed of a support made of silica and alumina impregnated with an oxide of chromium (sometimes called "chromia") and nickel. (DTX 95; 479 at 6–9; 482 at 6–7, 11). They obtained not a liquid fuel but rather a product which Banks characterized as a "heavy waxy polymer." (DTX 95; 479 at 7–9). Hogan and Banks further described the product as a "unique solid material" having a "tacky, latex-like nature." (DTX 42). In subsequent experiments, Hogan and Banks omitted the nickel and used only chromia on silica-alumina catalysts. (DTX 479 at 12; 482 at 7–8; 48; 17). Hogan and Banks' chromium oxide catalyst ultimately became known as the MARLEX catalyst. (DTX 93, 26, 4).

On two separate occasions, in October and November of 1951, Edward R. Francis, who reported to Hogan at Phillips, polymerized propylene with the chromia on silica-alumina catalyst. (DTX 482 at 5, 12–13; 16–18; 43–44). The polymers obtained in those runs were not characterized in terms

of melting point, density or intrinsic viscosity.

Hogan and Banks' work on the polymerization of propylene and other olefins using chromia on silica alumina catalysts continued throughout 1951 and 1952. Only two samples of solid polypropylene made by Hogan and Banks in 1951–52 were characterized by melting point, density and intrinsic viscosity. Sample PO–133, which was made in February, 1952, had a melting point of 236°F, a density of 0.914 and an intrinsic viscosity of 0.508. Sample PO–116, which was made in April, 1952, had a melting point of 267°F, a density of 0.906–0.907, and an intrinsic viscosity of 0.417–0.-422. (DTX 490). Phillips' scientists characterized both PO–133 and PO–116 as "very brittle." (DTX 34, 368, 490).

On March 14, 1952, Hogan and Banks submitted a Disclosure of Invention to the Phillips Patent Department, which was directed to a "process for the production of propylene polymers", "improved polymer products from propylene, 1–butene and other monoalkylethylenes" and a "new catalyst for polymerization." This invention disclosure did not characterize the solid polypropylene in terms of melting point, density or intrinsic viscosity. (DTX 53).

On November 26, 1952, in response to a request for information to be included in a patent application, Hogan recorded the following ranges of properties for the solid polypropylene made using the chromia on silica-alumina catalyst:

| | | |
|---|---|---|
| melting point °F: | 240 | – 280 |
| density: | 0.90 | – 0.95 |
| intrinsic viscosity: | 0.2 | – 1.0 |
| weight average molecular weight: | 5,000 | – 20,000. |

(DTX 56; 482 at 81–83).

On January 27, 1953, Phillips filed its original patent application. (DTX 15). The application contained the following description of the solid polypropylene fraction:

The solid polymer fraction is insoluble in pentane at room temperature. The solid material has a melting point in the range of 240 to 300 °F, a density in the range of 0.90 to 0.95, an intrinsic viscosity in the range of 0.2 to 1.0, and a weight average

molecular weight of approximately 5,000 to 20,000.

(DTX 15 at 30–31). On December 20, 1954, Phillips filed a continuation-in-part application. The 1954 application contained a written description of the solid polypropylene which was virtually identical to the description in the 1953 application. (DTX 14 at 39, lines 6–10; Long, Tr. at 678).

### b. The Discoveries of Ziegler and Natta

In 1953, Professor Karl Ziegler and his colleagues at the Max Planck Institute for Coal Research in Mulheim, Germany, discovered a catalyst system which would polymerize ethylene to high molecular weight linear crystalline macro-molecules. (Mark, Tr. at 505–09; 520–21). Ziegler and his colleagues eventually discovered a broad range of catalytic compositions which were formed by combining heavy metal salts with organometallic compounds. One of the earliest and most promising of these catalytic compositions was formed from titanium tetrachloride ($TiCl_4$) as the heavy metal salt and triethylaluminum ($AlEt_3$ or TEA) as the organometallic compound. (Mark, Tr. at 505–09, 520–21, 536–37; Bailey, Tr. at 255–56).

At the time of Ziegler's discovery, associates of Professor Guilio Natta of the Institute for Polymer Research of Milan, Italy, were working in Ziegler's laboratory. (Mark, Tr. at 509–10). In 1954, Natta polymerized propylene using Ziegler's $AlEt_3/TiCl_4$ catalyst system. Natta isolated a solid polymer from the total reaction product by extraction with boiling normal heptane. (Mark, Tr. at 511). The resulting product was a high molecular weight polypropylene. (Mark, Tr. at 521–22).

Following the initial experiments with Ziegler's $TiCl_4$ catalyst, Natta discovered that the properties of the resulting polypropylene fraction could be improved by using titanium trichloride ($TiCl_3$) rather than $TiCl_4$. (Mark, Tr. at 536–37, 566–68; Bailey, Tr. at 255–56). This improved catalyst became known as the Ziegler–Natta catalyst.

### c. Subsequent Developments at Phillips

In 1955, scientists at Phillips became aware of Natta's work with polypropylene. The results of Natta's work were first published in an article appearing in the *Journal of the American Chemical Society* on March 20, 1955. (DTX 98; Mark, Tr. at 512; Bailey, Tr. at 303–04). The article described only the properties of the polypropylene obtained by Natta, not the catalyst or the process for making it. (*Id.*) Following the publication of Natta's results, Dr. William B. Reynolds, Assistant Director of Research at Phillips, met with Professor Herman Mark. (Mark, Tr. at 515; DTX 487 at 52–53). Mark speculated to Reynolds that, in carrying out his polymerization of propylene, Natta had used a Ziegler catalyst, possibly comprised of triethyl aluminum and a metal oxide. (DTX 23; Mark, Tr. at 515–16). Dr. Reynolds concluded, however, that Natta's catalyst system might instead be composed of metal alkyls and titanium chloride. (DTX 23). He characterized Natta's work as a "very basic and important development" and suggested to his colleagues that Phillips should study the Ziegler–Natta system in connection with the polymerization of propylene. (DTX 23; 24; 64; 65; 69–73).

Phillips carried out Dr. Reynolds' proposal. In April, 1955, Mr. Gene Nowlin, a chemist at Phillips, began a series of experiments using a catalyst composed of triethyl aluminium and titanium tetrachloride. (DTX 27). He first polymerized propylene with this catalyst on May 13, 1955, and again on May 30, 1955, and, in the latter experiment, reported that he obtained a "tough" elastomer. (DTX 27). In May, 1955, Jimmie S. Payne, an employee of Phillips, was assigned a project of polymerizing various olefins using the Ziegler TEA/$TiCl_4$ system. (DTX 65; 486 at 4–5, 8, 10–12). Payne first polymerized propylene with a TEA/$TiCl_4$ catalyst on approximately June 23, 1955.[92] (DTX 65; 486 at 12–14, 24–25).

92. At that time, Payne did not fractionate the

total polymer. (DTX 65; 486 at 24–29). On

At about the time Payne was conducting his experiments, Dr. Reynolds observed: "The more I see of the so called Ziegler polymerization the more I am of the opinion that this process represents one of the most basic catalytic process discoveries in many years. The process is undoubtedly far more general and versatile than demonstrated for MARLEX." (DTX 26).

In August, 1955, Gerald T. Leatherman of Phillips' Hydrocarbon Conversion Branch began further studies of Hogan and Banks' chromium oxide catalyst. (DTX 2, 4). He later described the purpose of his work as an "attempt to make solid polypropylene of high molecular weights similar to the Natta isotactical polypropylene polymers." (DTX 4). The highest molecular weight solid polypropylene obtained had a molecular weight[93] of 31,030.[94] (DTX 4). Leatherman described the material as "brittle." (DTX 4). He also believed that "the molecular weight of the polymer may have to be greater than 50,000[95] for it to have much flexibility. (DTX 4). In summarizing his work, Leatherman concluded that "the MARLEX catalyst was not going to be readily adaptable to making high molecular weight polypropylene even in low yields." (DTX 4, 437).

In October, 1955, Leatherman submitted one of his polypropylene samples to Vernon Thornton, also of Phillips, for infrared analysis, seeking to know whether it was a "highly crystalline iso-tactical polymer like those made over Ziegler [sic] catalyst." (DTX 91B). Thornton's infrared study was inconclusive. (DTX 5). These results apparently caused Thornton to re-examine infrared studies he had performed on the Hogan and Banks polypropylenes made in 1951. (DTX 102). Following infrared and x-ray studies of these samples, Thornton concluded in a December 27, 1955, memo that "the sample of 'polypropylene gel' studied in December 1951, was an isotactical polymer." (DTX 102).

Thornton advised Phillips' patent department of his conclusions. (PTX 1594[96] at 81–82). Thornton also informed the patent department that others, including Natta, were claiming the invention of crystalline polypropylene. (PTX 1594 at 61–63; PTX 1878 at 10–11). Phillips decided to file a new patent application in order to provoke an interference. (PTX 1594 at 61–62, 191). Although Phillips believed that its 1953 application described crystalline polypropylene, it was concerned that other parties might attempt to word claim language so as to prevent Phillips from participating in an interference on crystalline polypropylene. (PTX 1594 at 61–62, 64, 94–95, 208; PTX 1878 at 21). In particular, Phillips was concerned because the word "crystalline" did not appear in the 1953 application. (*Id.*) Phillips believed that the Patent Office would look merely to the words used in the application rather than considering the melting point, solubility and other properties set forth in the application as disclosing crystallinity. (*Id.*) Phillips thus filed the 1956 application in order to establish the best possible support for a determina-

---

approximately July 29, 1955, Payne used boiling n-heptane to isolate a solid from the polypropylene he had made in his June 23 experiment. (DTX 65; 486 at 12–13, 15–16, 24–26). Payne's fractionation came shortly after Natta first publicly disclosed his use of boiling n-heptane to fractionate polypropylene made with the Ziegler catalyst. (DTX 127A, 128A; Mark, Tr. at 554). While Defendants point to DTX 21 for a disclosure of the properties of Payne's heptane insoluble fraction, there is nothing in DTX 21 which makes a specific reference to Payne's work. Nor have Defendants cited anything else in the record to tie DTX 21 to Payne's experiments. The Court thus cannot rely on DTX 21 for the purposes suggested by Defendants.

93. The Court assumes that the molecular weight data set forth in Table I of DTX 4 are *average*

molecular weight figures. (*See* Bailey, Tr. at 149).

94. The corresponding intrinsic viscosity for such a polymer would be 1.26. (Long, Tr. at 699–701).

95. The corresponding intrinsic viscosity for such a polymer would be 2.0. (Long, Tr. at 710).

96. At trial, the Court reserved decision on the admissibility of PTX 1594. While Defendants originally objected to its admission, they now cite the exhibit in support of their own position. (*See, e.g.,* DFF 99, 100). The Court thus finds that Defendants have waived their objection to PTX 1594.

tion of priority on the product of crystalline polypropylene, which Phillips believed its scientists were the first to invent. (*Id.*)

The disclosure in Phillips' January, 1956, application differed significantly from the disclosure in the 1953 and 1954 applications. (DTX 13A at 12; 14 at 39; 15 at 30–31; 432). The range of intrinsic viscosities was increased from a maximum of 1.0 to a maximum of 5.0. (*Id.*) The melting point range was broadened from 240–300%AlF to 230–320%AlF. (*Id.*) The weight average molecular weight was increased from a maximum of 20,000 to "50,-000 and higher." (*Id.*) Neither Hogan nor Banks knows why these ranges were broadened. (DTX 482 at 201–06; DTX 479 at 147–49). Hogan assumed that Phillips' patent attorneys had some legal reason for broadening the range of properties. (DTX 482 at 205).

The 1956 application included four descriptive examples of the invention. (DTX 13A at 13–19). None of these examples was in the 1953 or 1954 application. Hogan and Banks do not recall any discussions at Phillips concerning examples which were to be included in the January 1956 application. (DTX 482 at 139–41; DTX 479 at 91–92).

Examples I, II and III describe polymerizations carried out using a chromia on silica-alumina catalyst. (DTX 13A at 13–16). With respect to Example I, infrared analysis indicated that the solid polymer was at least 80% crystalline. (DTX 13A at 14, 31). "Marked crystallinity" was also reflected by x-ray scattering curves for the polymer. (*Id*). The application explained that the propylene polymer had a melting point of 290 to 305°F, and explained that in "most cases" the melting point was at least 280°F. (DTX 13A at 14). No other data, such as molecular weight, density or intrinsic viscosity, were provided for the product of Example I. The polypropylene product of Example II was described as having infrared spectra similar to those for Example I. (DTX 13A at 15). It was not otherwise characterized in terms of physical or mechanical properties. The polypropylene fraction of Example III was also character-

ized as having infrared spectra similar to those for Example I. (DTX 13A at 16). Its density was listed at 0.936. (*Id.*) The application included no other data or descriptive characteristics regarding the solid polypropylene fraction of Example III.

Unlike Examples I to III, Example IV of the 1956 application describes a propylene polymerization carried out with a catalyst comprised of triethyl aluminum and titanium tetrachloride. (DTX 13A at 16–19). The following properties are set forth for the solid polypropylene fraction:

| | |
|---|---|
| Density, grams per cc at room temp. | 0.905 |
| Melt index | 0.341 |
| Molecular weight (based on melt index) | 46,600 |
| Inherent viscosity | 3,361 |
| Molecular weight (based on inherent viscosity) | 82,175 |
| Melting point, °F | 300 |
| Ash content, % | 0.254 |
| Flexibility | Good |
| No strength temperature, °F | 318 |

(DTX 13A at 17) (footnote omitted). The application also explained that the solid polypropylene fraction had infrared spectra similar to those for Example I. (DTX 13A at 18). X-ray diffraction patterns for the sample indicated a "highly crystalline structure." (DTX 13A at 19).

Defendants argue that by withholding certain information from its 1956 application, Phillips engaged in inequitable conduct. More specifically, Defendants claim that Phillips: (1) failed to inform the PTO that Example IV was based on the work of Ziegler and Natta and did not represent the work of Hogan and Banks; (2) failed to inform the PTO that the processes invented by Hogan and Banks were not capable of producing polypropylenes having intrinsic viscosities of 0.2 to 5.0, the range specified in the application; (3) failed to include as examples Runs PO–116 and PO–133 which yielded polymers which Phillips itself characterized as "brittle"; (4) failed to inform the PTO that scientists at Phillips had concluded that the processes of Hogan and Banks "were not readily adaptable to making high molecular weight polypropylene even in low yields." (*See* DTX 4).

Phillips argues that in the section 146 proceeding Judge Wright considered and

rejected Defendants' claims that Phillips engaged in inequitable conduct. Phillips points to the following language in Judge Wright's opinion:

> Montedison, joined by Du Pont, also allege that Phillips copied into its 1956 application data published by Natta.... Both parties allege that as a result of these acts, Phillips fraudulently gained entry to this Interference.
>
> If Phillips had read Natta's disclosure, followed it, produced a conforming product for the first time, and then applied for a patent, the Court might well find fraud. Phillips did not however engage in this devious chain of activity, but merely executed Natta's tests on products that it had independently conceived and produced, in order to sharpen the issues before the Examiners. The Court does not find that this activity rises to the level of misrepresentation and therefore does not find fraud.

*Standard Oil*, 494 F.Supp. at 454 (footnotes omitted).

It is clear that Judge Wright addressed *a* claim of inequitable conduct against Phillips. In quoting Judge Wright's opinion, however, Phillips deleted two sentences which make it clear that Judge Wright's holding was a limited one. Those sentences, which Phillips chose to represent with an ellipse in the quotation set forth above, provided as follows:

> Specifically, Montedison faults Phillips's application for using both the term "crystalline" and the idea of relying upon x-ray analysis as proof of crystallinity. Du Pont faults Phillips only for appropriating the term "crystalline."

*Id.* The quoted sentences make it clear that the only claims of inequitable conduct by Phillips addressed by Judge Wright were Phillips' use of the term "crystalline" and its reliance on x-ray analysis. Those issues are separate and distinct from the assertions raised by Defendants in the instant case. The Court thus concludes that Judge Wright made no findings or conclusions with respect to the specific claims at issue here.

## 2. Materiality

Defendants argue that a reasonable examiner would have considered the information omitted by Phillips to be important in deciding whether to allow Phillips to participate in the interference. Additionally, Defendants contend that in the post-interference proceedings, the information would have been important to a reasonable examiner in deciding whether to allow Phillips a patent as broad in scope as that which Phillips sought.

Defendants produced no direct evidence of materiality. *See Pacific Furniture Mfg. Co. v. Preview Furniture Corp.*, 800 F.2d 1111, 1114 (Fed.Cir.1986). While the Court does not mean to imply that such proof is required, it certainly is preferable to mere speculation. It is not enough to simply point the Court to information withheld by an applicant and make a bald assertion that it would have been important. Instead, it is the burden of Defendants to demonstrate the specific manner in which a reasonable examiner would likely have used the particular information at issue. As the discussion below illustrates, Defendants have failed to meet that burden.

Defendants first fault Phillips for not informing the PTO that Example IV was derived from the work of Ziegler and Natta rather than the work of Hogan and Banks. In assessing the materiality of the information withheld, it is important to recognize the nature of the invention claimed by Phillips in its 1956 application. Phillips' claim 28, which corresponded to the count in the interference and which ultimately issued as the single claim of the '851 patent, was a *product* claim. If Phillips had filed an application which set forth the Ziegler-Natta process for polymerizing propylene without identifying its origins, and then claimed that *process* as its own, the Court would have little difficulty in concluding that such an omission would be material. But Phillips did not do that. Phillips simply set forth a process, albeit derived from the work of Ziegler and Natta, for making the *product* of Phillips' claim. Defendants must demonstrate how the information withheld by Phillips would have affected

the actions of a reasonable examiner with respect to the product claim at issue.

In attempting to meet that burden, Defendants emphasize that, in contrast to the Hogan and Banks process for polymerizing propylene, the Ziegler-Natta process produces a high molecular weight polymer. Indeed, Defendants specifically fault Phillips for failing to inform the PTO that the Hogan and Banks process could not produce high molecular weight polypropylene having an intrinsic viscosity of up to 5.0. Defendants neglect one crucial point: Phillips' claim 28, which ultimately became the count in interference, contained no limitation regarding molecular weight or intrinsic viscosity. It is, therefore, difficult to see how a reasonable examiner would have disallowed Phillips from participating in the interference even if he had had the information available to him.

While it might be argued that a reasonable examiner would have amended the count to incorporate a molecular weight or intrinsic viscosity limitation, there has been absolutely no proof to support any such contention. Indeed, it seems highly unlikely that the count would have been so amended. It was clear by the time the interference was declared that the molecular weight/intrinsic viscosity of a propylene polymer varied with the catalyst used in polymerization. Phillips' applications implied as much. In its 1953 and 1954 applications, which disclosed only the chromium oxide process for polymerization propylene, Phillips reported intrinsic viscosities of only 0.2 to 1.0, and a maximum weight average molecular weight of 20,000. (DTX 15 at 30–31). The 1956 application, however, which included the use of triethyl aluminum and titanium tetrachloride catalyst, reported intrinsic viscosities of 0.2 to 5.0 and weight average molecular weights of "50,000 and higher." (DTX 13A at 12).

While the 1956 application did not expressly state that the increased ranges of intrinsic viscosities and molecular weight were based on propylene polymers produced with the titanium tetrachloride catalyst, the Court finds that is a fair inference to be drawn from the disclosure.[97]

Moreover, the application filed by Natta himself on June 8, 1955, which was the vehicle through which Montedison gained entry to the interference, expressly stated that the titanium tetrachloride catalyst produced "highly crystalline polymers of *very high molecular weight*, having fiber-forming properties." (DTX 250 at 4)[98] (emphasis added). The application disclosed weight average molecular weight of "above 100,000" and intrinsic viscosities "above 3.0." (DTX 250 at 11–12). It was thus clear by the time the interference was declared that, depending on the catalyst used, propylene could be polymerized to products having a wide range of molecular weights.[99] Despite this knowledge, the patent examiner did not see fit to incorporate a molecular weight or intrinsic viscosity limitation into the count in interference. Nor did the patent examiner see fit to narrow the scope of Phillips' patent to low molecular weight polypropylene during the post-interference proceedings. Defendants' arguments regarding the materiality of information concerning: (1) the origins of the titanium tetrachloride catalyst used in example IV; and (2) the maximum intrinsic viscosity and molecular weight of polypropylene produced with the chromium oxide catalyst, are thus unconvincing.

Defendants' final attack on Phillips' 1956 application is based on Phillips' failure to include as examples Runs PO–116 and PO–133, the results of which Phillips' scientists characterized as "brittle." (*See* DTX 34, 368, 490). Defendants have wholly failed

<hr />

97. This inference is supported by Example IV in the 1956 application. Example IV, which specified the use of a titanium tetrachloride catalyst, disclosed a propylene polymer having an inherent viscosity of 3.36 and a molecular weight of 82,175.

98. DTX 250 was not offered at trial. During a telephone conference on August 20, 1987, however, the parties agreed that DTX 250 may be considered part of the record.

99. Indeed, Defendants concede that "[t]he basic structural features of Natta's isotactic polypropylene ... and its *high molecular weight* were publicly known by July, 1955." (DB at 11 n. 8) (emphasis added) (citations omitted).

to make any showing that a reasonable patent examiner would have considered this information important at the time the interference was declared. The Court is thus left to speculate with regard to the materiality of the information. As discussed *supra*, however, speculation is hardly a sufficient basis upon which to find inequitable conduct. The Court concludes that Defendants have failed to establish that the information at issue would have been important in the pre-interference proceedings.

Defendants have also failed to demonstrate that the information regarding Runs PO-116 and PO-133 would have been important during the post-interference proceedings. Indeed, the evidence is to the contrary. During the course of the interference, it was made clear that Phillips had, in fact, characterized its polypropylene as "brittle." (*See* DTX 254 at 43-44). Despite this information, the patent examiner did not narrow the scope of Phillips' patent following the award of priority to Phillips. The Court is thus unpersuaded by Defendants' arguments that Phillips' failure to include Runs PO-116 and PO-133 in its 1956 application was material.

In sum, Defendants have failed to make a threshold showing of materiality with respect to any of the information at issue. Defendants having failed to meet that burden, it is unnecessary for the Court to determine whether Defendants have made a threshold showing of intent. Even if the Court were required to examine Phillips' intent, however, the Court would conclude that Defendants have failed to make a threshold showing with respect to that element.

#### 3. Intent

 As with the element of materiality, it is critical to recognize the nature of the invention claimed by Phillips in its 1956 application in assessing Phillips' intent in withholding the information at issue. As discussed *supra*, Phillips claimed a *product:* crystalline polypropylene. In making that claim, Phillips was required to set forth the best mode known at the time for making the product. 35 U.S.C. § 112. When Phillips filed its application in 1956, it was clear that use of a titanium tetrachloride catalyst was in fact the best mode for making the product of the claim. Phillips was, therefore, not only justified in setting forth the titanium tetrachloride catalyst but was required to do so.

Defendants fault Phillips, however, not only for including the titanium tetrachloride catalyst but also for failing to disclose its origins. Again, it is critical to recognize that Phillips did not claim the catalyst as its own. If Phillips had done so, Defendants' assertions of inequitable conduct would stand in an entirely different light. Because Phillips did not claim the catalyst, however, the Court concludes that Defendants have failed to make a threshold showing of intent with respect to the information regarding the catalyst.

Defendants have failed to demonstrate a threshold showing of intent with respect to their remaining allegations of inequitable conduct as well. Defendants attack Phillips' expansion of the intrinsic viscosity range from a maximum of 1.0 in its 1953 application to a maximum of 5.0 in its 1956 application. It is most likely, however, that in so doing, Phillips was simply incorporating the possible range of intrinsic viscosities for polypropylene produced with the titanium tetrachloride catalyst. As discussed *supra*, Phillips was required to disclose the use of the the titanium tetrachloride catalyst. As such, Phillips can hardly be faulted for setting forth the possible range of intrinsic viscosities for polymers produced with that catalyst.

Defendants also fault Phillips for failing to disclose that its chromium oxide catalyst could not produce high molecular weight polypropylenes having intrinsic viscosities of up to 5.0. Again, it must be remembered that Phillips did not claim any *process* for the production of polypropylene. If Phillips had claimed that its chromium oxide catalyst could produce polypropylenes having intrinsic viscosities of up to 5.0 and that, in fact, was not true, the Court would have little difficulty in concluding that Phillips had acted with the

requisite intent. But Phillips did not engage in such conduct. The Court does not find that Phillips' failure to disclose that its chromium oxide catalyst could not produce high molecular weight polymers rises to the level of intent (*i.e.*, at least gross negligence) necessary to find inequitable conduct.

Defendants have also failed to establish the requisite level of intent with respect to Phillips' failure to include Runs PO–116 and PO–133 as examples in the 1956 application. As discussed above, Defendants emphasize these particular experiments because Phillips' scientists had characterized the resulting polymers as brittle. In assessing Phillips' intent in not including the experiments, the Court notes that Phillips made no statements in its application regarding the brittleness or toughness of its polymers. If Phillips had stated in its application that its polypropylene was a tough material, the Court would likely have little hesitation in finding an intent to mislead based on the failure to disclose Runs PO–116 and PO–133. Phillips, however, made no such statement.[100]

Nor did Phillips describe its polymer in terms of other mechanical properties, such as stiffness or modulus. Instead, Phillips had one goal in mind in filing its 1956 application: describing *crystalline* polypropylene. That one property—crystallinity—was the heart of what Phillips believed to be its invention. The thrust of Phillips' 1956 disclosure was that property. While the brittleness or toughness of polypropylene would ultimately become crucial to its commercial success or failure, the focus in 1956 was simply not on such properties. The Court concludes, therefore, that Phillips' failure to include Runs PO–116 and PO–133 as examples or to advise the patent examiner of the brittleness of the polymers produced in those runs does not indicate an intent to mislead.

The Court thus concludes that, even if it were necessary to address Phillips' intent in withholding the information at issue, Defendants' assertions of inequitable conduct would nonetheless be unavailing. Because Defendants have failed to establish inequitable conduct on the part of Phillips', the '851 patent is enforceable.

## IV. INFRINGEMENT

Plaintiff alleges that each of the Defendants produces or has produced products which infringe the sole claim of the '851 patent. Section 271 of title 35 of the United States Code provides that "whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent." An allegation of infringement thus raises "at least two questions: (1) what is patented, and (2) has what is patented been made, used or sold by another." *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569 (Fed.Cir. 1983).

Plaintiff has the burden of proving infringement by a preponderance of the evidence. *Envirotech*, 730 F.2d at 758; *Hughes Aircraft*, 717 F.2d at 1361. A plaintiff can meet that burden in either of two ways, that is, by proving infringement on either a literal or equivalents basis. "Literal" infringement is made out where the accused product falls within the literal scope of the claims of the patent as properly construed. *Palumbo v. Don-Joy Co.*, 762 F.2d 969, 974 (Fed.Cir.1985). Even where an accused product does not literally infringe the patent at issue, however, the patentee is entitled to demonstrate that the accused product infringes the patent under the doctrine of equivalents. Judicially devised to do equity, *Hughes Aircraft*, 717 F.2d at 1361, the doctrine of equivalents is designed to protect a patentee from one who appropriates the substance of the invention but avoids the literal language of the patent claims. *Atlas Powder*, 750 F.2d at 1579 (citing *Graver Mfg. Co., Inc. v. Linde Co.*, 339 U.S. 605, 608–09, 70 S.Ct. 854, 856–57, 94 L.Ed. 1097 (1950)). Thus, even though not literally infringing the pat-

---

**100.** The Court recognizes that inequitable conduct is not limited to affirmative misrepresentations but also encompasses acts of omission.

The Court concludes, however, that this particular omission, standing alone, does not indicate an intent to mislead.

ent, a product will be found infringing under the doctrine of equivalents "if it performs substantially the same function in substantially the same way to obtain the same result." *Graver*, 339 U.S. at 608, 70 S.Ct. at 856 (quoting *Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929)).

### A. Literal Infringement

■ In the instant case, Defendants have admitted that their products are "literally embraced" by the sole claim of the '851 patent. (Pretrial Order at 6–8; DFF 7; DCL 16). It thus appears that Defendants have admitted literal infringement of the '851 patent. *See Smith Intern., Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1579 n. 2 (Fed.Cir.1983) ("[A]n admission of 'claim coverage' is an admission of literal infringement.") Curiously, however, Defendants go on to argue that the '851 patent cannot be *construed* to cover their products. (DB at 38). In support of this contention, Defendants assert that the scope of the '851 patent is limited (1) by the specifications contained in Phillips 1953 and 1954 applications; and (2) by the prosecution history of the '851 patent under the doctrine of file wrapper estoppel. The arguments are somewhat puzzling to the Court because they are fundamentally inconsistent with a stipulation of literal infringement. The Court will address each argument in turn.

#### 1. Phillips' 1953 and 1954 Specifications

■ In its 1953 application, Phillips described the properties of its polypropylene as follows:

> The solid polymer fraction is insoluble in pentane at room temperature. The solid material has a melting point in the range of 240 to 300°F, a density in the range of 0.90 to 0.95, an intrinsic viscosity in the range of 0.2 to 1.0, and a weight average molecular weight in the range of approximately 5,000 to 20,000.

(DTX 15 at 30–31). The description contained in Phillips' 1954 application was essentially identical. (DTX 14 at 39). De-

fendants argue that the scope of the '851 patent should be limited to polypropylenes having the properties set forth in the 1953 and 1954 applications.

This argument is squarely at odds with Defendants' stipulation of literal infringement. It is elementary that a prerequisite to a determination of infringement, either literal or under the doctrine of equivalents, is claim construction. *See, e.g., Bausch & Lomb*, 796 F.2d at 450; *SRI*, 775 F.2d at 1118; *Palumbo*, 762 F.2d at 974; *Lemelson v. United States*, 752 F.2d 1538, 1549 (Fed.Cir.1985); *Autogiro Company of America v. United States*, 384 F.2d 391, 181 Ct.Cl. 55 (1967). A claim is to be construed in light of its language, other claims contained in the patent, the prior art, the prosecution history and the specification. *Loctite*, 781 F.2d at 866–67; *SRI*, 775 F.2d at 1118; *Palumbo*, 762 F.2d at 975; *McGill*, 736 F.2d at 672–75; *Fromson*, 720 F.2d at 1569–71; *Autogiro*, 384 F.2d at 391. By admitting literal infringement, Defendants have necessarily admitted that their products fall within the scope of the '851 patent *as properly construed.* *See Loctite*, 781 F.2d at 866; *SRI*, 775 F.2d at 1118; *Palumbo*, 762 F.2d at 969. Defendants now attempt to retreat from their earlier admission and ask the Court to redefine the literal scope of the '851 patent. The Court declines to modify the admission or its import. By their own choice, Defendants have admitted literal infringement of the '851 patent and that admission is binding upon them. *See Smith International*, 718 F.2d at 1579–80.

The Court is mindful of the possibility that by stipulating that their products are "literally embraced" by the '851 patent, Defendants may not have intended to admit "literal infringement" as that phrase has been interpreted by the courts. *See SRI*, 775 F.2d at 1117–18. It may be that Defendants, although admitting "literal correspondence" between their products and the words of the '851 claim, have not taken the full step of admitting literal infringement, a determination which requires one to go beyond the mere words of the claim and

consider such extrinsic sources as the specification. *Id.*

Any such contention by Defendants, however, must be regarded as highly circumspect. Indeed, Defendants' own proposed conclusions of law appear to belie such a claim. In their proposed Conclusions of Law, Nos. 16 and 17, Defendants stated:

> CL 16. The Consolidated Defendants have stipulated that they make polypropylenes that are literally embraced by the claim of the '851 patent. "Literal infringement," however, is not the end of the inquiry. *Mead Digital Systems, Inc. v. A.B. Dick Co.*, 723 F.2d 455, 463 (6th Cir.1983).
>
> CL 17. The doctrine of reverse equivalents....

The quoted statements indicate to the Court that Defendants have in fact admitted literal infringement in the full sense of the phrase. Moreover, it is clear that Phillips has relied upon Defendants' stipulation as a full admission of literal infringement. *See, e.g.,* PB at 91. The Court thus concludes that Defendants have admitted literal infringement and that their late attempts to redefine the scope of the patent are improper.

 Even if Defendants had not admitted literal infringement, their argument that the scope of the '851 patent is limited by the specifications contained in Phillips' 1953 and 1954 applications would be unavailing. While it is axiomatic that claims must be interpreted in light of the specification, it is equally well settled that limitations or embodiments contained in the specification generally will not be read into claims. *Loctite,* 781 F.2d at 867; *Raytheon,* 724 F.2d at 957. This is in recognition of the basic distinction between claims and specifications: "[s]pecifications teach. Claims claim." *SRI,* 775 F.2d at 1121 n. 4. As the Federal Circuit has explained, if everything contained in the specification were required to be read into the claims, there would be no need for claims. *Id.* Nor could an applicant claim more broadly than the particular embodiment or limitation set forth in the specification. *Id.* In

short, it is the claim and not the specification which measures the invention. *W.L. Gore,* 721 F.2d at 1557; *Environmental Designs v. Union Oil Co. of Cal.,* 713 F.2d 693, 699 (Fed.Cir.1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984).

 Thus, although the specification is to be considered in construing a claim, its role is a limited one. In the context of claim construction, the principal benefit of the specification is to ensure that words defined in the specification are given the same meaning when used in the claim. *See Loctite,* 781 F.2d at 867–69; *Palumbo,* 762 F.2d at 974; *McGill,* 736 F.2d at 674; *Autogiro,* 384 F.2d at 397–98. For example, in *McGill,* the court held that the meaning of the term "recovered liquid hydrocarbon absorbent" was restricted by the meaning given to it in the specification. Similarly, in *Loctite,* 781 F.2d at 867–69, the court looked to the specification to define the disputed term "anaerobic." *See also* ·*Bausch & Lomb,* 796 F.2d at 450; *Fromson,* 720 F.2d at 1569–70; *Caterpillar Tractor Co. v. Berco, S.P.A.,* 714 F.2d 1110, 1116 (Fed.Cir.1983).

In the instant case, Defendants do not simply ask the Court to look to the specification in construing an ambiguous term of the claim. Indeed, Defendants do not seriously contest the meaning of any of the words of the claim. Instead, Defendants have confused the distinct roles of the specification and the claim. They ask the Court to rewrite the patent in order to incorporate the specifications into the claim. Such incorporation would change in a substantive way the claim of the '851 patent. The Court declines to do this.

Thus, even if Defendants had not admitted literal infringement, their attempt to limit the scope of the '851 claim to polypropylene having the properties specified in Phillips' 1953 and 1954 applications would fail.

**2. File Wrapper Estoppel**

 Defendants also argue that the '851 patent is limited in scope by Phillips' prosecution history under the doctrine

of file wrapper estoppel. This argument is also fundamentally at odds with Defendants' stipulation of literal infringement. As both this Court and the Federal Circuit have made clear, once literal infringement is found, the doctrine of file wrapper estoppel is inapplicable. *Loctite*, 781 F.2d at 870; *Fromson*, 720 F.2d at 1571; *E.I. Du-Pont deNemours & Co. v. Phillips Petroleum Co.*, 656 F.Supp. 1343, 1388 (D.Del. 1987).[101] An analysis of the file wrapper estoppel doctrine, as well as the purposes it is intended to serve, illustrates the soundness of this conclusion.

File wrapper estoppel is an equitable doctrine designed to limit a patentee's use of the doctrine of equivalents. *Exhibit Supply Co. v. Ace Patents Corp*, 315 U.S. 126, 136, 62 S.Ct. 513, 518, 86 L.Ed. 736 (1942). *See also Thomas & Betts Corp. v. Litton Systems, Inc.*, 720 F.2d 1572, 1579–80 (Fed.Cir.1983); *Loctite*, 781 F.2d at 870; *Hughes Aircraft*, 717 F.2d at 1358; *Caterpillar Tractor*, 714 F.2d at 1115. By invoking the doctrine of equivalents, a patentee attempts to broaden the scope of his patent beyond the literal language of its claims. *Graver*, 339 U.S. at 608, 70 S.Ct. at 856; *Hughes Aircraft*, 717 F.2d at 1361. To counter that thrust, the

doctrine of file wrapper estoppel prevents the patentee from extending the scope of his patent to subject matter he previously surrendered. *Exhibit Supply*, 315 U.S. at 136, 62 S.Ct. at 518; *Hughes Aircraft*, 717 F.2d at 1362.

The doctrine of file wrapper estoppel is not applicable, however, where literal infringement has been found and the patentee is, therefore, not relying upon the doctrine of equivalents. *See, e.g., Hughes*, 717 F.2d at 1361 ("The doctrine of equivalents comes into play only when actual literal infringement is not present.") In such a case, the patentee is not seeking to extend the scope of his patent beyond the literal terms of his claims. Instead, he seeks to impose liability based precisely on the literal claim of his invention, nothing more, nothing less. The principles which lie at the heart of the doctrine of file wrapper estoppel consequently do not obtain.[102]

Alternatively, even if the doctrine of file wrapper estoppel were applicable,[103] Defendants' arguments would still be unsuccessful. In order to assess the merits of Defendants' file wrapper estoppel argument, it is necessary to briefly review the

---

**101.** Surprisingly, Defendants do not even discuss these cases in making their file wrapper estoppel argument despite the fact that both *Fromson* and *Loctite* are cited and relied upon by Phillips.

**102.** It is important to recognize that a patentee is not permitted to recapture abandoned subject matter merely because the doctrine of file wrapper estoppel does not apply. As Defendants correctly point out (DRB at 21), consideration of the prosecution history is appropriate not only in an estoppel context but in claim construction prior to determining infringement as well. *See Loctite*, 781 F.2d at 870; *McGill*, 736 F.2d at 673. Thus, an alleged infringer has every opportunity in the context of claim construction to argue that the scope of a patent must be limited by its prosecution history.

Because Defendants have admitted that their products literally infringe the '851 claim as properly construed, use of the prosecution history as a claim construction tool is inappropriate. As the Court's discussion of Defendants' file wrapper estoppel argument *infra* illustrates, however, even if the prosecution history could properly be used in construing the '851 claim,

the scope of the claim would not thereby be narrowed.

**103.** Phillips cites an additional ground in support of the claim that file wrapper estoppel is inapplicable. Phillips argues that because claims 29–38 were narrower than the broad claim ultimately allowed, the doctrine does not apply. The argument made by Phillips was rejected by the Supreme Court long ago. In *Schriber Co. v. Cleveland Trust Co.*, 311 U.S. 211, 61 S.Ct. 235, 85 L.Ed. 132 (1940), the Court explained that while the doctrine "is most frequently invoked when the original and cancelled claim is broader than that allowed ... the rule and the reason for it are the same if the cancelled or rejected claim be narrower." *See also, Morgan Envelope Co. v. Albany Paper Co.*, 152 U.S. 425, 429, 14 S.Ct. 627, 629, 38 L.Ed. 500 (1984); *Kaiser Industries Corporation v. McLouth Steel Corp.*, 400 F.2d 36, 55–56 (6th Cir.1968); *Chemical Construction Corp. v. Jones & Laughlin Steel Corp.*, 311 F.2d 367 (3d Cir. 1962). While Phillips baldly suggests that the principle of *Schriber* is limited to questions of validity and does not apply in an infringement context, it cites no principled basis for such a distinction.

post-interference proceedings before the PTO.

Following the award of priority to Phillips and the allowance of claim 28 in Phillips' 1956 application,[104] Phillips amended its application to add claims 29–38. (DTX 13A). Those claims provided as follows:

29. A normally solid polyproylene in accordance with claim 28 being substantially insoluble in solvents selected from the group consisting of methyl isobutyl ketone, chloroform, carbon tetrachloride, symmetrical dichloroethane, benzene and paraffinic hydrocarbon solvents having from 5 to 7 carbon atoms per molecule, at a temperature in the range of 70°F up to the boiling point of such solvent.

30. A normally solid polypropylene in accordance with claim 28, being characterized by marked absorption of infrared radiation at wave lengths at about 8.6, about 10.0, about 10.3 and about 11.9 microns.

31. A normally solid polypropylene in accordance with claim 28, being characterized by the selective absorption of infrared radiation at wavelengths of about 7.6, about 7.9, about 8.6, about 9.1, about 9.6, about 10.0, about 10.3, about 10.6, about 11.1, about 11.9 and about 12.3 microns.

32. A normally solid polypropylene in accordance with claim 28, having substantially the infrared absorption spectrum shown in Figure 1.

33. A normally solid polypropylene in accordance with claim 28, having substantially the infrared absorption spectrum shown in Figure 2.

34. A normally solid polypropylene in accordance with claim 28, characterized by the x-ray diffraction pattern shown in Figure 3.

35. A normally solid polypropylene in accordance with claim 28, characterized by the x-ray diffraction pattern shown in Figure 4.

36. A normally solid polypropylene in accordance with claim 28, having a density in the range of 0.90 to 0.96.

37. A normally solid polypropylene in accordance with claim 28, having a melting point in the range 230 to 320°F.

38. A normally solid polypropylene in accordance with claims 36 or 37 wherein the crystallinity is in excess of 80 percent.

(DTX 13A).

The examiner rejected claims 29–37 as duplicative of allowed claim 28. (DTX 13A, Paper No. 32 at 2). The examiner rejected claim 38 under 35 U.S.C. § 102(e) as anticipated by the Natta '300 patent and under the "judicially created doctrine that only one patent can issue for an invention." (DTX 13A, Paper No. 32 at 2–3). In addition, claim 38 was rejected for failure to comply with the requirements of 35 U.S.C. § 112 (DTX 13A, Paper No. 32 at 4). In response, Phillips cancelled, without comment, claims 29–38. (DTX 13A). Defendants argue that Phillips' cancellation of claims 29–38 precludes Phillips from construing the '851 patent so as to encompass Defendants' products because their products fall within the scope of those cancelled claims.

As the Federal Circuit has made clear, not every amendment of a patent application will serve as the basis for file wrapper estoppel. *Hughes Aircraft*, 717 F.2d at 1363. Amendment of claims is commonplace in the prosecution of patent applications and amendments are of various types and functions. *Id.* Thus, "[d]epending on the nature and purpose of an amendment, it may have a limiting effect ranging from great to small to zero." *Id.*[105]

 The primary circumstance giving rise to file wrapper estoppel is an

---

**104.** Phillips' claim 28 corresponded to the count in interference and ultimately became the single claim of the '851 patent.

**105.** *See also Mannesmann Demag Corp. v. Engineered Metal Prod.,* 793 F.2d 1279, 1284–85 (Fed. Cir.1986) (Effect to be given to actions by the patentee before the PTO "requires consideration of not only the nature of such action but the reasons therefor."); *Bayer Aktiengesellschaft v. Duphar Intern. Research,* 738 F.2d 1237, 1243 (Fed.Cir.1984); *Loctite,* 781 F.2d at 871 ("[A] close examination must be made as to, not only what was surrendered, but also the reason for such surrender.")

amendment designed to overcome a rejection based upon prior art. *Hughes Aircraft,* 717 F.2d at 1362 (Prosecution history estoppel "applies to claim amendments to overcome rejections based on prior art ... and to arguments submitted to obtain the patent.") *See also Mannesmann,* 793 F.2d at 1284 (File wrapper estoppel prevents a patentee from enforcing its claims against otherwise legally equivalent structures if those structures were excluded by claim limitations added in order to avoid prior art.); *Builders Concrete v. Bremerton Concrete Products,* 757 F.2d 255, 257 (Fed. Cir.1985) (Court holds patentee estopped from pursing particular claim construction based on his amendment to overcome prior art rejection.) By contrast, estoppel is not generally found where a patentee's amendments were not required in response to an examiner's rejection or were not critical to allowance of the claim. *Mannesmann,* 793 F.2d at 1285. Further, estoppel is not generally created by an amendment designed to overcome a rejection such as indefiniteness under section 112. *Id. See also Caterpillar Tractor,* 714 F.2d at 1115. With these principles in mind, the Court turns to the circumstances surrounding and the purposes underlying Phillips' cancellation of claims 29–38.

### a. *Claims 29–37*

■ Phillips cancelled claims 29–37 in order to overcome a rejection by the examiner on the ground that the claims were duplicative of the suggested claim 28. (DTX 13A, Paper No. 32 at 2). The examiner thus did not reject the subject matter of claims 29–37 as unpatentable. Instead, he rejected the proposed claims on the basis of their *form.* Under those circumstances, the Court cannot hold that by cancelling the claims, Phillips surrendered their subject matter.

The Court is mindful that in rejecting claims 29–37, the examiner expressed some doubt as to whether the claims were merely duplicative of allowed claim 28 or were intended to substantively limit the claim. The examiner stated:

> Actually, the examiner has no way of determining whether these claims sub-

stantively further limit parent claim 28 or merely recite additional properties of the same product. If the latter is the case, the claims cover the same thing, differing only in wording and are in violation of the requirements of this section. *In re Fitzgerald,* 205 USPQ 594, authorizes the examiner to require applicant to prove that a reference is not applicable when the claimed language prevents the examiner from making such a determination. This principal [sic] is considered applicable when other rejections are in question.

(DTX 13A, Paper No. 32 at 2). The examiner therefore requested the following information:

> How in terms of structure or utilitarian properties do claims 29–37 differ in scope from claim 28? What are examples of polymers falling within the scope of claim 28 that would not fall within the scope of each of these claims? How do the polymers of these claims differ from the claims of the Natta 300 or 301 patents? Applicants are requested to make of record where in the instant and parent applications, each of claims 29–38 is supported.

(DTX 13A, Paper No. 32 at 4). In response, Phillips simply cancelled the proposed claims. (DTX 13A). It made no attempt to provide the requested information.

Although the ambiguities of the language used do cast some doubt on the conclusion that his rejection was based solely on the ground that claims 29–37 were duplicative of claim 28, the fact is that the stated basis for the rejection was that the claims were duplicative. There is no evidence that the examiner was relying on some other ground, such as prior art, in rejecting the claims. The Court is, therefore, not prepared to hold that in cancelling claims 29–37, Phillips surrendered the subject matter contained therein.

### b. *Claim 38*

The examiner's rejection of claim 38 stands on an entirely different footing. In

rejecting that claim, the examiner expressly stated that the basis for his rejection was the prior art of Natta. (DTX 13A, Paper No. 32, at 2–3). The examiner's rejection of claim 38, together with Phillips' response thereto, thus gives rise to the classic situation in which a patentee is held to have surrendered the subject matter of an abandoned or cancelled claim.

The Court, however, finds it unnecessary to determine whether Phillips' cancellation of claim 38 precludes it from urging a construction of its patent encompassing the subject matter of the surrendered claim. Claim 38 added the requirement that the polymers exhibit 80% crystallinity. (DTX 13A). None of Defendants' products, however, is more than 64% crystalline.[106] (PTX 1811). Regardless of whether Phillips surrendered a claim to crystalline polypropylene exhibiting crystallinity in excess of 80%, the infringement inquiry in the instant case would be unaffected. The Court therefore declines to engage in the hypothetical exercise of determining whether Phillips should be held to have surrendered the subject matter of claim 38.

The Court thus concludes that even if the doctrine of file wrapper estoppel were applicable, it would be of no assistance to Defendants in their efforts to limit the scope of the '851 patent so as not to encompass their products.

### B. Reverse Doctrine of Equivalents

Defendants argue that even though their products fall within the literal scope of the '851 patent, the reverse doctrine of equivalents precludes a finding of infringement. Under that doctrine, "where a device is so far changed in principle from a patented article that it performs the same or similar function in a substantially different way but nevertheless falls within the literal words of the claim," infringement will not lie. *Graver*, 339 U.S. at 608–09, 70 S.Ct. at 856, *quoted in SRI*, 775 F.2d at

1123. *See also Westinghouse v. Boyden Power Brake Co.*, 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136 (1898).

The Federal Circuit has noted, however, that instances in which the doctrine is successful are rare because products which literally infringe a claim are often in fact the same in substance as the claimed invention. *SRI*, 775 F.2d at 1123, n. 19. As a result, the defense is seldom raised. *Caterpillar Tractor*, 714 F.2d at 1115 n. 3. A defendant who relies on the doctrine has the burden of establishing a *prima facie* case of noninfringement. *SRI*, 775 F.2d at 1124. If the defendant meets his burden, the patentee, who always retains the burden of persuasion on infringement, must rebut the *prima facie* showing. *Id.*

In the instant case, Defendants rely upon the reverse doctrine of equivalents to argue that their products are noninfringing. They contend that their polypropylene products belong to an "entirely different family of materials" from that of Phillips' invention. Defendants argue that in contrast to the low molecular weight, brittle polypropylene described in Phillips' 1953 application, which is useless as a plastic, their polypropylene products are high molecular weight, tough materials which are used in a wide range of commercial plastics applications. Thus, they point to all of these characteristics as demonstrating the substantially different character of their products.

### 1. Molecular Weight

As discussed *supra*, molecular weight represents the size of a molecule. (Bailey, Tr. at 126–28). Because a polymer is comprised of molecules of varying sizes, scientists characterize a polymer by its average molecular weight. (Bailey, Tr. at 146–47). While it is possible to calculate the average molecular weight of a polymer directly, in

---

**106.** While Defendants argue that it is *impossible* for polypropylene to exhibit crystallinity in excess of 65% by x-ray, they cite absolutely nothing in the record to support that contention. Indeed, the Court is at a loss to understand Defendants' statement in light of the testimony

of Dr. Long, Defendants' own witness, that the three samples of polypropylene he prepared following Phillips' 1953 application exhibited crystallinity in the amounts of 65.8%, 72% and 71.6%, respectively, as measured by x-ray analysis. (Long, Tr. at 773–74; PTX 1719).

practice, scientists rely upon certain other characteristics of a polymer, such as intrinsic viscosity ("IV") as an indirect measure of average molecular weight. (Bailey, Tr. at 146–48, 2192, 2239–40; Mark, Tr. at 484–87; Long, Tr. at 589–90; Mayfield, Tr. at 862–63).[107] Intrinsic viscosity is thus a substitute measurement for the molecular weight of a polymer. (Bailey, Tr. at 148–49, 2242; Long, Tr. at 589–90; Mark, Tr. at 484–87). From the intrinsic viscosity data, one can calculate the actual molecular weight of the polymer. (Long, Tr. 529–93). In general, the higher the intrinsic viscosity of a polymer, the higher its average molecular weight. (Long, Tr. at 593; Porter, Tr. at 1066).[108]

In support of their argument under the reverse doctrine of equivalents, Defendants emphasize the differences between the range of intrinsic viscosities specified in Phillips' 1953 application and the intrinsic viscosities of Defendants' commercial polypropylenes. Defendants' commercial polypropylenes have intrinsic viscosities ranging from 1.7 to 5.0. (DTX 413;[109] Tr. at 1062–63; Mayfield, Tr. at 864, 874–76; Bortolini, Tr. at 1874; Vernon, Tr. at 1713). The range of intrinsic viscosities set forth in Phillips' 1953 application, on the other hand, is 0.2 to 1.0. (DTX 15 at 31). Based on these data and based on the correlation between intrinsic viscosity and molecular weight, it is clear that the molecular weight of Defendant's commercial polypropylenes is substantially higher than the molecular weight of the polypropylene specified in Phillips' 1953 application.

### 2. Toughness

The molecular weight of a polymer is directly related to its toughness. (Porter, Tr. at 983–85, 1066, 2535; Bailey, Tr. at 250, 253–54; Vernon, Tr. at 1703, 1707).

The toughness of a polymer is a very important property. It is the property which provides the durability and resistance to stress which enables the polymer to be processed into useful articles. Moreover, toughness is the property which enables the plastic to survive the rigors of its intended use. (Porter, Tr. at 987–88, 995, 1004–07).

In order to demonstrate the contrast in toughness between their commercial polypropylene products and polypropylene having the properties specified in Phillips' 1953 application, Defendants introduced the results of "tensile tests." (DTX 328, 412). A tensile test measures the toughness of a polymer. (Porter, Tr. at 989–92, 995–97; Long, Tr. at 612–15). To perform a tensile test, a sample of the polymer is stretched at a constant rate. The force used to stretch or elongate the sample ("stress") is plotted against the amount of stretch ("strain") to form a "stress-strain" curve. (DTX 421; Porter, Tr. at 989–91). The area under the stress-strain curve is an absolute measure of the toughness of the polymer sample. (Porter, Tr. at 1003). The "slope" or steepness of the initial part of the stress-strain curve, in the range of 2 to 7 percent elongation, is the "modulus", which is a measure of the stiffness of the sample. (Porter, Tr. at 991–92, 1003). If the slope is steep, the sample is quite stiff and has a high modulus. If the slope is not steep, the sample has a low modulus and is not stiff. (Porter, Tr. at 991–92, 1003, 1008).

Unless the sample breaks, a point will occur at which the amount of stress on the material will actually begin to decrease even though the polymer is still being stretched. At this point, the plot of stress versus strain shows an area of marked curvature or rounding off. The top of this

---

**107.** The viscosity of a polymer refers to its resistance to flow. (Glossary at 41). In order to determine the intrinsic viscosity of a polymer, one measures the viscosity in a standard solvent at a standard temperature. (Long, Tr. at 589–90).

**108.** The relationship between intrinsic viscosity and molecular weight is not, however, one of direct proportion. (Long, Tr. at 593).

**109.** The intrinsic viscosities set forth in DTX 413 are those for typical plastics applications of Defendants' polypropylene. In addition, Himont manufactures much lower IV polypropylenes designed for use as melt-blown fibers. (Mayfield, Tr. at 865–67, 871–74, 886–87).

curve is the "yield point." (DTX 421; Porter, Tr. at 997–98). If the sample does not break at the yield point, the molecules and crystals of the polymer begin to orient and align in the direction of the stretching. (Porter, Tr. at 999). After the yield point, the polymer elongates irreversibly. (Porter, Tr. at 997). The sample becomes narrower or "necks" and the amount of stress decreases. (DTX 421; Porter, Tr. at 998–1001, 1007).

At some point, the stress required to stretch the sample begins to increase again. When this occurs, the sample is said to have become "strain hardened." Finally, the stress will increase until the sample breaks or "fails." The stress on the polymer when it fails is called the tensile strength. The amount by which the polymer sample has been stretched when it fails is called the elongation at break. (DTX 421; Porter, Tr. at 1000–01). As a general rule, the higher the tensile strength and the greater the elongation, the tougher the material. (Porter, Tr. at 1002–03).

A brittle polymer will fail before reaching a yield point. Its elongation at break will generally be less than 10 percent. (DTX 422; Porter, Tr. at 1009–12). The stress-strain curve for such a polymer will not exhibit the features of orientation, necking or strain hardening. (Porter, Tr. at 1012). In contrast, the curve for a tough polymer will have a yield point and will show the effects of necking, orientation and strain hardening. (DTX 423; Porter, Tr. at 1014).

The tensile test data introduced by Defendants were derived from tests performed on Himont's commercial polypropylene, grade 6523, having an intrinsic viscosity of 3.03, and on two polypropylene samples, designated A and B, which were prepared by Dr. Long following Phillips' 1953 application. (Long, Tr. at 611; DTX 328). Those samples had intrinsic viscosities of .86 and .94.[110] (Long, Tr. at 611; DTX 327). The test results reflect a dramatic difference in the toughness exhibited by the commercial polypropylene and by the polymers of Dr. Long's runs.

The toughness of Dr. Long's samples A and B ranges from 0.10 to 0.12 inch-pounds, (DTX 328;[111] Porter, Tr. at 1023, 1028, 1035–36), whereas the toughness of a typical commercial polypropylene is at least 24 inch-pounds. (DTX 328; Porter, Tr. at 1024, 1030–31). The commercial polypropylene yields on stretching while Dr. Long's samples fail before reaching a yield point. (DTX 427; Porter, Tr. at 1003). The commercial polypropylene can be stretched more than 400 percent while Dr. Long's samples rupture at 5 percent extension.[112] (DTX 328; Porter, Tr. at 1003). The commercial polypropylene necks on stretching while Dr. Long's samples do not. (DTX 427; Porter, Tr. at 1034). The commercial sample is ductile; it can be pulled without breaking. Dr. Long's samples are not ductile. (DTX 427; Porter, Tr. at 1034). The commercial polypropylene can be oriented but Dr. Long's samples cannot. (DTX 427; Porter, Tr. at 1035).[113] Defendants also

**110.** Dr. Long prepared an additional sample following Phillips' 1953 application, designated C, which had an intrinsic viscosity of 1.4. (DTX 327). Defendants did not introduce tensile test data for sample C.

**111.** The data set forth in DTX 328 are derived from PTX 1722 (Long, Tr. at 759–60). There was some confusion at trial as to the correspondence between data set forth in PTX 1722 and Dr. Long's runs. (Long, Tr. at 761–62). Based on the record, the Court understands that in PTX 1722, the designation 52–1 refers to the Himont commercial material, 52–2 to Dr. Long's Run C, 52–3 to Dr. Long's Run B and 52–4 to Dr. Long's Run A. (Long, Tr. at 761–62, 795; Porter, Tr. at 1113–14).

**112.** The commercial sample did not fail during the tensile test. Dr. Porter cautioned, however, that the lack of failure during the test did not mean the material would never fail. The maximum elongation allowed by the test instrument simply did not permit extension of material to failure. (Porter, Tr. at 1030).

**113.** The tensile test data relied upon by Defendants and set forth in DTX 328 are based on tensile tests run at 23°C (approximately room temperature). (Long, Tr. at 762–63). Dr. Long performed another set of tensile tests on the same material at 100±1C. (Long, Tr. at 763; PTX 1722). At that temperature, the tests results for Dr. Long's samples closely resembled the results for Himont's commercial sample. (Long, Tr. at 763; Porter, Tr. at 1112). Both the

introduced tensile test data for additional samples of their products. (DTX 412). The products tested had intrinsic viscosities ranging from 1.84 to 3.7. (DTX 412, 413). The products exhibited values of toughness ranging from 0.7 to 67.1 inch-pounds; [114] moduli ranging from 152,000 to 207,000; yield strengths ranging from 4,050 to 5,010 p.s.i.; values of elongation of yield ranging from 6.6 to 9.5%; tensile strengths ranging from 4,640 to 6,740 p.s.i.; and elongations of failure ranging from 12.3 percent to 900 percent.[115] (DTX 412).

In addition to the tensile test data, Defendants performed in-court demonstrations illustrating the contrast in toughness between the commercial polypropylenes and polypropylene having the properties specified in the 1953 application. Samples from each of Dr. Long's runs broke easily. (DTX 333C, 333H, 333I; PTX 1875; Long, Tr. at 621–22, 626, 628–30, 2749–51). Representative commercial samples, however, can be bent and flexed without breaking. (DTX 333K, 333L; Long, Tr. at 622–23, 627–28).

As a further illustration of the contrast in toughness between low intrinsic viscosity and high intrinsic viscosity polypropylene, Mr. John Mayfield, a representative of Himont, prepared two sample combs, one from a Himont polypropylene having an IV of 0.7 and the other from a Himont polypropylene having an IV of 1.7. (Mayfield, Tr. at 876–77, 881–82; DTX 334C, 334D). Mayfield demonstrated the toughness of the 1.7 IV material by bending and flexing it. It did not break. (Mayfield, Tr. at 884; DTX 334D). Mr. Mayfield then attempted to do the same with the low IV material. It crumbled into pieces. (Mayfield, Tr. at 884; DTX 334C).

Based on the tensile test data introduced by Defendants and the in-court demonstrations discussed above, the Court finds that a polymer having an intrinsic viscosity of 0.2 to 1.0 (*i.e.*, a polymer having the range of properties specified in the 1953 application) would not be considered "tough." Materials such as Defendants' commercial polypropylenes, however, having intrinsic viscosities of 1.7 or higher, are generally tough, flexible materials.

### 3. Commercial Utility

Defendants claim that because of their high molecular weight and consequent toughness, their products serve a wide range of commercial plastics functions. By contrast, they argue, Phillips' 1953 application describes a low molecular weight polymer which is commercially useless as a plastic. Defendants introduced a wide array of commercial products made with Defendants' polypropylene. (DTX 141; 141A–141C; 334F–334M; 335B–335E; 335H; 335L; 336A; 336F; 336G; 336J; 336K; 337A–337E). Phillips, however, was unable to point to any commercial product made with polypropylene having the properties specified in its 1953 application.

Defendants have thus established that polypropylene having the properties set forth in Phillips' 1953 application is a low molecular weight, brittle polymer from which no commercial product has ever been manufactured. In contrast, the polypropylene produced by Defendants is a high molecular weight polymer which is used in a wide array of commercial plastics applications.

It is upon these differences that Defendants rest their assertion of non-infringement under the reverse doctrine of equivalents. In so doing, Defendants have completely misconstrued the inquiry under that doctrine. They have not attempted to demonstrate that their polypropylene products are different in principle from the claim of the '851 patent. Instead, they have focused on the specification contained in Phillips' 1953 application and have looked to

---

Himont material and Dr. Long's samples exhibited a yield point. Moreover, the amount of elongation for both materials exceeded the highest scale on the test. (Long, Tr. at 763–74; 1113–15; PTX 1722).

**114.** With two exceptions, however, the values for toughness exceeded 18 inch-pounds. (DTX 412).

**115.** With one exception, however, the elongations at failure were 290% or higher. (DTX 412).

that particular embodiment of Phillips' invention as the basis for the infringement determination. As the Court has explained *supra*, however, it is the claim and not the specification which measures the scope of an invention. As in any infringement inquiry, the issue under the reverse doctrine of equivalents is whether the *claimed* invention is infringed by the accused products. *SRI*, 775 F.2d at 1124. The inquiry "is simple and direct: Is the accused product so far changed in principle that it performs the function of the *claimed* invention in a substantially different way?" *Id.* (emphasis added).

In order to determine whether Defendants' products are so far changed in principle from the claimed invention as to be non-infringing, the Court must determine the "principle" of Phillips' invention. *SRI*, 775 F.2d at 1124. The essence of the invention of the '851 patent is the production for the first time of crystalline polypropylene. (Bailey, Tr. at 172, 2332). Prior to the work of Hogan and Banks during 1951 to 1953, the only polypropylenes ever produced were non-crystalline amorphous materials. (Bailey, Tr. at 191–200, 281–82). While the concept of crystallinity in polymers was understood and while there were some crystalline polymers known, no one had yet produced crystalline polypropylene. (Bailey, Tr. at 171–72, 281–82, 2332). Nor was there any reason to predict prior to the work of Hogan and Banks that crystalline polypropylene could be produced. (Bailey, Tr. at 200–01, 281–86). Thus, with their production of crystalline polypropylene, Hogan and Banks invented an entirely new form of polypropylene. (Bailey, Tr. at 2332).

Hogan and Banks' discovery of crystalline polypropylene was an extremely important development. Indeed, one of Defendants' own witnesses testified that the first property one would want to know about in a polypropylene product is whether it is crystalline. (Powers, Tr. at 941). The crystallinity of a polymer is responsible for its stiffness or modulus. (Porter, Tr. at 1119–20; 1126; PTX 1858 at 368). Crystallinity is also related to the dimensional stability of a propylene polymer. (Porter,

Tr. at 1141–42). The dimensional stability of a polymer refers to its ability to hold its shape under a specified set of conditions. (*Id.*) Further, crystallinity contributes to the property of deflection under load. (*Id.* at 1143). Given these important properties, if a propylene polymer were amorphous rather than crystalline, it would be unable to compete in the market in which crystalline polypropylene competes today. (Porter, Tr. at 1127–28).

Defendants' products embody the heart of Hogan and Banks' invention; they are crystalline polypropylene. Indeed, each of Defendants has admitted as much. (Pretrial Order at 6–8; DFF 47; Mayfield, Tr. at 912; Bortolini, Tr. at 1878; Bowles, Tr. at 958; Powers, Tr. at 942; Porter, Tr. at 1105–06). Moreover, the relationship between Defendants' products and the '851 claim is not merely one of literal correspondence. Phillips introduced evidence regarding the solubility characteristics, melting points and densities of Defendants' products, together with infrared and x-ray analyses of those products, all of which confirmed that Defendants' products embody the substance of Phillips' invention.

### a. *Solubility*

There are several tests which can be run on a polymer to determine whether it is amorphous or crystalline. (Bailey, Tr. at 211). One such test is to analyze the solubility characteristics of the polymer. (Bailey, Tr. at 211). A polymer is said to be soluble in a particular solvent if, when placed in the solvent, it dissolves (*i.e.*, the molecules of the polymer disperse throughout the solvent). (Bailey, Tr. at 212–13).

Pentane at room temperature is one solvent used by chemists to determine crystallinity. (Bailey, Tr. at 213). Pentane is a relatively weak solvent. (Bailey, Tr. at 213). If a polymer dissolves in pentane at room temperature, it is an amorphous material. (Bailey, Tr. at 213). If, on the other hand, a polymer does not dissolve in pentane, it is not necessarily crystalline. The material is either crystalline or it is a cross-linked polymer (*i.e.*, its molecules have been chemically bonded together). (Bailey,

Tr. at 213–14). In order to determine whether a polymer is cross-linked or is crystalline, a more powerful solvent must be used. (Bailey, Tr. at 215–16). One such solvent is tetralin at 130°C. If the polymer dissolves in tetralin at 130°C, it is crystalline. (Bailey, Tr. at 216–17). If the polymer does not dissolve in tetralin at 130°C, however, it is a cross-linked polymer. (Bailey, Tr. at 216–17).

Solubility tests performed on representative samples of Defendants' products demonstrated that the products are crystalline polypropylene. Each of the sample products is at least 98% insoluble in pentane at room temperature. (Bailey, Tr. at 227; DTX 1820). Moreover, the fact that an intrinsic viscosity could be measured for each of the products indicates that the materials are in fact crystalline, as opposed to cross-linked polymers, since intrinsic viscosity is determined by dissolving the material in tetralin at 130°C. (Bailey, Tr. at 228).

b. *Melting Point*

A second method to determine whether a material is crystalline or amorphous is to determine its melting point. (Bailey, Tr. at 218). The melting point of a material refers to the temperature at which it undergoes a transition from a crystalline to an amorphous material. (Bailey, Tr. at 218). Thus, a polymer which has a melting point is by definition a crystalline material. (Bailey, Tr. at 218–19).

There are several different methods to determine the melting point of a polymer. (Bailey, Tr. at 218–20, 228–40). A sophisticated method used by scientists today is differential scanning calorimetry ("DSC"). (Bailey, Tr. at 229–40). DSC is a method of measuring the amount of heat absorbed or given off by a polymer sample as it is heated or cooled in a controlled environment. (Bailey, Tr. at 229–40; Glossary at 18). The intricate details of the DSC technique were described by Dr. Bailey (Bailey, Tr. at 229–40) and need not be restated here. Briefly summarized, a product sample is placed in a DSC machine which first heats, then cools and then heats again the polymer sample, at constantly increasing or decreasing rates of temperature. (Bailey, Tr. at 229–40). The effects on the polymer as it is heated and cooled are illustrated graphically in a DSC scan. (Bailey, Tr. at 229–40; PTX 1812). From the DSC scan, one can determine the melting point of the polymer.

Phillips introduced the DSC scans for representative samples of Defendants' products. (Bailey, Tr. at 230–40; PTX 1812). All of the DSC scans indicate melting points for Defendants' products in the range of 150°C to 160°C. (Bailey, Tr. at 239–40; PTX 1812). Thus, by virtue of the fact that they exhibit melting points, Defendants' products are by definition crystalline. (Bailey, Tr. at 218–19). Indeed, with melting points in the range of 150°C to 160°C, Defendants' products are substantially crystalline. (Bailey, Tr. at 239–40).

c. *Density*

A third method to determine whether a polymer is crystalline or noncrystalline is to measure its density. (Bailey, Tr. at 220–23). The density of a polymer reflects the degree to which its molecules are packed together. (Bailey, Tr. at 220–21). In general, the density of a crystalline material is greater than that of an amorphous material. (Bailey, Tr. at 220–22). By analyzing the density of a polymer, one can estimate the amount of its crystallinity. (Bailey, Tr. at 221–23). A polymer having a density of approximately .85 grams per cc ("gm/cc") is an amorphous material. (Bailey, Tr. at 222). A polymer having a density of .90 or higher is at least 50% crystalline. (Bailey, Tr. at 222–23).

Phillips introduced data on the densities of representative samples of Defendants' products. (Bailey, Tr. at 225–26; PTX 1821). The densities for all of Defendants' products are above .90, indicating that they are at least 50% crystalline. (Bailey, Tr. at 225–26; PTX 1821). Dr. Bailey explained that the degree of crystallinity exhibited by Defendants' products would render them "substantially crystalline" within the meaning of the claim of the '851 patent. (Bailey,

Tr. at 225–26). The Court accepts that conclusion.

### d. *Infrared Analysis*

Another way in which scientists determine whether a polymer is crystalline or non-crystalline is through infrared analysis. (Bailey, Tr. at 223; Wiles, Tr. at 380–82, 445–46).[116] As indicated earlier, the peaks characteristic of crystalline polypropylene are those at or near 3.4, 6.8, 7.25, 8.6, 10.03, 10.27 and 11.85 microns. (Wiles, Tr. at 394–97; PTX 1785). Absorbences characteristically absent from crystalline polypropylene are those at or near 8.9, 13.7 and 13.9 microns. (Wiles, Tr. at 404–08, 412).

The infrared spectra for representative samples of Defendants' products demonstrate that the products are crystalline polypropylene. Dr. Wiles analyzed the spectra of Defendants' representative products and found that each of the products has infrared absorption bands at 3.4, 6.8, 7.25, 8.6, 10.03, 10.27 and 11.85 microns and that the ratio of the height of the 10.03 band to the 10.27 band approaches 1.0. (Wiles, Tr. at 416–25; PTX 1814, 1822–26). In addition, absorbences at 8.9, 13.7 and 13.9 microns are absent from each of the spectra, further indicating that Defendants' products are indeed crystalline polypropylene. (Wiles, Tr. at 422, 424–25; PTX 1814, 1822–26). Thus, the infrared spectra for Defendants' representative products demonstrate that the products are in fact normally solid polypropylene, consisting essentially of recurring propylene units having a substantial crystalline polypropylene content. (Wiles, Tr. at 415–16, 421–24; PTX 1822–26).

### e. *X–Ray Analysis*

A final technique used to determine the crystallinity of a polymer is x-ray analysis. (Blackwell, Tr. at 325, 329). X-ray diffraction spectroscopy operates on the principle that certain molecules diffract x-ray radia-

tion.[117] (Blackwell, Tr. at 326–28, 338–39). When a well-ordered molecule, such as crystalline polypropylene, is exposed to x-ray radiation, a distinct and identifiable diffraction pattern is produced. (Blackwell, Tr. at 326–30). This pattern can be recorded in a scan plotting the x-ray intensities against the angles of diffraction. (Blackwell, Tr. at 326–30; PTX 1779). The resulting scan reflects a series of peaks representing the amount of radiation diffracted at a particular angle. (Blackwell, Tr. at 340–42). Using this scan, one can distinguish between the molecular structures of various polymers. (Blackwell, Tr. at 327–29, 340–41). While both the position and the intensity of the peaks are important in characterizing the structure of a particular polymer, the position of the peaks is the more important of the two features. (Blackwell, Tr. at 329–30).

Phillips introduced x-ray diffraction scans for representative samples of Defendants' polypropylene products. (Blackwell, Tr. at 345–51; PTX 1375, 1769–1772, 1813). In order to demonstrate the crystallinity of those products, Dr. Blackwell compared the x-ray diffraction patterns for the commercial polypropylenes to the x-ray diffraction scan reflected in figure 3 of the '851 patent (Blackwell, Tr. at 346–51; PTX 1, Fig. 3, 1779), which Dr. Blackwell had previously testified represented crystalline polypropylene. (Blackwell, Tr. at 321). When the x-ray scans for Defendants' products were compared with the scan reflected in figure 3 of the patent, Dr. Blackwell observed that the scans have peaks in virtually the same positions. (Blackwell, Tr. at 346–51; PTX 1775, 1769–72, 1813). The x-ray scans thus demonstrate that Defendants' products are in fact crystalline polypropylene. (Blackwell, Tr. at 346–51).

X-ray analysis can also be used to determine the degree of crystallinity of a poly-

---

**116.** The general principles of infrared analysis are discussed *supra* and will not be repeated here.

**117.** The specific procedures used by scientists to measure the amount of radiation diffracted by a polymer were described in detail by Dr. Blackwell (Blackwell, Tr. at 341–43) and will not be restated here.

mer.[118] (Blackwell, Tr. at 351–54). By calculating the amounts of radiation diffracted by the amorphous regions of the polymer and by the crystalline regions of the polymer, respectively, one can estimate the proportion of the polymer which is crystalline. (Blackwell, Tr. at 354–55).[119]

X-ray analyses performed on representative samples of Defendants' polypropylene products demonstrate that the products are at least 49% crystalline. (Blackwell, Tr. at 360–61; PTX 1811). More specifically, the x-ray analyses indicate the following ranges of crystallinity for Defendants' products:

| Manufacturer | Percent Crystallinity |
|---|---|
| Enron | 51 – 58% |
| Shell | 54 – 61% |
| El Paso | 51 – 61% |
| Hercules/Himont | 49 – 59% |
| USX | 60 – 64%. |

(PTX 1811). The x-ray analyses thus demonstrate that Defendants' products are crystalline and that the amount of crystallinity is substantial. (Blackwell, Tr. at 360–62).

### 4. Conclusion

The data introduced by Phillips regarding the solubility characteristics, melting points and densities of Defendants' products, together with the infrared and x-ray analyses of those products, demonstrate that Defendants' polypropylenes are, in fact, crystalline polypropylene. It is thus clear that Defendants' polypropylene products embrace, both literally and in substance, the invention of the '851 patent. In focusing on such properties as molecular weight and toughness, rather than on the elements of the claim, Defendants have completely misconstrued the infringement inquiry.

Defendants have further distorted the infringement inquiry by emphasizing the differences in commercial utility between their polypropylene products and polypropylene having the properties specified in the 1953 application. Even assuming *arguendo* that the 1953 specification is the appropriate yardstick for making an infringement determination—which it is not—Defendants' arguments regarding commercial utility would be unavailing. While the extensive array of commercial products paraded into the courtroom by Defendants was most impressive, such commercial success has no bearing on the Court's infringement determination. Commercial success is simply not the test of infringement.

Stripped to its essence, Defendants' assertion of noninfringement amounts to nothing more than a claim that their polypropylenes are superior to polypropylene having the properties specified in Phillips' 1953 application. Once again, even assuming that the 1953 specification is the appropriate basis for determining infringement, the mere fact that the accused products are superior does not, in and of itself, permit Defendants to escape liability under the reverse doctrine of equivalents. *Studiengesellshaft Kohle v. Dart Industries*, 726 F.2d 724, 728 (Fed.Cir.1984). If one could escape a finding of infringement merely by pointing to the fact that his product is better, the granting of a patent would be rendered almost meaningless.

It is simply not enough for Defendants to argue, with the benefit of hindsight and with the benefit of more than three decades of advances in the industry, that their polypropylene products are superior to the polypropylene first described by Phillips in its 1953 application. Indeed they may be. But one of the major elements of their success is that the material they use is crystalline polypropylene. It is the burden of an alleged infringer not merely to demonstrate that his product is better but to demonstrate that it is in fact a different product. Defendants have wholly failed to do this.

---

**118.** No propylene polymer is 100% crystalline. (Blackwell, Tr. at 354; Wiles, Tr. at 439–40). Instead, a polymer is composed of crystalline regions which are separated by amorphous regions. (Blackwell, Tr. at 354; Bailey, Tr. at 171–75). By degree of crystallinity, scientists mean the fraction of the total weight of the polymer which is comprised of crystalline material. (Blackwell, Tr. at 354).

**119.** The method for making such a calculation was described by Dr. Blackwell. (Blackwell, Tr. at 355–60).

The Court concludes that Phillips has carried its burden of proving by a preponderance of the evidence that Defendants' products infringe the '851 patent.

## V. ATTORNEYS' FEES

Both parties have requested attorneys' fees under 35 U.S.C. § 285, arguing that this is an "exceptional" case within the meaning of that section. Whether a party's actions qualify as "exceptional" is a question of fact. *See S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 201 (Fed.Cir.1986); *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 867 (Fed.Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986), *noted in Afros S.P.A.*, 671 F.Supp. at 1440–41. Factors to be considered include the closeness of the case, *see Kloster Speedsteel AB v. Crucible Inc.*, 793 F.2d 1565, 1580–81 (Fed.Cir.1986), *cert. denied*, — U.S. —, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987), and the parties' conduct, including trial tactics and any evidence of bad faith. *See Rolls-Royce Limited v. GTE Valeron Corp.*, 800 F.2d 1101, 1110–11 and n. 10 (Fed.Cir.1986).

Phillips argues that Defendants have simply relitigated many of the same questions decided by Judge Wright in the section 146 action and affirmed by the Third Circuit. Phillips contends that the section 146 action was comprehensive, lengthy and hotly contested and that Defendants have merely presented the same evidence through new witnesses, knowing that they could not in good faith have expected to prevail on "any of the issues already decided." (PB at 105).

There is no doubt that similar issues were litigated before Judge Wright and this Court. Nonetheless, I do not find that Defendants did not have a good faith basis for raising the arguments presently before the Court. Phillips did not move for summary judgment on any of the issues which it asserts are duplicative nor has it seriously pursued any issue or claim preclusion defenses. Defendants in the present suit were not involved in the section 146 action before Judge Wright and, in this trial,

presented what I have concluded to be good faith arguments before this Court.

As the Federal Circuit recently noted, "[a] party who has obtained advice of competent counsel, or otherwise acquired a basis for a *bona fide* belief that a patent is invalid, can be said to serve the patent system in challenging that patent in a lawsuit conducted fairly, honestly and in good faith. Such a party should not have ... attorneys fees imposed solely because a court subsequently holds that belief unfounded...." *Kloster Speedsteel*, 793 F.2d at 1581.

On numerous occasions, defense counsel candidly admitted to the Court that they bore a heavy burden of persuasion. Their trial tactics were beyond reproach. The Court noted as much on the record at the conclusion of the trial. (*See* Tr. at 2905).

Further, as the detailed nature of this Opinion indicates, most of the issues litigated were reasonably close questions. The Court found no argument raised by Defendants to be frivolous or without some legal or factual support. Phillips' request for attorneys' fees is denied.

In support of their request for attorneys' fees, Defendants point to the alleged inequitable conduct of Phillips. Because the Court concluded, *supra*, that Defendants have failed to demonstrate inequitable conduct on the part of Phillips, Defendants' request for attorneys' fees will also be denied.

## VI. CONCLUSION

In conclusion, the Court finds the '851 patent not invalid. The Court finds it enforceable and infringed. The requests for attorneys' fees are denied. This Opinion constitutes the Court's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52.

Phillips shall prepare and file a proposed order with approval as to form by all Defendants within thirty days. Should the parties fail to concur on a proposed form of order within that period, both Phillips and Defendants shall submit proposed orders accompanied by an explanation of the dif-

ferences between the parties and the reasons therefore.